**Nos. 2014-1439, -1441, -1444, -1445, -1446**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

WARNER CHILCOTT COMPANY, LLC and HOFFMANN-LA ROCHE INC.,

*Plaintiffs-Appellants,*

*v.*

TEVA PHARMACEUTICALS USA, INC.,

*Defendant-Appellee,*

AND

APOTEX CORP., APOTEX INC.,

*Defendants-Appellees,*

AND

MYLAN PHARMACEUTICALS INC.,

*Defendant-Appellee,*

AND

SUN PHARMA GLOBAL FZE,

*Defendant-Appellee.*

Appeals from the United States District Court for the District of Delaware in Case Nos. 1:08-cv-00627-LPS, 1:11-cv-00081-LPS, 1:09-cv-00061-LPS, 1:09-cv-00143-LPS, and 1:10-cv-00285-LPS, Judge Leonard P. Stark

## NON-CONFIDENTIAL BRIEF FOR PLAINTIFFS-APPELLANTS

June 23, 2014                         *(Counsel Listed on Inside Cover)*

MARK E. WADDELL
WARREN K. MACRAE
KATHLEEN GERSH
LOEB & LOEB LLP
345 Park Avenue
New York, NY 10154
(212) 407-4000
(646) 407-4990

*Attorneys for Plaintiff-Appellant*
*Hoffmann-La Roche Inc.*

DAVID B. BASSETT
CHRISTOPHER NOYES
MARTIN GILMORE
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

VINITA FERRERA
MARK C. FLEMING
SYDENHAM B. ALEXANDER, III
TASHA J. BAHAL
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

*Attorneys for Plaintiff-Appellant*
*Warner Chilcott Company, LLC*

# CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant Warner Chilcott Company, LLC certifies the following:

1.    The full name of every party or *amicus* represented by us is:

Warner Chilcott Company, LLC

2.    The names of the real party in interest represented by us is:

Not applicable.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Warner Chilcott Company, LLC is an indirectly wholly owned subsidiary of Actavis plc.  Actavis plc is a publicly traded company.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

WILMER CUTLER PICKERING HALE AND DORR LLP:  Sadaf R. Abdullah (former), Sydenham B. Alexander, III, Tasha J. Bahal, David B. Bassett, Richard I. Ewenstein (former), Vinita C. Ferrera, Mark C. Fleming, Martin E. Gilmore, Shira C. Hoffman, William F. Lee, Christopher R. Noyes, Allen C. Nunnally (former).

RICHARDS, LAYTON & FINGER, P.A.:  Frederick L. Cottrell, III, Steven J. Fineman, Katharine C. Lester, Jaclyn Levy

DLA PIPER LLP:  Laura D. Hatcher

Dated:  June 23, 2014          */s/ David B. Bassett*
                                    David B. Bassett

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant Hoffmann-La Roche Inc. certifies the following:

1.    The full name of every party or *amicus* represented by us is:

Hoffmann-La Roche Inc.

2.    The names of the real party in interest represented by us is:

Not applicable.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Hoffmann-La Roche Inc. is a wholly owned subsidiary of Roche Holdings, Inc.  Roche Holdings, Inc.'s ultimate corporate parent is Roche Holding Ltd.  More than 10% of Roche Holding Ltd.'s voting shares are held either directly or indirectly by Novartis AG.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

LOEB & LOEB LLP:  Mark E. Waddell, Warren K. MacRae, Joshua H. Harris, Jennifer Strong, John M. Griem Jr., Kathleen Gersh

RICHARDS LAYTON & FINGER, P.A.:  Frederick L. Cottrell, III, Steven J. Fineman, Katharine Crawford Lester, Jaclyn Levy

DLA PIPER LLP:  Laura D. Hatcher

Dated:  June 23, 2014                         */s/ Mark E. Waddell*
                                                              Mark E. Waddell

# TABLE OF CONTENTS

Page

CERTIFICATES OF INTEREST ................................................................... i

TABLE OF AUTHORITIES ........................................................... vii

STATEMENT OF RELATED CASES ............................................... 1

JURISDICTIONAL STATEMENT ................................................... 1

INTRODUCTION ............................................................................ 2

STATEMENT OF ISSUE ON APPEAL ........................................... 4

STATEMENT OF THE CASE ......................................................... 4

STATEMENT OF FACTS ............................................................... 6

I.     OSTEOPOROSIS AND ITS TREATMENT ................................... 6

       A.     Osteoporosis ................................................................. 6

       B.     Osteoporosis Treatment Using Bisphosphonates ............... 7

              1.     Safety and efficacy concerns ................................ 8

                     a.     Gastrointestinal side effects ...................... 8

                     b.     Renal toxicity ........................................... 9

                     c.     Bioavailability .......................................... 10

                     d.     Skeletal retention ..................................... 11

              2.     Patient compliance and dosing requirements ........... 11

II.    THE INVENTION AND WARNER CHILCOTT'S ACTONEL® ONCE-
       A-MONTH ............................................................................ 13

III.   DISTRICT COURT PROCEEDINGS ........................................... 16

A. There Was A Genuine Dispute Whether The Prior Art At The Time Of The Invention Taught Or Suggested A Single High Dose Of Risedronate Administered Once Per Month. .......................................................................................17

    1. Lunar News ...............................................................17

    2. Schofield ...................................................................18

    3. Riis, Delmas, and Zegels ........................................19

    4. U.S. Provisional Application No. 60/370,501 ..........21

B. There Was A Genuine Dispute Whether, As Of May 2002, A Skilled Artisan Would Have Had A Reasonable Expectation That Dosing 150 mg Of Risedronate Once-Monthly Would Be Safe Or Effective ...............................22

    1. As of May 2002, researchers continued to doubt the efficacy of long dose-free intervals....................23

    2. As of May 2002, researchers could not predict the absorption of risedronate into the body ...................24

    3. As of May 2002, researchers could not predict the retention of risedronate in bone ...............................27

C. There Was A Genuine Dispute Whether Objective Indicia Of Long-Felt Need And Skepticism Indicate Nonobviousness....................................................................28

IV. THE IBANDRONATE LITIGATION...................................................30

SUMMARY OF THE ARGUMENT ....................................................32

ARGUMENT .......................................................................................34

I. STANDARD OF REVIEW.................................................................34

II. DISPUTED FACTS COMPEL REVERSAL OF THE SUMMARY JUDGMENT ORDER ........................................................................36

A.     There Is A Material Dispute As To Whether What Was Known About The Bioavailability Of Risedronate In May 2002 Allowed A Reasonable Expectation Of Success For A Monthly 150 mg Dose....................................37

B.     There Is A Material Dispute As To Whether What Was Known About The Retention Of Risedronate In Bones Allowed A Reasonable Expectation Of Success For A Monthly 150 mg Dose........................................42

C.     There Is A Material Dispute As To Whether Monthly Doses Of Risedronate Could Have Been Expected To Succeed In 2002 ........................................44

III.    THE DISTRICT COURT COMMITTED LEGAL ERROR IN ITS ANALYSIS OF THE OBJECTIVE INDICIA OF NONOBVIOUSNESS.......................46

A.     The District Court's Analysis Of Long-Felt Need Was Legally Incorrect ........................................48

B.     The District Court Committed Legal Error In Ignoring Evidence Of Skepticism In The Industry ........................51

C.     The District Court Improperly Analyzed The Evidence For Simultaneous Invention ........................................55

IV.    THE IBANDRONATE DECISION DOES NOT SUPPORT SUMMARY JUDGMENT IN THIS CASE ........................................57

A.     The Hoffmann-La Roche Court Had No Bioavailability Or Skeletal Retention Data Concerning Risedronate........................57

1.     The Hoffmann-La Roche Court lacked information about risedronate's bioavailability..........................57

2.     The Hoffmann-La Roche Court lacked information about risedronate's skeletal retention. ......................59

B.     Warner Chilcott's Remaining Witnesses Provided Additional Critical Information Not Considered In Hoffmann-La Roche........................................60

1.      The testimony of Dr. Daifotis—Dr. Yates's co-inventor—demonstrates that skilled researchers at the time of the invention did not believe once-monthly bisphosphonate dosing would be effective. ................................................................. 60

2.      Dr. Schofield's testimony demonstrates the unexpected nature of risedronate's bioavailability. ................. 61

3.      Dr. Gately's testimony demonstrates further skepticism that monthly dosing of risedronate was possible. ................................................................. 62

CONCLUSION ...................................................................... 63

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

## CONFIDENTIAL MATERIAL OMITTED

The material omitted on page 12 is taken from a deposition transcript that was designated confidential by Appellees. The material omitted on page 14 discloses confidential information regarding the results of Roche's clinical trials. The material on page 18, lines 1-3 of page 19, page 27, lines 8-10 of page 29, page 46, lines 12-14 of page 52, and page 61 describes confidential studies of Procter & Gamble. The material omitted on lines 3-7 of page 19, page 24, lines 11-17 of page 29, page 31, lines 15-20 of page 52, pages 53-56, and page 62 describes confidential studies and their results by Procter & Gamble and Sanofi-Aventis and was designated highly confidential by Sanofi-Aventis. The foregoing material was designated pursuant to the district court's Protective Order entered August 13, 2009 and amended on November 15, 2010.

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)................................................................34

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
  320 F.3d 1339 (Fed. Cir. 2003) ...........................................51

*Burlington Industries, Inc. v. Quigg*,
  822 F.2d 1581 (Fed. Cir. 1987) ......................................54, 55

*Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*,
  424 F.3d 1293 (Fed. Cir. 2005) ...........................................34

*Dee v. Borough of Dunmore*,
  549 F.3d 225 (3d Cir. 2008) ................................................34

*Eli Lilly & Co. v. Zenith Goldline Pharmaceuticals, Inc.*,
  364 F. Supp. 2d 820 (S.D. Ind. 2005), *aff'd*, 471 F.3d 1369 (Fed.
  Cir. 2006) ...........................................................................49

*FirsTierMortgage Co. v. Investors Mortgage Insurance Co.*,
  498 U.S. 269 (1991)..............................................................5

*Gambro Lundia AB v. Baxter Heathcare Corp.*,
  110 F.3d 1573 (Fed. Cir. 1997) ...........................................51

*Giles v. Kearney*,
  571 F.3d 318 (3d Cir. 2009) ................................................34

*Gillette Co. v. S.C. Johnson & Son, Inc.*,
  919 F.2d 720 (Fed. Cir. 1990) .............................................54

*Graham v. John Deere Co.*,
  383 U.S. 1 (1966)....................................................46, 47, 50

*Grayzel v. St. Jude Medical, Inc.*,
  162 F. App'x 954 (Fed. Cir. 2005) .........................................5

- vii -

*Hart v. Electronic Arts, Inc.*,
    717 F.3d 141 (3d Cir. 2013) ................................................................34

*Hoffmann-La Roche Inc. v. Apotex Inc.*,
    748 F.3d 1326 (Fed. Cir. 2014) ...................................................passim

*Hoffmann-La Roche Inc. v. Apotex Inc.*,
    Civil Action No. 07-4417(SRC)(MAS), 2012 WL 1637736 (D.N.J.
    May 7, 2012), *aff'd*, 748 F.3d 1326 (Fed. Cir. 2014) ...........................3

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule
    Patent Litigation*,
    676 F.3d 1063 (Fed. Cir. 2012) ..........................................................48

*In re Dow Chemical Co.*,
    837 F.2d 469 (Fed. Cir. 1988) .............................................................54

*In re Mushroom Transportation Co., Inc.*,
    382 F.3d 325 (3d Cir. 2004) ..................................................................5

*Jones v. Hardy*,
    727 F.2d 1524 (Fed. Cir. 1984) ..........................................................57

*Knoll Pharmaceutical Co. v. Teva Pharmaceuticals USA, Inc.*,
    367 F.3d 1381 (Fed. Cir. 2004) (per curiam) ........................35, 45, 46

*Leo Pharmaceutical Products, Ltd. v. Rea*,
    726 F.3d 1346 (Fed. Cir. 2013) ....................................................35, 48

*Microsoft Corp. v. i4i Limited Partnership*,
    131 S. Ct. 2238 (2011)..........................................................................45

*Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*,
    139 F.3d 877 (Fed. Cir. 1998) ....................................................passim

*Orthopedic Equipment Co., Inc. v. United States*,
    702 F.2d 1005 (Fed. Cir. 1983) ..........................................................36

*Pressure Products Medical Supplies, Inc. v. Greatbatch Ltd.*,
    599 F.3d 1308 (Fed. Cir. 2010) ..........................................................47

*Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.*,
   75 F.3d 1568 (Fed. Cir. 1996) ..........................................................52

*Procter & Gamble Co. v. Teva Pharmaceuticals USA, Inc.*,
   566 F.3d 989 (Fed. Cir. 2009) ...................................................passim

*Rockwell International Corp. v. United States*,
   147 F.3d 1358 (Fed. Cir. 1998) ...........................................35, 41, 46

*Ruiz v. A.B. Chance Co.*,
   234 F.3d 654 (Fed. Cir. 2000) ..........................................................54

*Schneider (Europe) AG v. SciMed Life Systems, Inc.*,
   852 F. Supp. 813 (D. Minn. 1994).....................................................49

*Sitrick v. Dreamworks, LLC*,
   516 F.3d 993 (Fed. Cir. 2008) ..........................................................39

*Smith v. Barry*,
   502 U.S. 244 (1992).............................................................................5

*Spraytex, Inc. v. DJS&T*,
   96 F.3d 1377 (Fed. Cir. 1996) .............................................................5

*Texas Instruments, Inc. v. United States International Trade
   Commission*,
   988 F.2d 1165 (Fed. Cir. 1993) ...................................................49, 50

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors
   USA, Inc.*,
   617 F.3d 1296 (Fed. Cir. 2010) ...................................................47, 52

*TriMed, Inc. v. Stryker Corp.*,
   608 F.3d 1333 (Fed. Cir. 2010) ........................................................35

## STATUTES AND RULES

28 U.S.C.
   § 1295(a)(1) ........................................................................................1

35 U.S.C.
  § 103(a) ...........................................................................................46
  § 282 .............................................................................................57

Fed. Cir. R. 47.5 ...............................................................................1

Fed. R. App. P. 3(c) ..........................................................................5

Fed. R. Civ. P. 56(a)........................................................................34

## OTHER AUTHORITIES

Manual of Patent Examining Procedure § 716.04 (Mar. 2014, 9th ed.)..................50

## STATEMENT OF RELATED CASES

Plaintiffs-Appellants Warner Chilcott Company, LLC and Hoffmann-La Roche Inc. (collectively, "Warner Chilcott") are not aware of any related cases currently pending before this Court. *See* Fed. Cir. R. 47.5.

*Hoffmann-La Roche Inc. v. Apotex Inc.*, Nos. 2013-1128 *et al.*, 748 F.3d 1326 (Fed. Cir. 2014) (Bryson, J., joined by Lourie, J.; dissent by Newman, J.), which addressed the validity of other claims of one of the patents-in-suit, was decided on April 11, 2014. Hoffmann-La Roche Inc. has petitioned for panel rehearing and rehearing en banc, and this Court has called for and received a response from the defendants-appellees in that case.

Counsel for Warner Chilcott are not aware of any other cases pending in this or any other court that could directly affect or be directly affected by the ruling in this case.

## JURISDICTIONAL STATEMENT

Final judgment entered on April 1, 2014. A39-48. Warner Chilcott timely filed notices of appeal on April 25, 2014. A13159-13183. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

**INTRODUCTION**

The patents-in-suit led to the first once-a-month tablet ever approved for any disease. At the time of the invention, the barriers to that breakthrough were formidable. No one knew whether the osteoporosis drug at issue in this appeal— risedronate—could be absorbed into the body in a way that could allow a monthly dose. Even if it were absorbed, no one knew whether bones would sufficiently retain risedronate such that a monthly dose could be effective. No one knew whether any monthly dose of risedronate could be safe as well as effective, or what that monthly dose could be. The obstacles facing a once-a-month pill at the time of the invention were like those facing a once-a-year pill today; it would be a wonderful invention, but no one knew whether it was possible, and no one had a reasonable expectation that it could succeed.

Moreover, the invention bore the objective indicia of nonobviousness. It met a long-felt need to free patients from the burdens of frequent medication that could have such painful side effects that patients frequently failed to take the medicine as prescribed. Scientists in the field were skeptical that the claimed monthly treatment, or any oral monthly treatment, could succeed. The invention enjoyed great commercial success.

Nevertheless, the district court granted summary judgment, ruling the claims invalid as obvious. That ruling should be reversed because it depends on

inferences about disputed facts, wrongly drawn against nonmovant Warner Chilcott. In the face of conflicting evidence, the district court resolved disputes in Defendants' favor about the expected absorption of risedronate into the body; about the expected retention of risedronate in the bone; and about the expected feasibility and amount of the first-ever monthly dose.

The summary judgment ruling also relies on a repeated inference that the claims in this case must be obvious because other claims in the same patents were found obvious in another case. *See Hoffmann-La Roche Inc. v. Apotex Inc.*, Civil Action No. 07-4417(SRC)(MAS), 2012 WL 1637736 (D.N.J. May 7, 2012), *aff'd*, 748 F.3d 1326 (Fed. Cir. 2014). That inference is wrong, especially on summary judgment. The claims in this case are directed to a different compound (risedronate), for which the available data at the time of the invention posed far greater obstacles to any expectation of success. The parties in this case contested crucial facts about that compound—especially the expected absorption of the drug into the body and retention of the drug in the bones—that were not adjudicated in *Hoffmann-La Roche*. As this Court recognized the last time it heard (and rejected) a challenge to the validity of a patent on risedronate, "'every compound … exhibits its own physical-chemical, biological and therapeutic characteristics,'" and each distinct compound "'has to be considered on its own.'" *Procter & Gamble Co. v. Teva Pharms. USA, Inc*., 566 F.3d 989, 996 (Fed. Cir. 2009) (quoting Herbert

Fleisch, *Chemistry and Mechanisms of Action of Bisphosphonates*, in *Bone Resorption, Metastasis, and Diphosphonates* 33-40 (S. Garattini ed., 1985)).

Factual disputes compel reversal of the summary judgment, so that the parties' competing evidence can be considered at trial.

## STATEMENT OF ISSUE ON APPEAL

Whether the district court erred in granting summary judgment that the asserted claims are invalid as obvious.

## STATEMENT OF THE CASE

U.S. Patent No. 7,192,938 ("the '938 patent"), entitled "Method Of Treatment Using Bisphosphonic Acid," issued March 20, 2007. A110. U.S. Patent No. 7,718,634 ("the '634 patent") issued May 18, 2010. A117. Both patents issued from applications that were continuations of the same parent application. A110; A117. Warner Chilcott Company, LLC licenses these patents to produce Actonel® Once-A-Month, a highly successful, once-monthly drug that treats and prevents osteoporosis. When the Defendants sought FDA approval to market generic copies of Actonel® Once-A-Month, Warner Chilcott filed consolidated cases under the Hatch-Waxman Act, because administration of Defendants' generic versions would infringe certain claims of the '938 and '634 patents directed to Actonel® Once-A-Month's dosing regimen.

Defendants moved for summary judgment of invalidity due to obviousness in June 2012. A8857-8864. On March 28, 2014, the district court held in relevant part that the asserted claims are invalid as obvious. A20-36; A37-38.

On June 6, the district court issued an order and oral decision denying a preliminary injunction pending appeal. A87. Although the court ruled that Warner Chilcott Company, LLC had shown a substantial case on the merits of its appeal, it concluded that the remaining factors weighed against relief. ECF No. 41, Ex. B at 50. This Court, in a per curiam opinion from which Judge Newman dissented, also denied an injunction pending appeal. ECF Nos. 41, 48.[1]

---

[1] Defendant Apotex has contended, most recently through an "amended docketing statement" filed June 18, 2014, that the '634 patent is not at issue as to Apotex in this case because Warner Chilcott did not formally file its notice of appeal in every docketed case in the district court. ECF No. 55. But the district court consolidated eight related cases for pretrial purposes (A282-285; A318-327; A721-726), and Warner Chilcott's notice of appeal was filed in the lead case (A13159-13163). *See Spraytex, Inc. v. DJS&T*, 96 F.3d 1377, 1379-1382 (Fed. Cir. 1996) (holding that consolidation in the district court is to be viewed as merging the actions rather than the actions retaining their separate identities for purposes of appellate review). Warner Chilcott additionally filed notices of appeal in the dockets in which defendants filed their summary judgment motion and the district court filed its summary judgment order. A8857-8864; A37-38; A13159-13183. At most, Apotex identifies a technical defect in the notice of appeal's caption designating the judgment appealed from, *see* Fed. R. App. P. 3(c)—a requirement that is construed "liberally" and "in light of all the circumstances." *Smith v. Barry*, 502 U.S. 244, 248 (1992); *FirsTier Mortg. Co. v. Investors Mortg. Ins. Co.*, 498 U.S. 269, 276 n.6 (1991); *see also Grayzel v. St. Jude Med., Inc.*, 162 F. App'x 954, 965 (Fed. Cir. 2005); *In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 334-335 (3d Cir. 2004). Indeed, Apotex's initial docketing statement in this Court acknowledged that both patents were at issue; there can accordingly be no claim of prejudice. *See* ECF No. 28 ("Warner Chilcott is appealing from the Final

## STATEMENT OF FACTS

Based on the record adduced at summary judgment, a trier of fact could have found the following.

## I.   OSTEOPOROSIS AND ITS TREATMENT

### A.   Osteoporosis

Osteoporosis is a widespread chronic disorder of human bone metabolism, characterized by reduced bone density and quality that can lead to reduced bone strength and increased susceptibility to fractures.  A895-896(¶20).

Osteoporosis results from an imbalance in the process by which older bone gets replaced by younger, more resilient bone, known as "bone remodeling." A896(¶21).  Bones undergo a continuous process of bone "resorption," through which old bone is removed, and bone "formation," through which new bone material is added.  *Id.*  Two types of cells are primarily responsible for bone remodeling:  osteoclasts (cells involved in bone resorption) and osteoblasts (cells involved in bone formation).  *Id.*

In normal human bone, the processes of bone resorption and bone formation are in balance, such that the amount of bone being resorbed is balanced by the

---

Judgment (Doc. #402) entered on April 1, 2014, in favor of Defendants and against Plaintiffs following Order (Doc. #401) granting summary judgment of invalidity on the basis of Memorandum Opinion (Doc. #400) concluding that the asserted claims of U.S. Pat. No. 7,192,938 and of U.S. Pat. No. 7,718,634 are invalid as obvious.")

amount of bone being formed. *Id.* In a person suffering from osteoporosis, however, the osteoclasts resorb more bone than is formed by the osteoblasts, such that the remodeling cycle leaves the body with less bone than it had at the beginning. A897(¶24). This may be due to the osteoclasts being overly active, the osteoblasts not being active enough, or both. *Id.*

### B. Osteoporosis Treatment Using Bisphosphonates

All osteoporosis treatments seek to reestablish a balance in the bone remodeling process and thereby reduce the incidence of fractures. A12461-12462(¶12). In about 1969, a class of compounds known as bisphosphonic acids or bisphosphonates[2] became of interest as a potentially effective and safe therapeutic approach to various metabolic bone diseases, including osteoporosis. A8582(¶24). Bisphosphonates primarily reduce bone resorption; upon administration, they are taken up preferentially by the skeleton, where they bind strongly to hydroxyapatite crystals of bone mineral. A8583(¶27); A12462(¶13). During resorption, bisphosphonates are liberated from the bone mineral and taken up by osteoclasts, which reduces osteoclast activity and/or life span. A12462(¶13). In this way, bisphosphonates inhibit bone resorption and help to mitigate the weakening effect of osteoporosis. A112(1:45-51); A120(1:47-53). Because the

---

[2] The term "bisphosphonate" generally refers to the salt forms of bisphosphonic acids. A8582-8583(¶26). For example, "risedronate" is the salt form of risedronic acid. *Id.*

object of bisphosphonate therapy is to reduce the amount of bone resorbed during each bone remodeling cycle, researchers believed it important to target the bone while the osteoclasts were active.  A12486-12487(¶67);  A12654-12655(¶18). This period, known as the "osteoclast lifecycle," lasts for approximately 2 weeks at each remodeling site.  *Id.*  Thus, it was believed that bisphosphonates needed to be administered "at least once every 3 to 16 days (*i.e.*, preferably once weekly) to maintain beneficial suppression of bone turnover and optimal increases in bone density ... .  However, dosing at intervals much longer than weekly may lead to suboptimal control of bone remodeling and, therefore, may have less clinical benefit."  A11963; A11966.

### 1.      Safety and efficacy concerns

Although highly effective in inhibiting bone resorption, bisphosphonates as a class suffer from several disadvantages with respect to both safety and efficacy, which necessitated onerous dosing restrictions with which it was difficult for many patients to comply.

### a.      *Gastrointestinal side effects*

One significant disadvantage of bisphosphonates is that, when given orally, they may cause side effects involving the upper gastrointestinal tract ("UGI"), due to irritation of the mucous membranes if a bisphosphonate directly contacts the esophagus or the stomach.  A112(1:60-64); A120(1:62-66).  Such irritation can

lead to esophagitis, which in severe cases can be accompanied by pain, vomiting, and difficulty swallowing. A12463-12464(¶16). In the mid-1990s, serious UGI side effects were observed with two bisphosphonates: pamidronate and alendronate. A12463-12464(¶¶16-17). One study, in which patients received 150 mg of pamidronate daily, had to be terminated because of the severity of UGI symptoms that some patients suffered. A12463-12464(¶16); A11525-11527. This produced significant concern that other bisphosphonates, such as risedronate (which is at issue in this case), could also cause esophagitis. A12463-12464(¶¶16-18).

Further, studies in the early 2000s demonstrated that nitrogen-containing bisphosphonates, such as risedronate, are more likely than non-nitrogen containing bisphosphonates to cause UGI irritation when taken orally on either a daily or bi-weekly basis, A112(1:60-64); A120(1:62-66), and that the damage to the epithelial cells of the UGI tract is greater at higher doses. A12463-12466(¶20).

### b. *Renal toxicity*

Renal (kidney) toxicity was also a concern, because many osteoporosis patients are elderly and especially susceptible to impairment of renal function. A12682(¶39); A12468(¶24). Because the body primarily eliminates bisphosphonates via the kidneys, impairment in renal function could result in more of the drug remaining in the system with potentially adverse long-term

consequences. A12682(¶39). The label for Warner Chilcott's 5 mg Actonel® product accordingly cautioned that "Actonel® is not recommended for use in patients with severe renal impairment." *Id.*

As of May 2002, the applicable priority date, the highest single dose of risedronate that had been tested in a patient suffering from osteoporosis was 50 mg. A12468(¶24). It was unknown at that time whether higher doses of risedronate could be administered safely in view of renal impairment concerns. *Id.*

### c. Bioavailability

Before the invention of the patents-in-suit, safe and effective use of bisphosphonates was also challenged by the fact that most oral bisphosphonates have low bioavailability, meaning that only a small proportion of the administered drug actually reaches the systemic circulation. A12672(¶12); A12677(¶26). By definition, when a drug is administered intravenously, its bioavailability is 100%. A12677(¶26). However, when a medication is administered via other routes, including orally, its bioavailability generally decreases. *Id.* Bioavailability is one of the essential factors to be considered when determining the appropriate dosage for non-intravenous routes of administration. *Id.*

In general, bisphosphonates have very low oral bioavailability compared to most other pharmaceuticals. A12672(¶12). The bioavailability for different bisphosphonates "lies between less than 1% and 10%." A12672(¶13). In addition,

the bioavailability of bisphosphonates can vary widely even in a single person. A12678(¶28). For risedronate, studies showed that intrasubject variability in drug exposure was 74% between two oral doses administered to a single person, as compared to 7% variability between intravenous doses. *Id.* Such variability led to concerns that the amount of drug being absorbed might be either too high and therefore toxic or too low and therefore ineffective. *Id.*

### d.   *Skeletal retention*

Another obstacle to treatment with bisphosphonates is the retention of the drug in the bones. Bisphosphonates achieve their therapeutic effect by binding to bones. A12672(¶11); A12678(¶¶29-30). But retention in the skeleton varies, depending on the specific binding property of the particular compound. *Id.* Risedronate dissociates quickly off bone, especially compared to other bisphosphonates. A12679-12680(¶31). If skeletal retention were insufficient, then the drug would not be effective. *Id.* And, at higher doses, the delivery amount to the skeleton could be disproportionately higher and pose safety concerns. A12678(¶30).

### 2.   **Patient compliance and dosing requirements**

As a result of the UGI toxicity and bioavailability issues described above, most oral bisphosphonates, including risedronate, have inconvenient and onerous dosing requirements. A12462-12463(¶14). Every time a patient takes her

- 11 -

medication, she must do so on an empty stomach while in an upright position and then wait at least 30 minutes before lying down, eating, or drinking. *Id.*

Many osteoporosis patients—a substantial percentage of whom are elderly and on a variety of other medications—found it difficult to comply with these directives, and would either miss doses or discontinue treatment altogether. *Id.* Indeed, approximately 50% of patients who begin taking a bisphosphonate to treat osteoporosis were no longer taking it after one year, thus forgoing the beneficial effects of bisphosphonate therapy. *Id.*

Researchers sought solutions to this problem almost from the time the FDA approved the first bisphosphonate, Fosamax® (alendronate), for treatment of osteoporosis in the United States in 1995. The goal was to mitigate UGI toxicity or to lessen the inconvenience associated with complying with the strict dosing requirements, all without sacrificing efficacy. A12489(¶71). Researchers, ████████████████████████████████, filed patent applications directed to using a high "loading dose" to load up the bone with a bisphosphonate to ensure efficacy before administering a lower "maintenance dose." A12476-12477(¶42) (discussing U.S. Pub. No. 2003/0118634, A9613-9617); A10967(115:3-12) (██ ██████████████████████████████████ ████████████████). However, these "loading dose" applications never issued as patents and were not approved by the FDA. A10968(119:5-11).

- 12 -

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

As of May 2002, the FDA had approved weekly oral alendronate and daily oral risedronate for treatment and prevention of osteoporosis. A8675(¶32). Weekly risedronate did not become available until after May 2002. A8691-8692(¶63). And while weekly dosing of bisphosphonates mitigated the problems somewhat by reducing the frequency with which patients had to endure the inconvenient dosing restrictions and by increasing the time the UGI tract had to heal between administrations, compliance continued to pose challenges. A12489(¶71). Accordingly, as of May 2002, researchers were still searching for ways to overcome the problem of noncompliance with bisphosphonate therapy. *Id.*

## II. THE INVENTION AND WARNER CHILCOTT'S ACTONEL® ONCE-A-MONTH

In May 2002, scientists at Roche discovered an inventive solution to the problem of noncompliance:  a single high dose that could be taken once a month to treat or inhibit osteoporosis.  The patents-in-suit explain that "given the administration restrictions related to low oral bioavailability and potential for gastro-intestinal effects, there is a clear opportunity for regimens which offer improved convenience and flexibility, leading to a higher level of compliance and superior patient management/satisfaction." A112(2:30-36); A120(2:32-37).  Prior to the inventors' successful work, numerous studies testing bisphosphonates over longer dosing intervals had failed to demonstrate anti-fracture efficacy.  A11196-11197(181:17-182:17); A11200(197:15-25).  Indeed, according to the first-named

inventor, Dr. Bauss, ██████████████████████████████████

████████. A11196(178:9-179:16). Dr. Bauss and his colleagues undertook

lengthy pre-clinical and clinical studies in an attempt to demonstrate the safety and

efficacy of administering high doses of bisphosphonates once a month.

A11209(231:14-21); A5508-5510; A11194-11195(173:17-174:4). Based on their

extensive research, the inventors found that "it is quite unexpected that fracture

reduction benefit can be derived from a monthly administration of an oral

bisphosphonate." A112-113(2:63-3:1); A120-121(2:63-3:3). As a result of their

work, the inventors created the first once-a-month tablet ever approved for any

disease. A5510; A11171-11172(81:22-82:15); A11156(20:12-16).

On May 10, 2002, the Roche inventors filed a European patent application

that eventually led to the issuance in the United States of the '938 and '634 patents.

A110-116; A117-123.[3] The '938 patent covers methods of treating or inhibiting

osteoporosis by orally administering a dose of risedronate in an amount ranging

from about 100 mg to about 150 mg on a single day, and thereafter continuing such

administrating once-monthly on a single day. A115(7:23-8:65). The '634 patent

covers methods of treating or inhibiting postmenopausal osteoporosis by orally

administering a 150 mg dose of risedronate to a postmenopausal woman on a

---

[3] The patents-in-suit are assigned to Roche, and Warner Chilcott Company, LLC is
a licensee.

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

single day, and thereafter continuing such administration once monthly on a single
day.  A123(8:19-45).

Warner Chilcott's drug product, Actonel® Once-A-Month, contains 150 mg
of risedronate as the active ingredient and embodies the inventions of the '938 and
'634 patents.  A8984; A9073-9114.  From August 2008 through February 2011,
Defendants filed abbreviated new drug applications seeking approval to market
generic versions of Actonel® Once-A-Month.  A8986-8987; A9119-9120; A9146-
9157; A9910-9914; A10243-10245; A10501-10502.  Warner Chilcott filed suit
under the Hatch-Waxman Act, because administration of Defendants' proposed
generic risedronate drugs would infringe several claims of the patents-in-suit.  At
issue in this case are claims 6, 8, 9, 13, 14, and 15 of the '938 patent, all of which
depend from independent claim 1, which provides:

> A method for treating or inhibiting osteoporosis comprising
> **commencing treatment by orally administering** to a subject in need
> of such treatment, **a first dose, on a single day**, of a pharmaceutical
> composition comprising from about 100 mg to about 150 mg of
> bisphosphonic acid or an amount of a pharmaceutically acceptable salt
> thereof that is equivalent to about 100 mg to about 150 mg of said
> bisphosphonic acid **and continuing said treatment by orally
> administering, once monthly on a single day**, a pharmaceutical
> composition comprising from about 100 mg to about 150 mg of
> bisphosphonic acid or an amount of a pharmaceutically acceptable salt
> thereof that is equivalent to from about 100 mg to about 150 mg of
> bisphosphonic acid.

A115(7:23-35) (emphasis added).  The asserted dependent claims are limited to the
administration of risedronic acid or a pharmaceutically acceptable salt thereof,

including risedronate, with the narrowest claim covering administration of 150 mg of risedronic acid or a salt equivalent in a solid pharmaceutical composition. A115(8:5-11).

Claims 9 and 10 of the '634 patent are also asserted, and are directed to a "method of treating or inhibiting postmenopausal osteoporosis in a postmenopausal woman" by administering, on a single day on a monthly basis, a "pharmaceutically acceptable salt of risedronic acid … equivalent to about 150 mg of risedronic acid." A123(8:19-36).

## III.  DISTRICT COURT PROCEEDINGS

Defendants moved for summary judgment that the asserted patent claims were obvious. The district court concluded that "the prior art disclose[d] that a once monthly 150 mg dosage of risedronate effectively and safely treats osteoporosis, rendering the '938 and '634 patents obvious," and that "[n]o reasonable fact finder could conclude otherwise." A28. However, viewing the prior art as a whole and taking all inferences in Warner Chilcott's favor, as the court was required to do, there was ample evidence from which a factfinder could draw a contrary conclusion.

**A.    There Was A Genuine Dispute Whether The Prior Art At The Time Of The Invention Taught Or Suggested A Single High Dose Of Risedronate Administered Once Per Month.**

The district court's ruling depends on combining numerous references.  But Plaintiffs' experts, Dr. John Bilezikian, Dr. Anastasia Daifotis, and Dr. David Mitchell, explained that none of these references, alone or in combination, taught administering a single high dose of risedronate once-monthly to treat osteoporosis. This testimony sufficed to create a genuine dispute of fact warranting a trial.

**1.    Lunar News**

The district court cited the Winter 2000 issue of the publication Lunar News as disclosing the once-monthly administration of risedronate to treat osteoporosis. *See* A28-29.  But the publication's relevant discussion consists only of the speculation that "[w]eekly, or even monthly dosing, ***if done properly could*** foster long-term compliance as well as minimizing side effects."  A9498 (emphasis added).  Lunar News offers no guidance as to how monthly dosing should be "done properly," much less what the appropriate dose would be for monthly dosing to be safe and effective.  *See* A9498.  Dr. Bilezikian, Professor of Medicine and Pharmacology at the College of Physicians & Surgeons at Columbia University and Chief of the Division of Endocrinology and Director of the Metabolic Bone Diseases Program at Columbia University Medical Center, explained that Lunar News does not give a skilled artisan any reason to believe that monthly

- 17 -

administration of a large dose of risedronate—which had never been done before—could be done safely or effectively.  A12470(¶29).

### 2.    Schofield

The district court also cited a published patent application by Schofield et al., U.S. Pub. No. 2003/0118634 ("Schofield").  A29.  Schofield describes a specific dosing regimen, in which a high "loading dose" is administered daily or every other day for 7 to 180 days, followed by a period during which the patient receives lower "maintenance" doses of the drug; the loading dose ranges between twice and 20 times the later maintenance dose.  A12476(¶42); A9613[0008].  According to the reference, "the maintenance dose may be administered every day, twice a week, weekly, bi-weekly, or monthly."  A9613[0008].  The district court relied on Schofield's disclosure of a monthly *maintenance* dose as the basis for its conclusion that once-monthly dosing of risedronate was known.  A29.  This conclusion was contradicted not only by the statements and testimony of Warner Chilcott's experts, but also by Dr. Maurice Gately, a Sanofi-Aventis scientist involved in the development of Actonel® Once-A-Month, and by Dr. Pamela Schofield herself.  ████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

- 18 -



A11412(324:18-325:3). Then, "                                                "
A11410(319:4-7).

A11353(291:13-292:4). Dr. Bilezikian explained that a skilled artisan would not have separated Schofield's teaching of a monthly maintenance dose from its teaching of a loading dose, and would instead have recognized that the loading dose was a critical first step in the Schofield regimen. A12476-12477(¶42). The maximum dose of risedronate that Schofield mentions is 50 mg. A12477-12478(¶44).

### 3. Riis, Delmas, and Zegels

The district court also identified other articles that it believed, along with Schofield, supported the conclusion "that bisphosphonates were effective treatments for osteoporosis, even when dosed in intervals exceeding two weeks," including a 2001 article by Riis et al. (A11921-11928), a 1997 article by Delmas et al. (A11938-11945), and a 2001 article by Zegels et al. (A11931-11935). A29-30. But as Dr. Bilezikian explained, these references were similar to Schofield, in that

- 19 -

each described first administering a high loading dose over a period of time, followed by a dose-free interval. A12481-12483(¶¶52, 56, 60). Riis reports that subjects received 20 mg of ibandronate every other day for 24 days (which would equate to 10 mg per day, four times the normal daily dose of ibandronate), followed by a 9-week dose-free interval. A12481(¶52); A9321(¶41); A9453. Delmas describes a complicated regimen in which 30 mg oral risedronate (six times the normal daily dose) was administered daily for two weeks, followed by a 10-week drug free interval; this cycle was repeated eight times over two years. A12483(¶60); A9331-9332(¶66); A9698. In Zegels, patients received 20 mg of risedronate (four times the normal dose) daily for 14 days, followed by a 6-week drug-free period, or for 7 days prior to a 3-week drug-free period. A12482(¶56); A9334-9335(¶¶70-71); A9690(Fig. 1). None of these references taught or suggested administering a single high dose of a bisphosphonate—and certainly not 150 mg of risedronate—in dosing intervals exceeding two weeks, without an initial loading dose period.

The absence of any such teaching in the prior art is not surprising, given the prevailing view in the field for many years leading up to the time of the invention that bisphosphonate dosing, to be effective, needed to correlate with the lifecycle of the osteoclasts, the cells responsible for the bone resorption process. A12487-12488(¶¶68-69). Like others in the field, Defendants' expert Dr. John Yates was a

proponent of this osteoclast lifecycle theory, co-authoring an article describing the theory in 2000 and even obtaining a patent based on it. A12653-12655(¶¶15-18).

### 4. U.S. Provisional Application No. 60/370,501

An additional reference cited by the district court was U.S. Provisional Application No. 60/370,501 to Daifotis et al. ("the '501 Application"). A30. According to the district court, the '501 Application disclosed monthly dosing of 280 mg of alendronate to treat osteoporosis. *Id.* As an initial matter, what the '501 Application actually disclosed was 280 mg alendronate ***combined with vitamin D*** in a buffered liquid form. A12656-12657(¶24) (emphasis added). This resulted from the belief of Dr. Daifotis and her fellow inventors at the time that the buffered liquid formulation would protect a patient's UGI tract from the increased risk of irritation from such a high dose. A12657(¶25). As explained by Dr. Daifotis herself in her declaration in this case, that disclosure would not have given a skilled artisan a reasonable expectation of success in administering a single high dose of a bisphosphonate in tablet form once monthly. *Id.* In fact, Dr. Daifotis and her fellow Merck researchers "were so skeptical that once-monthly oral administration would work" that, when the '501 Application subsequently was converted to U.S. Publication No. 2003/0195171 ("the '171 Publication"), the example disclosing a tablet formulation for monthly dosing was removed. *Id.*

Additionally, even if the '501 Application could be read to foreclose any genuine dispute regarding disclosure of once-monthly dosing of oral *alendronate*, the record showed that a skilled artisan would still not have had a reasonable expectation that such a dosing regimen would work for *risedronate* because of differences in the way alendronate and risedronate bind to bone. At the relevant time, studies showed that risedronate dissociated from bone more quickly than some other bisphosphonates, including alendronate. A12679-12680(¶31). For example, in one study co-authored by Defendants' expert Dr. Yates, "a much greater fraction of risedronate" was excreted from bone over a four-week period than alendronate over the same period. *Id.* (citing A12398, A12333-12337). Because risedronate dissociates from bone more rapidly, a skilled artisan would have been concerned that, if dosed on a once-monthly basis, the level of risedronate remaining on the bone over a one-month period would be too low to have a sustained antiresorptive effect. *Id.*

**B.    There Was A Genuine Dispute Whether, As Of May 2002, A Skilled Artisan Would Have Had A Reasonable Expectation That Dosing 150 mg Of Risedronate Once-Monthly Would Be Safe Or Effective**

The district court concluded that the prior art also rendered the choice of the *particular dose* claimed in the patents-in-suit—namely a monthly dose of 150 mg of risedronate—obvious. A31. In essence, despite evidence to the contrary, the

- 22 -

district court found that a skilled artisan could simply have extrapolated from a daily dose of 5 mg risedronate to a monthly dose of 150 mg.  *Id.*

### 1. As of May 2002, researchers continued to doubt the efficacy of long dose-free intervals.

Underpinning the district court's conclusion that 150 mg was the obvious choice for a monthly dose was its crediting (improper on this summary judgment record) of the disputed opinion of Defendants' expert Dr. Yates that, as of May 2002, Riis had validated the so-called "total dose concept."  A29.  Under that theory, "a total dose administered over a defined period provides equivalent results irrespective of the dosing schedule."  A9456.  In other words, giving 5 mg of risedronate every day for 7 days should produce the same effect on bone as giving 35 mg once a week.  But this assertion in general, and its application to the asserted claims, was highly disputed in this case, and Dr. Yates' theory depended on hindsight.

In fact, the data in Riis demonstrated that, while longer dosing intervals produced *some* antiresorptive effect, the effect was less sustained than with daily dosing.  A12481-12482(¶53).  The witnesses in this case disagreed about the inference to draw from the Riis data.  Dr. Bilezikian stated that Riis "reinforced the belief that intermittent dosing regimens were unlikely to be effective because bone turnover marker suppression was not sustained."  A12481-12482(¶55).

Skepticism about longer dosing intervals, in part, 

. A11291(42:20-25) ("

").  Likewise, Dr. Daifotis and her fellow

Merck researchers decided to remove any disclosure of a monthly dosing regimen

from their '171 Publication (published in October 2003, two years after Riis's

purported validation of the total dose concept) because of their skepticism "that

once-monthly oral administration would work."  A12657(¶25).

**2.  As of May 2002, researchers could not predict the absorption of risedronate into the body**

The district court determined that a skilled artisan in May 2002 could simply

have relied on the "total dose concept" to extrapolate from a 5 mg daily dose of

risedronate to a 150 mg monthly dose.  A31.  But that ruling ignored the

substantial evidence from Warner Chilcott's fact and expert witnesses—unrebutted

by Defendants—regarding the unpredictability of the behavior of bisphosphonates

generally and risedronate specifically inside the body.  The "total dose concept"

depends on the assumption that the drug's absorption is linear across all doses,

such that when a person ingests a 150 mg dose of risedronate once a month, the

same amount of drug is absorbed as if she ingested 5 mg each day for 30 days.

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED

However, the record shows at least a genuine dispute as to whether a skilled artisan in May 2002 would have believed that to be the case for a 150 mg dose of risedronate.

Absorption of a drug by the body may be linear or non-linear. When absorption is linear, the rate of absorption is constant regardless of the amount of drug administered, such that doubling the dose results in doubling the amount of drug absorbed. A12675(¶20). When absorption is non-linear, however, the relationship between the amount of drug administered and the amount absorbed is not proportional, such that doubling the dose of a drug might result in tripling or quadrupling the amount of drug absorbed. *Id*. When absorption is non-linear, one cannot extrapolate the extent of absorption at any particular dose. A12676(¶23). Nor can one predict at what threshold dose absorption will become non-linear. *Id*.

As of May 2002, studies had found certain bisphosphonates to possess linear absorption properties within certain tested ranges. A12675(¶20). For example, oral alendronate demonstrated linear absorption for doses up to 80 mg; oral risedronate demonstrated linear absorption for doses up to 50 mg; and oral ibandronate had demonstrated linear absorption for doses up to 5 mg. *Id*. However, various studies also had shown that for some bisphosphonates, including etidronate, alendronate, tiludronate, and incadronate, absorption could become non-linear above a threshold dose. A12675-12676(¶¶21, 23) (citing A12264-12268,

- 25 -

A12270-12275, A12223-12228, A12277-12279, and A12211-12220). For example, in the case of etidronate, which was Procter & Gamble's precursor to risedronate (A12676(¶23 n.1)), a 5 mg/kg dose, which is approximately a therapeutic dose, resulted in 3.3% absorption, whereas a 30 mg/kg dose (6 times higher) resulted in 7.2% absorption, about twice the amount that would have been expected if absorption were linear. A12676(¶23); A12211; A12219. Defendants' expert, Dr. Yates, did not identify any references to rebut this evidence of non-linear absorption for various bisphosphonates.

As of May 2002, no studies had administered risedronate at doses higher than 50 mg. A12468(¶24). The record accordingly contains evidence that—based on the data showing non-linear absorption with other bisphosphonates above a threshold dose, including in particular etidronate and alendronate—it was reasonable for researchers to assume that risedronate too might demonstrate non-linear absorption at higher doses. A12677(¶25).

The consequences of potential non-linear absorption are significant with respect to both efficacy and safety. If risedronate absorption turned out to be non-linear at higher doses such as 150 mg, then one would have no way of predicting whether the body would absorb too little of the drug to be effective or too much to be safe (including causing increased UGI toxicity, renal toxicity, or other adverse side effects). A12678(¶28); A12676(¶23); A12465-12466(¶20); A12468(¶24). A

skilled artisan would have harbored particularly heightened concerns because only about 0.6% of risedronate is absorbed at low doses.  A12677(¶¶24-25) (citing A12282-12289).  Such a low absorption rate poses the risk of toxicity effects for even a slightly higher-than-expected absorption rate.  *Id.*

In fact, these concerns would have been well-founded because, ███

████████████████████████████████████████████

████████████████████████████████████████████

████.  A11433(408:20-409:20).  The fact that 150 mg turned out to be a safe and effective monthly dose was unexpected and could not have been predicted based on the prior art as of May 2002.

### 3.    As of May 2002, researchers could not predict the retention of risedronate in bone

As of May 2002, it was not known whether bones would retain a once-a-month dose of risedronate in a way that was safe and effective.  It was known that the retention of some bisphosphonate compounds varies markedly among patients, and that retention varies among different bisphosphonates.  A12672(¶11); A12678(¶¶29-30).  It was also known that risedronate dissociates quickly off bone.  In a 2001 study, 85% of risedronate was excreted from the body within four weeks, leaving at most 15% in the bones.  A12679(¶31).  A 2000 study compared the skeletal retention of risedronate with alendronate and found that "a much greater fraction of risedronate initially retained after an IV dose is excreted over four

- 27 -

weeks (70%) than the fraction of alendronate excreted over the same period

(32%)." *Id.* Based on such data, skilled artisans would not have had a reasonable

expectation that a monthly dose of risedronate would be effective in suppressing

osteoclasts, and would not have relied on data from studies with alendronate to

make predictions about monthly dosing of risedronate. A12679(¶31).

### C. There Was A Genuine Dispute Whether Objective Indicia Of Long-Felt Need And Skepticism Indicate Nonobviousness

Warner Chilcott presented unrebutted evidence of objective indicia of

nonobviousness, namely skepticism in the industry and long-felt but unmet need.

Since its launch in 2008, Actonel® Once-A-Month has become a

commercial success, achieving over $1 billion in gross sales and more than 7

million prescriptions in the United States alone. A11494-11506. At the time of its

launch, the market for osteoporosis treatments was highly competitive, including

generic alendronate (which accounted for nearly 50% of the market), Boniva®

(once-a-month ibandronate), and daily and weekly Actonel® (risedronate).

A11494-11506; A12429-12430(¶11). Despite the crowded field, Actonel® Once-

A-Month quickly secured a significant share of the branded market, with 11.7% by

prescription volume in 2009, 16.1% in 2010, and 15.1% in 2011. A11494-11506;

A12429-12430(¶11).

Regarding skepticism in the industry, Dr. Bilezikian, who has spent decades

studying and treating osteoporosis patients (A12492-12645), explained that the

notion that "a method of treating or inhibiting osteoporosis by administering a bisphosphonate once monthly on a single day would be safe and efficacious was met with significant skepticism by those working in the field in May 2002." A12488(¶70); *see also* A12485(¶64).  Similarly, Dr. Daifotis stated that she and other Merck researchers, including Defendants' expert Dr. Yates, "were so skeptical that once-monthly oral administration would work that they removed" an example in their provisional application directed to a monthly oral alendronate formulation.  A12657(¶25). ████████████████████████████

████████████████████████████████████████

██████████████████████████████████ A11448(471:18-

22). ████████████████████████████████████████████

█████████████████████████████████ A11291(42:7-25)

(emphasis added). ████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████ A11334(214:19-215:7); A11336(222:17-223:7).

The safety and efficacy concerns that fueled industry skepticism were also the core of the long-felt but unmet need that existed among osteoporosis patients. It was undisputed that the drawbacks of bisphosphonates—which were first

- 29 -

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED

observed in 1995 when Fosamax® (alendronate) was approved for daily administration—included the need for patients to take the drug in an upright position without taking food or drink (thus avoiding even a morning coffee) and to remain upright for at least 30 minutes. A8874-8875; A12489(¶71). These onerous requirements negatively affected patient compliance, with some patients discontinuing treatment altogether because they could not tolerate the inconvenience of daily or even weekly dosing regimens. A12489(¶71). Defendants recognized that monthly administration is more convenient, fosters patient compliance, and minimizes side effects. A8874-8875; A8877-8878. As Dr. Bilezikian opined, the claimed monthly regimen of Actonel® Once-A-Month met the long-felt and unmet need for a safe and effective bisphosphonate that solved the prior art's inconvenient and onerous dosing regimen. A12489(¶71).

## IV. THE IBANDRONATE LITIGATION

On April 11, 2014, this Court affirmed a judgment of invalidity of a number of claims—including claims from the '634 patent—directed to once-monthly dosing of **ibandronate**. *Hoffmann-La Roche Inc. v. Apotex Inc.*, 748 F.3d 1326 (Fed. Cir. 2014). That litigation concerned different claims directed to a different compound and did not consider evidence that presents genuine disputes here.

First, the Court in *Hoffmann-La Roche* had no cause to consider the evidence regarding the bioavailability and skeletal retention of risedronate that is of record

- 30 -

here.  In this case, Warner Chilcott presented testimony from pharmacokinetic expert Dr. David Mitchell describing the state of knowledge at the time of the invention regarding risedronate's bioavailability and skeletal retention, as well as the corresponding concerns regarding efficacy and safety.  *See generally* A12668-12704.

Second, *Hoffmann-La Roche* rested in part on prior art references co-authored by Dr. Pamela Schofield and Dr. Anastasia Daifotis; in this case, both researchers gave statements that, far from suggesting that their published work supported obviousness, reinforced the skepticism toward monthly dosing at the time of the invention.  A11398-11461(Schofield); A12649-12667(Daifotis).  Finally, Warner Chilcott offered testimony from Dr. Maurice Gately, the global project team leader for Sanofi-Aventis team in its joint venture with Procter & Gamble to develop better osteoporosis treatments, ███████████████

████████████████████████

██████████.  A11291(42:7-25).  Dr. Gately's testimony was not offered in *Hoffmann-La Roche* (he was not involved with ibandronate research).  Accordingly, affirmance of summary judgment on the very different record considered by this Court in *Hoffmann-La Roche* does not support that outcome here.

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED

# SUMMARY OF THE ARGUMENT

Summary judgment in this case turned on the factual question whether a monthly 150 mg dose of risedronate was understood to have a reasonable expectation of success in May 2002.  At that time, nobody knew whether a monthly dose would succeed, or what that monthly dose should be, because, among other things, nobody had ever reported administering risedronate monthly or indeed giving ***any*** human subject a dose above 50 mg.  In the absence of direct evidence, scientists drew inferences.  Warner Chilcott presented detailed scientific evidence that at the very least permits an inference of no reasonable expectation of success because of unresolved problems regarding (1) the bioavailability of risedronate; (2) the retention in bone of risedronate; and (3) the lack of information about monthly dosing.  Warner Chilcott's evidence on these disputed facts consists of specific data and facts showing why each of these issues precluded a reasonable expectation of success.

The district court incorrectly resolved these genuine disputes by drawing inferences against Warner Chilcott, the nonmoving party.  The district court relied extensively on the inference that skilled artisans prior to the invention would have been able to predict the properties of risedronate based on prior art discussing other bisphosphonates, ibandronate and alendronate.  At a minimum, that inference was improper on summary judgment.  Indeed, this Court affirmed a district court's

rejection of such inferences about the very compound at issue (risedronate) in another case. *Procter & Gamble*, 566 F.3d at 996 (evidence about a different bisphosphonate did not render claims to risedronate obvious).

The district court also wrongly resolved genuine disputes regarding objective indicia of nonobviousness: long-felt need, skepticism, and alleged simultaneous invention. The court expressly and erroneously ***disregarded*** Warner Chilcott's evidence of long-felt need, due to a legal error regarding the relevant period for such evidence. Warner Chilcott also presented extensive evidence of skepticism, but the district court did not address that evidence at all. And the district court wrongly credited Defendants' theory of simultaneous invention, despite conflicting evidence that the alleged simultaneous inventors did not possess the invention or have a reasonable expectation of success.

Although this Court previously affirmed a summary judgment invalidating claims directed to ibandronate, that decision does not control here. Each distinct patent claim is a separate invention, and Warner-Chilcott raised arguments and proffered evidence not considered by the Court in *Hoffmann-La Roche*, including evidence of the state of the art regarding risedronate and the testimony of three witnesses (Dr. Mitchell, Dr. Schofield, and Dr. Gately) not presented in the ibandronate litigation. The evidence in this case presents factual disputes as to

risedronate that were not at issue in *Hoffmann-La Roche* and that compel reversal

of the summary judgment order here.

## ARGUMENT

### I.    STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo* by reapplying the

standard applicable to the district court.  *Dee v. Borough of Dunmore*, 549 F.3d

225, 229 (3d Cir. 2008).  Summary judgment is appropriate when no genuine issue

of material fact exists and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a); *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009).  "In

determining whether summary judgment is warranted '[t]he evidence of the

nonmovant is to be believed, and all justifiable inferences are to be drawn in his

favor.'"  *Hart v. Electronic Arts, Inc.*, 717 F.3d 141, 148 (3d Cir. 2013) (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Obviousness is a question of law based on underlying facts.  *Cross Med.*

*Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1302 (Fed. Cir.

2005).  The underlying factual considerations include:  (1) the scope and content of

the prior art; (2) the level of ordinary skill in the art; (3) the differences between

the claimed invention and the prior art; and (4) the objective indicia of

nonobviousness.  *Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*, 139 F.3d

877, 881 (Fed. Cir. 1998).  "Thus, to review a summary judgment of obviousness,

this court first determines anew whether the record raises any genuine issues about these critical facts." *Id.* Because patents are presumed valid, an accused infringer must prove obviousness by clear and convincing evidence. *TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1340 (Fed. Cir. 2010).

A patent is not invalid as "obvious to try" unless "a skilled artisan would have had a reasonable expectation that such an experiment would succeed in being therapeutically effective." *Leo Pharm. Prods, Ltd. v. Rea*, 726 F.3d 1346, 1357 (Fed. Cir. 2013) (internal quotation marks omitted). Summary judgment is not appropriate where there is a genuine dispute regarding "whether the prior art would have suggested to one of ordinary skill in the art that … [the invention] would have a reasonable likelihood of success." *Rockwell Int'l Corp. v. United States*, 147 F.3d 1358, 1366 (Fed. Cir. 1998) (internal quotation marks omitted). If the prior art taught the possibility of trying the invention, but finding a reasonable likelihood of success "required [an] assumption or inference against … the nonmovant," summary judgment is inappropriate. *Id.* A genuine dispute regarding the expected likelihood of success is sufficient to preclude summary judgment. *See Knoll Pharm. Co., Inc. v. Teva Pharms. USA, Inc.*, 367 F.3d 1381, 1384-1385 (Fed. Cir. 2004) (per curiam) (reversing summary judgment where "prior art appears to suggest" invention, but genuine dispute existed regarding expected results).

The Court evaluates obviousness without hindsight. "Defining the problem in terms of its solution reveals improper hindsight." *Monarch*, 139 F.3d at 881; *see also Orthopedic Equip. Co. v. United States*, 702 F.2d 1005, 1012 (Fed. Cir. 1983) ("It is wrong to use the patent in suit as a guide through the maze of prior art references, combining the right references in the right way[.]").

## II. DISPUTED FACTS COMPEL REVERSAL OF THE SUMMARY JUDGMENT ORDER

The district court ruled that there was no genuine dispute of material fact as to the obviousness in May 2002 of using a monthly 150 mg dose of risedronate to treat osteoporosis. That was error because there are numerous genuine issues based on which a factfinder could conclude that the asserted claims were not obvious.

In May 2002, no source had ever reported administering risedronate to a human in a dose above 50 mg. A12469(¶26). The district court relied on two risedronate studies, Delmas and Zegels, but they only involved doses of 20 and 30 mg. A30-31. Delmas gave 30 mg oral risedronate doses to 27 patients. A11937-11945; A12483((¶60). Zegels gave 20 mg oral risedronate doses to 24 patients. A11930-11935; A12482(¶56). No other source cited by the district court—Lunar

News, Riis, Schofield, or the '501 Application—reported giving risedronate to human subjects at all.[4]

From such limited data, the only way to evaluate a 150 mg dose is by inferences based on scientific judgment.  Warner-Chilcott presented detailed expert testimony explaining, with the support of specific evidence, why those inferences do not support a finding of obviousness.  Defendants urged the court to draw contrary inferences.  Those competing inferences should have been resolved through live testimony and cross-examination at trial, not on summary judgment.

### A.   There Is A Material Dispute As To Whether What Was Known About The Bioavailability Of Risedronate In May 2002 Allowed A Reasonable Expectation Of Success For A Monthly 150 mg Dose

For medicine taken orally, the first obstacle to success is bioavailability—how much of the drug is absorbed from the gastrointestinal tract and becomes available to the bones that need treatment.  A12672(¶¶11-12).  If bioavailability is too low, the drug may not be effective; if it is too high, the drug may not be safe: "[h]igher absorption at higher doses could … result in excessive systemic exposure and increase the potential for toxicities."  A12674-12675(¶18).  If bioavailability is

---

[4]  Riis studied ibandronate.  A9452; A12481(¶52).  The '501 Application (published as U.S. Publication 2003/0195171) reported data for alendronate. A8948-8956; A12656-12657(¶24).  Schofield's patent application does not present clinical data for any compound; it includes hypothetical examples of risedronate and refers in its background section to two articles regarding risedronate. A9613[0005]; A9616[0042]-[0046].  Lunar News did not present any original data but merely cited studies published elsewhere.  A9497-9499.

inconsistent, a patient's exposure to the drug can vary even when the dose taken is the same. A12678(¶28) (intrasubject variability was 74% for oral doses versus 7% for intravenous doses). And if bioavailability is not predictable, it is not possible to predict what would be a safe and effective dose. A12676-12677(¶¶23-25). Accordingly, the first disputed material fact is whether, in May 2002, a skilled artisan would have expected a monthly 150 mg dose of risedronate to be effective and safe in light of what was known about risedronate's bioavailability.

Knowledge of the bioavailability of risedronate was sparse in May 2002. At that time, there were only a handful of studies in which a human being had swallowed more than even *5 mg* of risedronate. The two studies cited by the district court—Delmas and Zegels (A30-31)—did not report bioavailability. In one of the few remaining studies, Dr. David Burgio tested the bioavailability of risedronate doses of 5, 35, and 50 mg. A12252; A12676(¶24). And Dr. Mitchell tested bioavailability at doses of 2.5, 5, and 30 mg. A12677(¶24); A12243-12249; A12282-12289. While this data showed that risedronate's bioavailability was linear from 2.5 mg to 50 mg (A12675, A12677(¶¶20, 24)), the witnesses below strongly disagreed about what this data would convey to a skilled artisan regarding bioavailability at the higher, untested dose of 150 mg.

Defendants' expert Dr. Yates drew inferences from a study of zoledronic acid, administered by intravenous injection, in doses ranging from 0.25 mg to 4

- 38 -

mg.  A9320(¶40); A9452-9459.  As an initial matter, Dr. Yates' reliance on this

data is facially dubious given that intravenous administration avoids an important

problem of oral administration—poor absorption from the gastrointestinal tract into

the blood circulation—that confounds predictions about bioavailability and

increased dosing.  A12672(¶¶11-12); A12674 (¶17); A12677(¶26).  Even beyond

this inherent defect in Dr. Yates' testimony, however, Warner Chilcott presented

direct contradictory evidence.

Dr. Mitchell, who conducted two of the bioavailability studies of

risedronate, disagreed with Dr. Yates, and his disagreement was not a "conclusory

expert assertion" as it was supported by actual information in the record and was

presented by a person skilled in the art.  *Contra  Sitrick v. Dreamworks, LLC*, 516

F.3d 993, 1001 (Fed. Cir. 2008); A12678-12679(¶¶28, 31).  Dr. Mitchell provided

detailed reasoning supported by specific evidence that studies of a different

compound (zoledronic acid) administered by a different method (intravenous

injection) are not a sound basis for predicting bioavailability for a tablet of

risedronate.  A12677-12678(¶¶26-28) (discussing differences between oral and

intravenous bioavailability and citing evidence).  Intravenous administration,

which delivers the drug directly into the bloodstream (and thus by definition

provides 100% bioavailability) provides no useful information that a skilled artisan

could use to predict the bioavailability of an orally administered drug, as Dr. Yates

in fact conceded. A12673(¶14) ("A person of reasonable skill in the art would not have had a reasonable expectation that a particular dosing regimen that works for one route of administration would be safe and effective for another."); A9315(¶24) (Dr. Yates admitting that intravenous administration delivers 100% of the drug into the bloodstream, while "after oral administration absorption of [the drug] is generally less than one percent"). Moreover, Dr. Mitchell cited specific evidence that, in May 2002, risedronate's bioavailability was known to vary significantly when administered orally (74% variation between two doses) compared to intravenous administration (7% variation between two doses). A12678(¶28).

Defendants also argued below that the court could infer expected success for 150 mg doses of risedronate from data for 20 mg doses of ibandronate. A8878-8879; A9320(¶40); A9324(¶44); A9452-9461. But as this Court previously recognized, "'every compound, while remaining a bisphosphonate, exhibits its own physical-chemical, biological and therapeutic characteristics, so that each bisphosphonate has to be considered on its own.'" *Procter & Gamble*, 566 F.3d at 996 (quoting Herbert Fleisch, *Chemistry and Mechanisms of Action of Bisphosphonates*, in *Bone Resorption, Metastasis, and Diphosphonates* 33-40 (S. Garattini ed., 1985)) (evidence about a different bisphosphonate did not render claims to risedronate obvious). While Dr. Yates sought to infer that risedronate had linear bioavailability at 150 mg because of data for ibandronate at 20 mg, Dr.

- 40 -

Mitchell pointed to more relevant studies finding that four other bisphosphonates had ***non-linear*** bioavailability at high doses.  A12675-12676(¶¶21, 23) (citing A12222-12228; A12263-12268; A12270-12275; A12277-12279; A1221-12220). Based on this detailed evidence, Dr. Mitchell concluded that a skilled artisan "would not have found it reasonable"—much less obvious—"to assume that absorption of risedronate at high doses—such as 150 mg—would be linear." A12677(¶25).

The genuine dispute about linear bioavailability cuts to the heart of Defendants' obviousness argument.  The lack of knowledge about bioavailability of risedronate at high doses meant that skilled artisans in May 2002 could not simply rely on a total dose concept to "scale up a known-effective dose from a short-term interval" to a monthly treatment.  *Hoffmann-La Roche*, 748 F.3d at 1332.  There was no obvious monthly tablet for osteoporosis in May 2002, any more than there was an obvious annual tablet.  At the very least, this conflicting evidence "creates a genuine issue as to whether those of ordinary skill in the art" would have a reasonable expectation that a 150 mg monthly dose of risedronate would succeed.  *See Rockwell*, 147 F.3d at 1366 (reversing summary judgment due to dispute regarding what "one of ordinary skill in the art would have known"); *Monarch*, 139 F.3d at 882 (reversing summary judgment due to dispute regarding "[w]hether prior art discloses 'trend'").

**B.      There Is A Material Dispute As To Whether What Was Known About The Retention Of Risedronate In Bones Allowed A Reasonable Expectation Of Success For A Monthly 150 mg Dose**

For an osteoporosis treatment, a second hurdle after absorption is retention in the bones.  A12671-12673(¶¶10-16); A12678-12680(¶¶29-31).  Not only is oral absorption low and unpredictable, as discussed above, but, in addition, only a percentage of that absorbed drug is selectively retained by the bones.  A12672-12673(¶¶11, 12, 14); A12678((¶¶29-30).  If the drug is not retained in the bones, it may not work.  A12678-12679(¶30) ("delivery to the skeleton is what matters").  Moreover, the longer the period between doses, the longer the period over which the drug must be retained in the bone to be effective.  *See* A12679(¶31).

This record presents, at the very least, a factual dispute about whether the data on skeletal retention in May 2002 allowed a reasonable expectation of success for any monthly risedronate pill.  Warner Chilcott presented evidence from Dr. Mitchell, who himself studied retention of risedronate over four-week intervals—the most relevant interval for the disputed factual question before the Court.  A12679(¶31).  The Mitchell data, published in 2001, showed that 85% of the risedronate was excreted from the body within four weeks, leaving at most 15% in the bones.  A12679(¶31).  Dr. Mitchell stated that, "[b]ased on such data, a person of ordinary skill in the art in May 2002 would not have had a reasonable expectation that risedronate would succeed in suppressing osteoclast activity when

- 42 -

dosed at a monthly interval." A12679(¶31). Testimony by a qualified scientist who studied the retention of the specific drug at issue for the period at issue and published his results shortly before the invention creates a genuine dispute that should have precluded summary judgment.

Defendants offered no contrary data regarding the retention of risedronate over a month. Instead, they sought to draw an inference from ***alendronate*** given ***weekly***—a different chemical and a different dosing interval. A8874. Warner Chilcott presented evidence specifically rebutting Defendants' desired inference that retention of risedronate over a month was expected to be equivalent to that of alendronate over a week. A 2000 study compared the skeletal retention of risedronate and alendronate over a four-week period and reported a major difference in the behavior of the two chemicals: "a much greater fraction of risedronate initially retained after an IV dose is excreted over four weeks (70%) than the fraction of alendronate excreted over the same period (32%)." A12679(¶31); *accord Procter & Gamble*, 566 F.3d at 996. This factual dispute should be resolved at trial, not by preferring the moving Defendants' desired inference against that of the nonmoving Plaintiffs at summary judgment.

## C.     There Is A Material Dispute As To Whether Monthly Doses Of Risedronate Could Have Been Expected To Succeed In 2002

With twelve years' hindsight, the attraction of monthly doses may appear self-evident today, but Warner-Chilcott presented substantial evidence that scientists in the field did not expect monthly doses of risedronate to work in 2002.

At the time of the invention, notwithstanding general discussion of the "total dose concept," *no* monthly pill had ever been approved for *any disease*. A11156(19:11-20:16).  No study considered by the district court even attempted to administer risedronate monthly, much less at a dose as high as 150 mg.  To the contrary, the studies show that scientists believed that elaborate and more frequent dosing schedules were required.  Delmas administered risedronate daily for 14 days, followed by a ten-week period without treatment, which was repeated eight times over two years.  A9697.  Zegels administered risedronate every day for 14 days and then no drug for 6 weeks, or risedronate every day for 7 days and then no drug for 3 weeks.  A12482(¶56); A11930-11935.  Riis gave patients ibandronate every other day for 24 days, followed by a 9-week period of no treatment, then returning to every other day for 24 days, and so on.  A12481(¶52); A11920-11928. If monthly dosing was expected to succeed, it is difficult to understand why all of the scientists working in the field at the time pursued more burdensome and complicated schemes.

- 44 -

The district court concluded that Lunar News and Schofield establish that monthly dosing had a reasonable expectation of success. A29. But those references are not nearly sufficient to eliminate the genuine factual dispute. Lunar News, Schofield, Riis, and Delmas were all before the examiner during prosecution of the '634 patent, and Schofield was extensively discussed during prosecution of the '938 patent, yet the Patent Office did not find that they rendered the claims-in-suit obvious. A12471(¶31); A12478-12481(¶¶46-47, 54); A11125; A111; A118; *see Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2251 (2011) (presumption of validity is strongest when art was before the Patent Office). Lunar News states, without any support, that "[w]eekly, or even monthly, dosing if done properly could foster long-term compliance as well as minimiz[e] side effects." A9498. Schofield includes a hypothetical example of administering risedronate in doses of "about 15 mg to about 50 mg per day," and states that "[e]quivalent doses can be given every other day, twice a week, weekly, biweekly or monthly." A9615[0037]. These bare statements are insufficient, on their own, to resolve this case at summary judgment. Whether those statements reveal a reasonable expectation of success for monthly dosing of risedronate depends on the rest of the information that a skilled artisan would have found material in 2002. *See Knoll*, 367 F.3d at 1384 (total set of evidence shows genuine factual dispute); *Monarch*, 139 F.3d at 885 (court may not grant summary judgment by "discount[ing] record

evidence"). If Lunar News or Schofield had speculated about other extended dosing regimens (for example, an annual pill for osteoporosis), there would be no more evidence to support the expectation of a skilled artisan that such a dose could work, or what it should be.

There is, at least, a material factual dispute about whether the total mix of information supported a reasonable expectation of success for monthly dosing of risedronate. The available information about risedronate's bioavailability and bone retention strongly suggested that a monthly dose would not work. ████████

████████████████████████████

████████████████████. A11448(471:18-22)(Schofield); A11291(42:7-25)(Gately); A11312(129:8-12)(Gately). This is ample basis to find a genuine dispute of fact to be resolved at trial. *See Knoll*, 367 F.3d at 1384 (reversing summary judgment due to dispute regarding unexpected results); *Monarch*, 139 F.3d at 885 (disputed question of fact remained where record supports an inference of unexpected results). See also *Rockwell*, 147 F.3d at 1361-1362.

## III. THE DISTRICT COURT COMMITTED LEGAL ERROR IN ITS ANALYSIS OF THE OBJECTIVE INDICIA OF NONOBVIOUSNESS

The district court also incorrectly discounted overwhelming evidence of objective indicia of nonobviousness, which is a relevant factual inquiry under 35 U.S.C. § 103(a). *See Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). In fact,

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

such considerations are often the most probative evidence in the obviousness inquiry. *Id.* at 17-18. "Th[e] court has repeatedly explained that secondary consideration evidence [including evidence of long-felt need, skepticism of experts, and unexpected results] is not just a cumulative or confirmatory part of the obviousness calculus but constitutes independent evidence of nonobviousness." *Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1319 (Fed. Cir. 2010) (internal quotation marks omitted); *see also Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1304-1305 (Fed. Cir. 2010) (reversing grant of summary judgment despite prima facie case of obviousness, because "significant objective evidence" of industry skepticism followed by industry praise for the patented invention and commercial success created disputed issues of material fact); *Procter & Gamble*, 566 F.3d at 998 (affirming district court's finding that risedronate, marketed as Actonel®, had been an undisputed commercial success and satisfied a long-felt unmet need, and noting that "such factors may often be the most probative and cogent evidence of non-obviousness in the record" (internal quotation marks omitted)).

Warner Chilcott's evidence of objective indicia permitted a reasonable factfinder to find the following.

### A.    The District Court's Analysis Of Long-Felt Need Was Legally Incorrect

The record indicates that, since the FDA's 1995 approval of Fosamax® (alendronate) for daily administration, patients were subject to onerous bisphosphonate dosing restrictions.  A12489(¶71).  To minimize GI side effects, patients were required to "take the drug in a fasting state, to wait 30 minutes before eating, and not to recline during this time."  A12489(¶71).  These burdensome requirements often led to patient noncompliance, which triggered a long-felt and unmet need for an improved dosing regimen.  A12489(¶71).  The claimed monthly regimen of Actonel® Once-A-Month met that need, and that supports a holding of nonobviousness.  *See Leo Pharm.*, 726 F.3d at 1359  (passage of 22 years between recognition in the art of a need for a single formulation of both vitamin D and corticosteroids in the treatment of psoriasis and fulfillment of that need was evidence of nonobviousness); *see also In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1081-1083 (Fed. Cir. 2012) (reversing district court's obviousness finding where district court ignored expert and non-expert testimony proffered as to long-felt need, and noting that "where … the obviousness determination turns on whether … a particular formulation of [a drug] would be successful … [or] effective treatment[,] objective indicia of … longfelt need [is] particularly telling").

Here, the district court's sole basis for dismissing long-felt need as a relevant and compelling consideration was its assertion that "[l]ong-felt need is evaluated from the date of the closest prior art." A35. Following this logic, it determined that since "Lunar News proposed a monthly dose of risedronate to treat osteoporosis in 2000, only two years before the May 2002 priority date of the patents[, ] [a]ny long-felt need prior to 2000 is not relevant." A35. That was error.

Contrary to the district court's ruling, this Court has held that long-felt need is properly "analyzed as of *the date of an articulated identified problem* and evidence of efforts to solve that problem." *Texas Instruments Inc. v. Int'l Trade Comm'n*, 988 F.2d 1165, 1178 (Fed. Cir. 1993) (emphasis added); *see also id.* (rejecting argument that "there can be no long-felt need when the period between the date of the most pertinent prior art references … and the claimed invention is very short"). This Court's definition of the proper starting date for evaluating long-felt need is correct and has been applied repeatedly. *See, e.g.*, *Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*, 364 F. Supp. 2d 820, 906 (S.D. Ind. 2005) (patent for unfluorinated chemical compound used as schizophrenia drug was not obvious; citing *Texas Instruments*, court finds that compound satisfied long-felt need that existed from 1975 until 1990 for efficacious drug without prior art's adverse side effects), *aff'd*, 471 F.3d 1369 (Fed. Cir. 2006); *Schneider (Europe) AG v. SciMed Life Sys., Inc.*, 852 F. Supp. 813, 854 (D. Minn. 1994) (citing *Texas Instruments*

- 49 -

and finding patent covering a dilatation catheter and the method of using that catheter not obvious where trial testimony established that between 1978 (when the first over the wire catheter was invented) and 1984 (the priority date of the patent), exchanging over the wire catheters "was generally regarded as highly problematic"). The Patent Office has also adopted the *Texas Instruments* standard. *See* Manual of Patent Examining Procedure § 716.04 (Mar. 2014, 9th ed.) ( "long-felt need is measured from the date a problem is identified and efforts are made to solve it").

The district court premised its disregard of pre-2000 need on *Graham*, but *Graham* does not support the court's proposition. *Graham*'s discussion focuses on the "exceedingly small and quite non-technical mechanical differences" between the patented invention at issue and one piece of prior art that made those differences apparent—the Livingstone patent, which the Supreme Court found was not even necessary to its discussion. 383 U.S. at 30, 36. The Supreme Court did not address the proper starting date for evaluating long-felt need, much less hold that "the date of the closest prior art" was the correct standard. No decision of this Court has cited *Graham* for such a principle.[5]

---

[5] Rather than laying down a rule as to the proper date or calculation for defining long-felt but unmet need, *Graham* found certain "unsuccessful attempts" by artisans irrelevant to the obviousness inquiry in that case (*i.e.* where those persons did not consider all of the prior art that must be considered in determining obviousness). The failure of others to solve the problem to which a patent claim is

The district court's error in applying the wrong standard caused it to disregard a material factual dispute.  Warner Chilcott submitted a declaration—unrebutted by Defendants—from its expert Dr. Bilezikian, an osteoporosis clinician, who spoke to both the duration and the extent of the problem.  A12462-12470(¶¶14-27); A12489(¶71).  The district court improperly discounted this evidence and dismissed any showing of need for a less frequent dosing regimen prior to the publication of Lunar News in 2000.  It therefore erroneously concluded that the need existed for only two years (2000-2002), rather than dating back to at least 1995.  *See supra* pp. 11-13.  Because any long-felt need prior to the publication of Lunar News in 2000 is indeed relevant and was not considered by the district court or rebutted by Defendants, it raises material questions of fact regarding nonobviousness.

## B.   The District Court Committed Legal Error In Ignoring Evidence Of Skepticism In The Industry

Warner Chilcott presented evidence of significant skepticism by those working in the field in May 2002 that a method of treating or inhibiting osteoporosis by administering a once monthly bisphosphonate would be safe and

---

addressed is only one aspect of long-felt need.  *E.g.*, *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1354 (Fed. Cir. 2003); *Gambro Lundia AB v. Baxter Heathcare Corp.*, 110 F.3d 1573, 1579-1580 (Fed. Cir. 1997).

efficacious. The district court made no findings on this point and, in fact, never discussed or evaluated this evidence at all. That was error. *See Transocean*, 617 F.3d at 1305 ("[A] district court must ***always*** consider any objective evidence of nonobviousness presented in a case[.]"); *Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1573 (Fed. Cir. 1996) ("The district court did not provide reasons for apparently discounting [appellant's] evidence of secondary considerations; that was error as a matter of law.").

The evidence of skepticism included the testimony of multiple witnesses. Dr. Daifotis stated that she and other Merck researchers, including Defendants' expert Dr. Yates, "were so skeptical that once-monthly oral administration would work that they removed" an example in their provisional application directed to a monthly oral alendronate formulation. A12657(¶25). █████████████

███████████████████████████████████████

███████████████████████████████████████

A11448(471:18-22). █████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████ A11291(42:7-25) (emphasis added). █████████

███████████████████████████████████████

███████████████████████████████████████

- 52 -

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

███████████████████████████████████████████████████████

A11309(117:19-25).

Dr. Bilezikian also specifically addressed skepticism in the industry, opining

that the art as of May 2002 "simply did not reflect a belief that dosing once-

monthly on a single day would be safe and effective." A12488(¶70). In Dr.

Bilezikian's view, "both Merck and the Alliance for Better Bone Health (the

"Alliance") went to great lengths to **avoid a high-dose, monthly oral dosing**

**regimen**, particularly a solid oral dosage form." *Id.* (emphasis added). As

evidence of this avoidance, Dr. Bilezikian pointed to U.S. Patent No. 5,994,329—

on which Drs. Daifotis and Yates are co-inventors—which "explored an oral

buffered solution for monthly dosing regimens," and Schofield, which "relied on a

loading dose over a few weeks to generate a rapid decrease in bone turnover,"

A12488(¶70) —neither studying a single monthly dose of 150 mg of a

bisphosphonate or anything close to it. Dr. Bilezikian further pointed to Procter &

Gamble's internal research documents, ████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████ *Id.*[6] It

─────────────────

[6] ████████████████████████████████████████████████████

███████████████████████████████████████████████████████

- 53 -

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

was Dr. Bilezikian's opinion—based on the art at the time of the invention, the avoidance of a single high-dose, monthly oral regimen, and the lack of any study involving 150 mg of risedronate—that there was skepticism in the industry that the claimed invention would work in a safe and effective manner. *Id.*

This Court has instructed that "skepticism of an expert, expressed before [the] inventors proved him wrong, is entitled to fair evidentiary weight," *In re Dow Chem. Co.*, 837 F.2d 469, 473 (Fed. Cir. 1988), and has found error where the district court has failed to consider such evidence, *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 667-668 (Fed. Cir. 2000) (vacating district court's finding of obviousness where the court "erred in failing to consider, or at least to discuss, evidence of secondary considerations," including evidence that "one of the inventors of the prior art[] had expressed skepticism that [the patent owner's] prototype model offered advantages over the [prior art]," and noting that "proceeding contrary to the accepted wisdom ... is strong evidence of unobviousness" (internal quotation marks omitted)); *see also Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 726 (Fed. Cir. 1990) (affirming district court's finding of nonobviousness and noting that "Gillette's skepticism is relevant and persuasive evidence of the nonobviousness of Monson's invention"); *Burlington*

██████████████████████████████████████
A12060-12157.

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED

*Indus., Inc. v. Quigg*, 822 F.2d 1581, 1582, 1584 (Fed. Cir. 1987) (patent owner successfully rebutted obviousness case with testimonial evidence that an invention met with "initial incredulity and skepticism by experts").

The district court erred by not considering evidence of skepticism, or at the very least by failing to make findings regarding this objective indication of nonobviousness.  This error led the court to disregard genuine issues of material fact regarding skepticism at the time of invention.  Under the correct standard, the court should have denied summary judgment.

### C.    The District Court Improperly Analyzed The Evidence For Simultaneous Invention

The record includes a March 2002 email between Dr. Gately of Sanofi-Aventis and Dr. Richard Dansereau of Procter & Gamble regarding "███████████ ██████████████████████████████████████████████"  A8912.  Viewing this email in isolation, the district court determined that "[h]ere, there is evidence of simultaneous invention."  A34.  The court erred by interpreting Dr. Gately's email without considering the context provided by Dr. Gately's deposition testimony.  Viewed as a whole, the record creates at least a genuine dispute of fact on this issue.

When Defendants asked Dr. Gately about this e-mail during his deposition, Dr. Gately explained that, ███████████████████████████████ ███████████████████████████

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**



A11312(128:9-129:12).

A12488(¶70).

A11291(42:7-25).

See *Monarch*, 139 F.3d at 884

(reversing district court's grant of summary judgment of obviousness even though two other companies had designed knitting needles similar to the patented invention; noting that "[t]he question … is whether this evidence of contemporaneous development solved the need[,]" and in considering evidence that the designer expressed doubts about the patented needle, concluding "it is difficult to see how a solution solves [the need] if its developer does not recognize that it does so").  In any event, at summary judgment, the district court should have taken Dr. Gately's deposition statements as true; once so taken, they plainly create a genuine dispute of material fact as to simultaneous invention.

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED

## IV. THE IBANDRONATE DECISION DOES NOT SUPPORT SUMMARY JUDGMENT IN THIS CASE

Although this Court previously affirmed summary judgment of obviousness regarding claims directed to monthly ibandronate, *see Hoffmann-La Roche*, 748 F.3d 1326, that ibandronate decision does not control here. Each distinct patent claim is a separate invention. *Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed. Cir. 1984); *see also* 35 U.S.C. § 282. Moreover, Warner-Chilcott raised arguments and proffered evidence concerning risedronate not before the Court in *Hoffmann-La Roche*, which present genuine disputes of material fact.

### A. The *Hoffmann-La Roche* Court Had No Bioavailability Or Skeletal Retention Data Concerning Risedronate

Dr. Mitchell's testimony regarding the bioavailability and skeletal retention of risedronate provides vital information that was not available to the Court in *Hoffmann-La Roche* and that bears directly on the nonobviousness of a monthly 150 mg dose of risedronate.

#### 1. The *Hoffmann-La Roche* Court lacked information about risedronate's bioavailability.

The *Hoffmann-La Roche* Court held that data generated after the invention showing the "nonlinear bioavailability of ibandronate does not rebut the prima facie showing of obviousness of a once monthly dose of 150 mg" because the "increased level of bioavailability has not been shown to be responsible for the improved osteoporosis treatment efficacy of the 150 mg dose." *Hoffmann-La*

- 57 -

*Roche*, 748 F.3d at 1334. In this case, however, Warner-Chilcott produced detailed prior art evidence that demonstrated the importance of—and uncertainty surrounding— risedronate's oral bioavailability at the time of the invention.

Dr. Mitchell explained that "[w]hen absorption is non-linear, it is not possible for one of ordinary skill in the art to extrapolate what a particular dose would be at a particular concentration" and presented the district court with five prior art studies indicating that four different bisphosphonates showed non-linear absorption at higher doses. A12675-12676(¶¶21-23). These studies and their demonstration of unpredictable bioavailability at higher doses across a range of bisphosphonates, along with the lack of any data for risedronate bioavailability at doses over 50 mg (A12677(¶24)) make clear—through means not considered by the Court in *Hoffmann-La Roche*—that, contrary to the district court's finding, a skilled artisan would not have predicted linear absorption for all doses of risedronate in May 2002.

Absorption is material to the reasonable expectation of success because, as Dr. Mitchell explained, "one of ordinary skill in the art would be uncertain if oral administration of a high dose of a bisphosphonate would provide consistent drug absorption on a monthly basis to ensure efficacious drug levels in the systemic circulation and subsequently to the bone, or if the variable drug absorption would be too high and elicit toxicities, or too low and provide sub-efficacious systemic

exposure." A12679(¶28). None of this information about risedronate was presented in *Hoffmann-La Roche*, and it presents material factual questions that distinguish this case.

> **2.    The *Hoffmann-La Roche* Court lacked information about risedronate's skeletal retention.**

Dr. Mitchell's testimony regarding the rapid speed at which risedronate dissociates from bone also distinguishes *Hoffmann-La Roche*. "Bisphosphonate uptake and long-term retention in the skeleton depend primarily on renal function, rate of bone turnover, and available binding sites. In addition, retention and subsequent release depend on the specific binding properties of the different bisphosphonates." A12672(¶11). The Court in *Hoffmann-La Roche* did not address any information about the relative strength of risedronate's bond to the surface of the bone. Here, however, Dr. Mitchell testified about the rapid dissociation and clearance of risedronate from the bone surface, especially in contrast to alendronate. A12679-12680(¶31). Moreover, this Court's explanation that "the effects of the systemically available amount of a bisphosphonate are almost exclusively related to its ***concentration in bone*** rather than [blood] serum level" (*Hoffmann-La Roche*, 748 F.3d at 1334 (emphasis added)) heightens the importance of considering risedronate's skeletal retention and relative speed of dissociation from bone.

### B. Warner Chilcott's Remaining Witnesses Provided Additional Critical Information Not Considered In *Hoffmann-La Roche*

#### 1. The testimony of Dr. Daifotis—Dr. Yates's co-inventor—demonstrates that skilled researchers at the time of the invention did not believe once-monthly bisphosphonate dosing would be effective.

Dr. Daifotis's explanation of the state of mind of Merck researchers at the time of the invention provides another important distinction between this case and *Hoffmann-La Roche*. Following the lead of the *Hoffmann-La Roche* district court, the district court in this case relied in part on Dr. Daifotis's publications as support for its conclusion that the disclosed *weekly* dose's linear relationship to the known *daily* dose made it obvious to select a 150 mg *monthly* dose. A31 (citing A9621-9642 (U.S. Patent No. 6,432,932), which Drs. Daifotis and Yates co-invented); *cf. Hoffmann-La Roche*, 748 F.3d at 1331-1332. But the record in this case shows that Dr. Daifotis's team removed once-monthly oral alendronate dosing from the later-published '171 Publication based on their belief that it was not "a feasible endeavor for us to investigate." A12657-12658(¶26). The evidence that a team of skilled researchers knowledgeable about bisphosphonates did not believe that a monthly bisphosphonate regime would be effective—more than two years *after* the publication of Riis—creates a genuine dispute of fact as to the knowledge of a skilled artisan before May 2002.

Dr. Daifotis's additional testimony is even more powerful when combined with Dr. Mitchell's testimony about the low skeletal retention of risedronate, which was not considered by the Court in *Hoffmann-La Roche* either.  Defendants did not rebut Dr. Mitchell's evidence on this point, nor could they have—Dr. Mitchell's testimony was based on a study conducted by Defendants' own expert Dr. Yates.  As a result of this differential in skeletal retention, a skilled artisan would be even less likely to consider that risedronate was subject to the "total dose concept," because risedronate would dissociate from bone too quickly—even more quickly than alendronate, which Dr. Daifotis and her team believed would be ineffective in monthly doses—to inhibit breakdown of bone.  A12679-12680(¶31).

### 2. Dr. Schofield's testimony demonstrates the unexpected nature of risedronate's bioavailability.

A11433(408:20-24).  A skilled artisan would have considered it surprising that a 150 mg monthly dose of risedronate would be safe and effective.  A12676(¶23); A12480-12481(¶¶48-50).  *Hoffmann-La Roche* did not involve risedronate and relied on the Schofield reference without the benefit of Dr. Schofield's testimony.

- 61 -

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

*See* 748 F.3d at 1332-1333. In this case, the evidence showed that a skilled artisan would not have been able to predict risedronate's absorption for a monthly dose.

### 3. Dr. Gately's testimony demonstrates further skepticism that monthly dosing of risedronate was possible.

Dr. Gately's testimony regarding his time as global project team leader for the Sanofi-Aventis effort to develop risedronate also raises material factual questions about risedronate not applicable to ibandronate in *Hoffmann-La Roche*. Dr. Gately testified that, ███████████████████████████████████ ███████████████████████████████████ ███████████████████████ A11291(42:7-25). Dr. Gately's testimony, █████████████████████████████████ ██████████████████ was not of record in *Hoffmann-La Roche*, but does raise a genuine issue of fact here.

Because the *Hoffmann-La Roche* Court had no occasion to evaluate this important evidence regarding risedronate's bioavailability and skeletal retention and widespread skepticism among researchers regarding monthly dosing of risedronate at the time of the invention, the decision in *Hoffmann-La Roche* does not control here. Rather, the record in this case is replete with genuine factual issues that should be resolved at trial.

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**

# CONCLUSION

The district court's judgment should be reversed and the case remanded for further proceedings.

Respectfully submitted,

/s/ Mark E. Waddell

MARK E. WADDELL
WARREN K. MACRAE
KATHLEEN GERSH
LOEB & LOEB LLP
345 Park Avenue
New York, NY 10154
(212) 407-4127
(646) 619-4540

Attorneys for Plaintiff-Appellant
Hoffmann-La Roche Inc.

/s/ David B. Bassett

DAVID B. BASSETT
CHRISTOPHER NOYES
MARTIN GILMORE
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

VINITA FERRERA
MARK C. FLEMING
SYDENHAM B. ALEXANDER, III
TASHA J. BAHAL
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

Attorneys for Plaintiff-Appellant
Warner Chilcott Company, LLC

June 23, 2014

## ECF-3(B)(2) REPRESENTATION

Pursuant to this Court's Administrative Order Regarding Electronic Case

Filing, the undersigned represents under ECF-3(b)(2) that counsel for Plaintiff-

Appellant Hoffmann-La Roche Inc. has consented to his signature on the

Certificates of Interest and this brief.

Dated:  June 23, 2014          /s/ David B. Bassett
                               DAVID B. BASSETT

# CERTIFICATE OF SERVICE

I hereby certify that, on this 23rd day of June, 2014 I filed the foregoing

Brief for Plaintiffs-Appellants with the Clerk of the United States Court of Appeals

for the Federal Circuit via the CM/ECF system, which will send notice of such

filing to all registered CM/ECF users.


/s/ David B. Bassett

June 23, 2014                                                David B. Bassett


**Law Firm:**              Wilmer Cutler Pickering Hale and Dorr LLP
**Address:**               7 World Trade Center, 250 Greenwich Street
**City, State, ZIP:**      New York, NY  10007
**Telephone:**             (212) 230-8800
**FAX:**                   (212) 230-8888
**E-mail Address:**        David.Bassett@wilmerhale.com

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(b).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 13,786 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

*/s/ David B. Bassett*
DAVID B. BASSETT
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY  10007
(212) 230-8800

*Attorney for Plaintiff-Appellant*
*Warner Chilcott Company, LLC*

June 23, 2014

# ADDENDUM

# TABLE OF CONTENTS

**Page(s)**

Memorandum Opinion regarding Claim Construction,
Dkt. No. 289 (Dec. 29, 2011) ........................................................ A1 (TAB 1)

Order re: Memorandum Opinion regarding Claim Construction,
Dkt. No. 290 (Dec. 29, 2011) ...................................................... A17 (TAB 2)

Memorandum Opinion regarding dkt. Nos. 303, 330 and 333,
Motions for Summary Judgment of Infringement,
Dkt. No. 400 (Mar. 28, 2014) ...................................................... A20 (TAB 3)

Order re Memorandum Opinion regarding dkt. Nos. 303, 330
and 333, Motions for Summary Judgment of Infringement,
Dkt. No. 401 (Mar. 28, 2014) ...................................................... A37 (TAB 4)

Judgment, Dkt. No. 402 (Apr. 1, 2014) ................................................ A39 (TAB 5)

Judgment in *Warner Chilcott Company et al v. Sun Pharma
Global FZE*, U.S.D.C., D. Del. Case No. 1:09-cv-00061-LPS,
Dkt. No. 1 (Jan. 26, 2009), Dkt. No. 29 (Apr. 1, 2014) .............. A41 (TAB 6)

Judgment in *Procter &Gamble Company et al v. Apotex Inc. et al.*,
U.S.D.C., D. Del. Case No. 1:09-cv-00143-LPS,
Dkt. No. 53 (Apr. 1, 2014) .......................................................... A43 (TAB 7)

Judgment in *Warner Chilcott Company LLC et al v. Mylan
Pharmaceuticals Inc.*, U.S.D.C., D. Del. Case
No. 1:10-cv-00285-LPS, Dkt. No. 32 (Apr. 1, 2014).................. A45 (TAB 8)

Judgment in *Warner Chilcott Company LLC et al. v. Teva
Pharmaceuticals USA Inc.*, U.S.D.C., D. Del. Case
No. 1:11-cv-00081-LPS, Dkt. No. 15 (Apr. 1, 2014).................. A47 (TAB 9)

U.S. Patent No. 7,192,938, issued March 20, 2007 ........................... A102 (TAB 10)

U.S. Patent No. 7,718,634, issued May 18, 2010 .............................. A109 (TAB 11)

CASE PARTICIPANTS ONLY

# TAB 1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WARNER CHILCOTT COMPANY, LLC, and HOFFMAN-LA ROCHE INC., | : | **UNSEALED ON** |
| | : | **JANUARY 9, 2012** |
| Plaintiffs, | : | |
| | : | |
| v. | : | C.A. No. 08-cv-627-LPS, 11-cv-81-LPS |
| | : | |
| TEVA PHARMACEUTICALS USA, INC., | : | |
| | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| WARNER CHILCOTT COMPANY, LLC, and HOFFMAN-LA ROCHE INC., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | C.A. No. 09-cv-143-LPS, 10-cv-1111-LPS |
| | : | |
| APOTEX, INC. and APOTEX CORP., | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| WARNER CHILCOTT COMPANY, LLC, and HOFFMAN-LA ROCHE INC., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | C.A. No. 10-cv-285-LPS, 11-cv-286-LPS |
| | : | |
| MYLAN PHARMACEUTICALS INC., | : | |
| | : | |
| Defendant. | : | |

| WARNER CHILCOTT COMPANY, LLC, | : | |
|---|---|---|
| and HOFFMAN-LA ROCHE INC., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | C.A. No. 09-cv-61-LPS, 10-cv-1085-LPS |
| | : | |
| SUN PHARMA GLOBAL, INC., | : | |
| | : | |
| Defendant. | : | |

Frederick L. Cottrell III, Esquire, Steven J. Fineman, Esquire, and Laura D. Hatcher, Esquire of RICHARDS LAYTON & FINGER, P.A., Wilmington, Delaware.

William F. Lee, Esquire, Vinita Ferrera, Esquire, Hollie L. Baker, Esquire, and Allen C. Nunnally, Esquire of WILMER CUTLER PICKERING HALE & DORR LLP, Boston, Massachusetts.

David B. Basset, Esquire of WILMER CUTLER PICKERING HALE & DORR LLP, New York, New York.

     Counsel for Plaintiffs.


Mark E. Waddell, Esquire of LOEB & LOEB LLP, New York, New York.

     Counsel for Plaintiff Hoffman-La Roche Inc.


Richard K. Herrmann, Esquire and Mary B. Matterer, Esquire of MORRIS JAMES LLP, Wilmington, Delaware.

Edgar H. Haug, Esquire, Richard Colletti, Esquire, and Richard E. Parke, Esquire of FROMMER LAWRENCE & HAUG, LLP, New York, New York.

     Counsel for Defendant Mylan Pharmaceuticals, Inc.


Richard W. Riley, Esquire of DUANE MORRIS LLP, Wilmington, Delaware.

Steven E. Feldman, Esquire, Louise T. Walsh, Esquire, Philip D. Segrest, Jr., Esquire, and Sherry L. Rollo, Esquire of HUSCH BLACKWELL SANDERS LLP, Chicago, Illinois.

     Counsel for Defendants Apotex Inc. and Apotex Corp.

**A2**

Karen L. Pascale, Esquire of YOUNG, CONAWAY, STARGATT & TAYLOR LLP,
Wilmington, Delaware.
James Galbraith, Esquire, Antony Pfeffer, Esquire, and Peter L. Giunta, Esquire of KENYON &
KENYON LLP, New York, New York.

Counsel for Defendant Teva Pharmaceuticals USA, Inc.


John C. Phillilps, Jr., Esquire and Megan C. Haney, Esquire of PHILLIPS, GOLDMAN &
SPENCE, P.A., Wilmington, Delaware.
Eric C. Cohen, Esquire and Jeremy C. Daniel, Esquire of KATTEN MUCHIN ROSENMAN
LLP, Chicago, Illinois.

Counsel for Defendant Sun Pharma Global, Inc.

---

## MEMORANDUM OPINION

December 29, 2011
Wilmington, Delaware.

**STARK, U.S. District Judge:**

## I.     INTRODUCTION

In these consolidated Hatch-Waxman actions, Plaintiffs Warner Chilcott Company, LLC

and Hoffman-La Roche Inc. ("Plaintiffs") allege that Defendants Teva Pharmaceuticals USA,

Inc., Apotex, Inc., Apotex Corp., Mylan Pharmaceuticals Inc., and Sun Pharma Global, Inc.

("Defendants") infringe U.S. Patent Nos. 7,192,938 ("the '938 patent") and 7,718,634 ("the '634

patent") (together, "the patents-in-suit"). (*See* 08-cv-627-LPS D.I. 1; 11-cv-81-LPS D.I. 1; 09-

cv-143-LPS D.I. 1; 10-cv-1111-LPS D.I. 1; 10-cv-285-LPS D.I. 1; 11-cv-286-LPS D.I. 1; 09-cv-

61-LPS D.I. 1; 10-cv-1085-LPS D.I. 1)  Plaintiffs also assert U.S. Patent No. 6,165,513 ("the

'513 patent") against Defendant Teva Pharmaceuticals USA, Inc. (*see* 08-cv-627-LPS D.I. 1),

and Defendants Apotex, Inc. and Apotex Corp. assert counterclaims of non-infringement,

invalidity, and unenforceability of the '513 patent (*see* 09-cv-143-LPS D.I. 1).  Presently before

the Court is the matter of claim construction.  Briefing on claim construction was completed on

June 2, 2011. (*See* D.I. 156; D.I. 178; D.I. 168; D.I. 173; D.I. 150; D.I. 153; D.I. 163; D.I. 164)

The Court held a *Markman* hearing on June 14, 2011. *See* Claim Construction Hr'g Tr., June 14,

2011 (D.I. 205) (hereinafter "Tr.").[1]

## II.     LEGAL STANDARDS

"It is a bedrock principle of patent law that the claims of a patent define the invention to

which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

(Fed. Cir. 2005) (internal quotation marks omitted).  Construing the claims of a patent presents a

---

[1]On December 9, 2011, the Court granted the Stipulation of Dismissal Relating to U.S.
Patent No. 5,583,122 and U.S. Patent No. 6,165,513 (D.I. 288), which, among other things,
withdrew the parties' request to construe disputed terms of the '513 patent.

1

**A4**

question of law. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 388-90 (1996). "[T]here is no magic formula or catechism for conducting claim construction." *Phillips*, 415 F.3d at 1324. Instead, the court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). The patent specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent . . . ." *Id.* (internal citation omitted).

It is likewise true that "[d]ifferences among claims can also be a useful guide . . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in

2

**A5**

dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It bears emphasis that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (internal quotation marks omitted), *aff'd*, 481 F.3d 1371 (Fed. Cir. 2007).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman*, 52 F.3d at 980. The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

A court also may rely on "extrinsic evidence," which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the

3

**A6**

court in determining the meaning of a term to those of skill in the relevant art because such
dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science
and technology." *Phillips*, 415 F.3d at 1318. In addition, expert testimony can be useful "to
ensure that the court's understanding of the technical aspects of the patent is consistent with that
of a person of ordinary skill in the art, or to establish that a particular term in the patent or the
prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose
sight of the fact that "expert reports and testimony [are] generated at the time of and for the
purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.*
Overall, while extrinsic evidence "may be useful" to the court, it is "less reliable" than intrinsic
evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim
scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19.

Finally, "[t]he construction that stays true to the claim language and most naturally aligns
with the patent's description of the invention will be, in the end, the correct construction."
*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows
that "a claim interpretation that would exclude the inventor's device is rarely the correct
interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007).
Thus, if possible, claims should be construed to uphold validity. *See In re Yamamoto*, 740 F.2d
1569, 1571 (Fed. Cir. 1984).

## III.   CONSTRUCTION OF DISPUTED TERMS

### A.   "treating or inhibiting" ('938 patent Claim 1, 6, 8-9, 13-16, 21, 23-24, 28-30; '634, patent Claim 9-10)

1.   Plaintiffs' Construction: Taking measures to counteract, prevent, retard, or
interfere with the progression of a disease or disorder.

4

**A7**

2. <u>Defendants' Construction</u>: The phrase "treating or inhibiting" indicates that the steps of the recited method affect or are intended to affect the progress of a disease already having been diagnosed, and does not include preventing a disease that has not yet been diagnosed.

3. <u>Court's Construction</u>: Taking measures to counteract, prevent, retard, or interfere with the progression of a disease or disorder.

**B.** **"a subject in need of such treatment"**
  **('938 patent Claim 1, 6, 8-9, 13-16, 21, 23-24, 28-30)**

1. <u>Plaintiffs' Construction</u>: Denotes patients who have osteoporosis or have experienced bone loss or are otherwise at risk of developing osteoporosis.

2. <u>Defendants' Construction</u>: The phrase "in need of such treatment" indicates that the subject already has been diagnosed with osteoporosis.

3. <u>Court's Construction</u>: A patient who has osteoporosis or has experienced bone loss or is otherwise at risk of developing osteoporosis.

**C.** **"a postmenopausal woman in need of treatment or**
  **inhibition of postmenopausal osteoporosis" ('634 patent Claim 9-10)**

1. <u>Plaintiffs' Construction</u>: Patients who have postmenopausal osteoporosis or have experienced bones loss or are otherwise at risk of developing postmenopausal osteoporosis.

2. <u>Defendants' Construction</u>: The phrase "in need of such treatment" indicates that the subject already has been diagnosed with osteoporosis.

3. <u>Court's Construction</u>: A patient who has postmenopausal osteoporosis or has experienced bones loss or is otherwise at risk of developing postmenopausal osteoporosis.

There appears to be no meaningful dispute among the parties that the plain and ordinary meaning of "inhibit" encompasses prevention. *See Merriam-Webster's Medical Desk Dictionary* 394 (2d ed. 2002) (defining "inhibit" as "to retard, interfere with, or prevent (a process or reaction)"); *see also* '938 patent, col.1 ll.45-51 (referring to "treatment and prevention" of diseases). Defendants dedicate no portion of their briefing to this issue. (*See* D.I. 178 at 16-22;

5

**A8**

D.I. 173 at 2-6)

Instead, the parties' dispute is whether there is a prosecution history disclaimer. Specifically, the question is whether Plaintiffs forfeited preventing, and prevention of, osteoporosis during the prosecution of this family of patents.[2] To limit the scope of a claim term based on prosecution disclaimer, the case law "requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable." *Omega Eng'g, Inc., v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003). The prosecution proceedings here fall short of this standard. In response to three separate enablement rejections (one during prosecution of the patents-in-suit's parent patent, and one for each of the '938 and '634 patents-in-suit),[3] Plaintiffs changed the claim term "treating and preventing" to "treating and inhibiting."[4] With respect to the '938 and '634 patents, however, the applicants included in their responsive filings a statement that "inhibiting" "is considered appropriate as it encompasses prevention of osteoporosis in subjects who do not yet suffer from the disorder but are likely candidates to develop it, as well as inhibition of further osteoporosis in subjects who already suffer from the disorder." (D.I. 177 Ex. E at AP-RISE0004477; *see also id.* Ex. F at AP-RISE0006359) Thus, the Court does not find a clear and unmistakable disavowal of "prevention;" the examiner voiced

_____

[2]This same disagreement is reflected in the proposed constructions of "a subject in need of such treatment" and "a postmenopausal woman in need of treatment or inhibition of postmenopausal osteoporosis." If the claims do not cover prevention of osteoporosis in patients who do not yet have osteoporosis, people without osteoporosis are not within the scope of these terms.

[3]*See* D.I. 177 Ex. D at AP-RISE0006865-66, AP-RISE000690; *id.* Ex. E at AP-RISE 0004419-23; *id.* Ex. F at AP-RISE0005955-57.

[4]*See* D.I. 177 Ex. D at AP-RISE0006905-07; *id.* Ex. E at AP-RISE0004472, AP-RISE0004276-77, AP-RISE0004279; *id.* Ex. F at AP-RISE0006355-57, AP-RISE0006359.

6

**A9**

no objection to the quoted statement. (*See id.* Ex. E at AP-RISE0004516) Instead, as Plaintiffs

concede (*see* D.I. 168 at 10; *see also* Tr. at 28-29), the claim scope they forfeited was with

respect to "complete" prevention of osteoporosis (i.e., ensuring a patient will never develop the

disease as a result of the patented method), which was a matter with which the examiner

explicitly voiced concern when rejecting the application which led to the '634 patent.[5]  The Court

will hold Plaintiffs to this concession and exclude "complete prevention" from the scope of this

term.[6]

### D. "commencing treatment . . . and continuing said treatment" ('938 patent Claim 6, 8-9, 13-15)

1. Plaintiffs' Construction: Within the timeframe of the treatment episode, beginning a regimen of taking a particular bisphosphonic acid or a pharmaceutically acceptable salt thereof . . . and proceeding with that regimen thereafter.

2. Defendants' Construction: To begin treatment for (or inhibiting the progression of) the disease osteoporosis, for the first time . . . and to go on

---

[5]*See* D.I. 177 Ex. F at AP-RISE0005957 ("[T]he term 'prevention' is broad enough to encompass an outcome of absolute absence of such disorders.  In the medical arts, however, therapeutic outcomes of absolute success is not the norm . . . .  Further regarding the concept of prevention, as noted above, this term may be reasonably interpreted as being synonymous with the term 'curing' and both circumscribe objectives of absolute success.  Because absolute success is not reasonably possible with most diseases/disorders, especially those having an etiology and pathophysiological manifestations as complex/poorly understood as bone-remodeling conditions, the specification, which lacks an objective showing that such conditions may actually be prevented, is viewed as lacking an enabling disclosure of the same.").

[6]The Court's constructions addressed in this section are consistent with those recently issued by U.S. District Judge Stanley R. Chesler of the U.S. District Court for the District of New Jersey, who was called on to construe terms of the '634 patent. *See Hoffman-La Roche Inc. v. Apotex Inc.*, 2011 WL 5325565 (D.N.J. Nov. 3, 2011); *see also id.* at 2 n.2 ("One could reasonably conclude from the prosecution history that the applicant did surrender coverage of a method for absolutely successful prevention of osteoporosis, but this has little meaning in this dispute, since there do not appear to be at issue any methods for the absolutely successful prevention of osteoporosis.").

with treating (or inhibiting the progression of) the disease osteoporosis, by any means, after the first "commencing treatment" step.

3.    Court's Construction: Within the timeframe of the treatment episode, beginning a regimen of taking a particular bisphosphonic acid or a pharmaceutically acceptable salt thereof . . . and proceeding with that regimen thereafter.

The Court's construction is supported by the intrinsic evidence. The claim language itself indicates what is meant by "commencing treatment:" "What is claimed is . . . A method for treating or inhibiting osteoporosis comprising *commencing treatment by* . . . ." ('938 patent col.7 ll.23-24) (emphasis added) "Treatment" refers to the "treating and inhibiting" of the claimed methods, and the claims teach how to begin these methods (i.e., with what follows "commencing treatment by"). (*See, e.g.,* '938 patent col.7 ll.24-35) The remainder of the specification adds little with respect to this dispute because the claims were redrafted as two-step methods to overcome an obviousness rejection over Schofield et al., U.S. Pub. No. 2003/0118634 ("Schofield") (*see* D.I. 168 Ex. E at AP-RISE0004551-53), although the substance of the claimed methods was not changed (*see id.* at AP-RISE0004657-58). There is no clear intent to limit the meaning of "treatment" to only the approved indication of risedronate present in the specification. *See Liebel-Flarsheim*, 358 F.3d at 906. A person of ordinary skill in the art would understand that the claims are drawn to a specific regimen and would appreciate that anything occurring before the claimed regimen is outside the scope of the claims. (*See* D.I. 157 at ¶ 44)

The Court's construction is also supported by the prosecution history. As noted, the claims were redrafted as two-step methods to avoid reading on Schofield; the first step of the claimed method is different from that of the method disclosed in Schofield. (*See* D.I. 168 Ex. E

8

**A11**

at AP-RISE000457-58) A new "treatment episode" is not started with every dose of

bisphosphonate. A "treatment episode" is the time frame which a person of skill in the art would

understand as a regimen. (*See* D.I. 157 at ¶ 44; *see also Hoffmann-La Roche Inc. v. Apotex Inc.*,

2010 WL 1875569, at *12 (D.N.J. May 10, 2010) In any event, the second step of the Schofield

method cannot begin the claimed regimen; it is improper to construe claims as covering prior art

distinguished in prosecution. *See Kinik Co. v. Int'l Trade Comm'n*, 362 F.3d 1359, 1365 (Fed.

Cir. 2004); *SciMed Life Sys. v. Advanced Cardiovascular*, 242 F.3d 1337, 1343 (Fed. Cir. 2001);

*see also Hoffmann-La Roche Inc.*, 2010 WL 1875569, at *14.

**E. "subject" ('938 patent Claim 1, 6, 8-9, 13-16, 21, 23-24, 28-30)**

    1.    <u>Plaintiffs' Construction</u>: A human patient.

    2.    <u>Defendants' Construction</u>: Encompasses not only human subject, but also any other animal subjects that can have or be diagnosed with osteoporosis.

    3.    <u>Court's Construction</u>: A human subject or any other animal subject that can have or be diagnosed with osteoporosis.

The dispute here is whether osteoporosis afflicts only humans and not animals. The

Court's construction is consistent with the claim language, which does not indicate any exclusion

of animals from being subjects, and the specification, which refers to administering

bisphosphonic acids or salts thereof "to a mammal." (*See, e.g.*, '938 patent col.7 ll.24-25; *see*

*also id.* col.6 ll.9-13) Additionally, prior art cited in the patents-in-suit supports the Court's

construction. (*See id.* col.3 ll.28, 38; D.I. 177 Ex. M, U.S. Patent No. 4,761,406, col.2 ll.67-68;

D.I. 177 Ex. N, U.S. Patent No. 3,962,432 at [57], col.1 ll.6-7) Both sides present expert opinion

in their favor (*see* D.I. 157 at ¶¶ 20, 51; D.I. 154 at ¶¶ 17-20; D.I. 166 at ¶¶ 26-32), but

Defendants' position is consistent with the plain meaning of "subject" in a medical dictionary,

9

**A12**

*see Dorland's Illustrated Medical Dictionary* 1559 (27th ed. 1988) (defining "subject" as "a

person or animal subjected to treatment, observation, or experiment").

**F.** **"a pharmaceutical composition comprising from about 100 mg to about 150 mg of bisphosphonic acid" ('938 patent Claim 1, 6, 8-9, 13-15)**

1. <u>Plaintiffs' Construction</u>: A composition of matter that is a medicament, with the two references to "a pharmaceutical composition" in claim 1 referring to the same pharmaceutical composition, not two distinct compositions.

2. <u>Defendants' Construction</u>: A composition of matter that is a medicament; the claim recites two distinct "pharmaceutical compositions" which could include different bisphosphonates or the same bisphosphonate; a pharmaceutical composition may include a single dose or as multiple sub-doses.

3. <u>Court's Construction</u>: A composition of matter that is a medicament, which may include a single dose or multiple sub-doses, with the two references to "a pharmaceutical composition" in claim 1 referring to the same thing.

**G.** **"the pharmaceutical composition" ('938 patent Claim 3, 5, 6, 8-9)**

1. <u>Plaintiffs' Construction</u>: The composition of matter that is a medicament referenced in independent claim 1.

2. <u>Defendants' Construction</u>: Has no proper construction.

3. <u>Court's Construction</u>: The composition of matter that is a medicament referenced in independent Claim 1.

**H.** **"said bisphosphonic acid" ('938 patent Claim 6, 8-9, 13-15)**

1. <u>Plaintiffs' Construction</u>: The single bisphosphonic acid recited in the independent claim

2. <u>Defendants' Construction</u>: Has no proper construction

3. <u>Court's Construction</u>: The bisphosphonic acid recited in the independent claim.

10

**A13**

It is evident from the claim language, specification, and prosecution history that the "a" preceding the second occurrence of "pharmaceutical composition comprising about 100 mg to about 150 mg of bisphosphonic acid" was a drafting error. By referring to "the pharmaceutical composition" (*see, e.g.*, '938 patent col.7 ll.41-45, 50-53), the dependent claims imply that both references are to the same thing. The specification describes the claimed treatment method as involving the monthly administration of bisphosphonate, making no mention of a process in which two different compositions are administered. As discussed above, the claimed method is a one-step method which was redrafted as a two-step process explicitly to distinguish the prior art. (*See* D.I. 168 at AP-RISE0004657-58) In this way, the prosecution history also supports the Court's construction. Given this, the required correction is not subject to reasonable debate (that is, the second "a" should read "said"). Accordingly, the Court can correct the drafting error. *See Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003) ("A district court can correct a patent only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims."). The terms in the dependent claims, thus, have distinguishable antecedent bases, ascertainable meaning, and are amenable to construction.[7] *See Energizer Holdings, Inc. V. Int'l Trade Comm'n*, 435 F.3d 1366, 1370-71 (Fed. Cir. 2006).

Additionally, no limitation requiring a single dose is warranted. The claim language supports this conclusion – "a" is typically construed to mean "one or more." *See Baldwin*

---

[7]The term "risedronic acid or a pharmaceutically acceptable salt thereof" in Claims 8-9, 21, and 23-24 of the '938 patent is likewise amenable to construction. "Risedronic acid or a pharmaceutically acceptable salt thereof" replaces "bisphosphonic acid or an amount of pharmaceutically acceptable salt thereof" in the independent claim, since the latter is the antecedent basis for "said bisphosphonic acid."

11

**A14**

*Graphics Sys., Inc., v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008); *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000). Thus, "a pharmaceutical composition" is best interpreted as "one or more pharmaceutical compositions," which encompasses sub-doses. The remainder of the specification confirms this construction. (*See, e.g.*, '938 patent col.3 ll.51-54, 59-61, 63-67; *id.* col.4 ll.6-19; *id.* col.6 ll.21-24, 29-31) The statement that the "medicament comprises about 50 to 250 mg" ('938 patent col.2 ll.54-55) is no clear disavowal of multiple sub-doses.

Likewise, there is no basis for excluding multiple-day administrations from the scope of Claims 16-30 of the '938 patent, which do not include the limitation "on a single day" present in other claims. *See Phillips*, 415 F.3d at 1314-15; *Liebel-Flarsheim*, 358 F.3d at 906. The specification amply supports this conclusion. (*See, e.g.*, '938 patent col.2 ll.56-58; *id.* col.3 ll.11-12, 20-21, 64-67; *id.* col.4 ll.10-19; *id.* col.6 ll.18-21, 25-28, 31-39)

## I. "once monthly" ('938 patent Claim 16-30)

1. <u>Plaintiffs' Construction</u>: Once in a period or interval of approximately 30 days.

2. <u>Defendants' Construction</u>: Repeated with a repeating period of approximately four (4) weeks, approximately 30 days, or something approaching 1/12 of a calendar year. Something occurring "once monthly" may have a duration of more than one minute, hour, or day, provided that it repeats at an interval of once a month.

3. <u>Court's Construction</u>: Receiving a dose, in either a single dose or multiple subdoses on one or more days, once in a period or interval of approximately 30 days.

The parties do not meaningfully disagree as to the "monthly" portion of this term, which for simplicity the Court construes as "a period or interval of approximately 30 days," which is

12

**A15**

Plaintiffs' proposal. Defendants' proposal for monthly, while in some ways more precise than Plaintiffs' (and having support in the specification, *see* '938 patent col. 3 ll.54-58), risks confusing the jury on a point not reasonably subject to dispute.

More important is the parties' disagreement as to whether the "once" that occurs on a monthly basis during treatment must consist of receiving a single dose on a single day or may, instead, consist of multiple subdoses (either on a single day or multiple days). For the reasons already given in connection with the very similar dispute in the previous section of this Memorandum Opinion, the Court agrees with Defendants that multiple subdoses (on one or more days) are within the scope of the patent claims.

## IV.  **CONCLUSION**

A separate Order, consistent with this Memorandum Opinion, will be entered.

13

# TAB 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| WARNER CHILCOTT COMPANY, LLC, and HOFFMAN-LA ROCHE INC., | : |
| | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : C.A. No. 08-cv-627-LPS, 11-cv-81-LPS |
| | : |
| TEVA PHARMACEUTICALS USA, INC., | : |
| | : |
| Defendant. | : |

---

| | |
|---|---|
| WARNER CHILCOTT COMPANY, LLC, and HOFFMAN-LA ROCHE INC., | : |
| | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : C.A. No. 09-cv-143-LPS, 10-cv-1111-LPS |
| | : |
| APOTEX, INC. and APOTEX CORP., | : |
| | : |
| Defendants. | : |

---

| | |
|---|---|
| WARNER CHILCOTT COMPANY, LLC, and HOFFMAN-LA ROCHE INC., | : |
| | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : C.A. No. 10-cv-285-LPS, 11-cv-286-LPS |
| | : |
| MYLAN PHARMACEUTICALS INC., | : |
| | : |
| Defendant. | : |

---

**A17**

WARNER CHILCOTT COMPANY, LLC,  :
and HOFFMAN-LA ROCHE INC.,   :
          :
    Plaintiffs,    :
          :
   v.       : C.A. No. 09-cv-61-LPS, 10-cv-1085-LPS
          :
SUN PHARMA GLOBAL, INC.,   :
          :
    Defendant.   :

---

## ORDER

At Wilmington, this 29th day of December 2011:

For the reasons set forth in the Memorandum Opinion issued this date,

IT IS HEREBY ORDERED that the disputed claim language of U.S. Patent Nos.

7,192,938 ("the '938 patent") and 7,718,634 ("the '634 patent") shall be construed as follows:

1. **"Treating of inhibiting,"** as is appears in Claim 1, 6, 8-9, 13-16, 21, 23-24, and
28-30 of the '938 patent and Claims 9-10 of the '634 patent, is construed as "taking measures to
counteract, prevent, retard, or interfere with the progression of a disease or disorder."

2. **"A subject in need of such treatment,"** as it appears in Claim 1, 6, 8-9, 13-16,
21, 23-24, and 28-30 of the '938 patent, is construed as "a patient who has osteoporosis or has
experienced bone loss or is otherwise at risk of developing osteoporosis."

3. **"A postmenopausal woman in need of treatment or inhibition of
postmenopausal osteoporosis,"** as it appears in Claims 9-10 of the '634 patent, is construed as
"a patient who has postmenopausal osteoporosis or has experienced bones loss or is otherwise at
risk of developing postmenopausal osteoporosis."

4. **"Commencing treatment . . . and continuing said treatment,"** as it appears in
Claim 6, 8-9, and 13-15 of the '938 patent, is construed as "within the timeframe of the treatment

episode, beginning a regimen of taking a particular bisphosphonic acid or a pharmaceutically acceptable salt thereof . . . and proceeding with that regimen thereafter."

5. **"Subject,"** as it appears in Claim 1, 6, 8-9, 13-16, 21, 23-24, and 28-30 of the '938 patent, is construed as "a human subject or any other animal subject that can have or be diagnosed with osteoporosis."

6. **"A pharmaceutical composition comprising from about 100 mg to about 150 mg of bisphosphonic acid,"** as it appears in Claim 1, 6, 8-9, and 13-15 of the '938 patent, is construed as "a composition of matter that is a medicament, which may include a single dose or multiple sub-doses, with the two references to 'a pharmaceutical composition' in claim 1 referring to the same thing."

7. **"The pharmaceutical composition,"** as it appears in Claim 3, 5, 6, and 8-9 of the '938 patent, is construed as "the composition of matter that is a medicament referenced in independent Claim 1."

8. **"Said bisphosphonic acid,"** as it appears in Claim 6, 8-9, and 13-15 of the '938 patent, is construed as "the bisphosphonic acid recited in the independent claim."

9. **"Once monthly,"** as it appears in Claims 16-30 of the '938 patent, is construed as "receiving a dose, in either a single dose or multiple subdoses on one or more days, once in a period or interval of approximately 30 days."

Delaware counsel are reminded of their obligation to inform out-of-state counsel of this Order. To avoid the imposition of sanctions, counsel should advise the Court immediately of any problems regarding compliance with this Order.

UNITED STATES DISTRICT JUDGE

**A19**

**TAB 3**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WARNER CHILCOTT COMPANY, LLC   :
and HOFFMANN-LA ROCHE INC.,   :
                    :
        Plaintiffs,   :
                    :   C.A. No. 08-627-LPS
    v.                :   C.A. No. 11-81-LPS
                    :
TEVA PHARMACEUTICALS USA, INC.,  :
                    :
        Defendant.   :
                    :

---

WARNER CHILCOTT COMPANY, LLC   :
and HOFFMANN-LA ROCHE INC.,   :
                    :
        Plaintiffs,   :
                    :   C.A. No. 09-143-LPS
    v.                :   (consolidated with C.A. No. 08-627-LPS)
                    :
APOTEX, INC. and APOTEX CORP.,   :
                    :
        Defendants.   :

---

WARNER CHILCOTT COMPANY, LLC   :
and HOFFMANN-LA ROCHE INC.,   :
                    :
        Plaintiffs,   :
                    :   C.A. No. 10-285-LPS
    v.                :   (consolidated with C.A. No. 08-627-LPS)
                    :
MYLAN PHARMACEUTICALS, INC.,   :
                    :
        Defendant.   :

---

WARNER CHILCOTT COMPANY, LLC   :
and HOFFMANN-LA ROCHE INC.,   :
                    :
        Plaintiffs,   :

**A20**

|  |  | : | C.A. No. 09-61-LPS |
| v. |  | : | (consolidated with C.A. No. 08-627-LPS) |
|  |  | : |  |
| SUN PHARMA GLOBAL FZE, |  | : |  |
|  |  | : |  |
|  | Defendant. | : |  |

Frederick L. Cottrell, III, Steven J. Fineman, Jaclyn C. Levy, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE. David B. Bassett, WILMER CUTLER PICKERING HALE AND DORR LLP, New York, NY. Vinita Ferrera, Allen C. Nunnally, WILMER CUTLER PICKERING HALE AND DORR LLP, Boston, MA. Mark E. Waddell, LOEB & LOEB LLP, New York, NY.

     Attorneys for Plaintiffs.

Karen L. Pascale, Pilar G. Kraman, YOUNG, CONWAY, STARGATT & TAYLOR LLP, Wilmington, DE. James Galbraith, Maria Luisa Palmese, Antony Pfeffer, Peter L. Giunta, KENYON & KENYON LLP, New York, NY.

     Attorneys for Defendant Teva Pharmaceuticals USA, Inc.

Richard K. Herrmann, Mary B. Matterer, MORRIS JAMES LLP, Wilmington, DE. Edgar H. Haug, Robert E. Colletti, Richard E. Parke, FROMMER LAWRENCE & HAUG, LLP, New York, NY.

     Attorneys for Defendant Mylan Pharmaceuticals, Inc.

Richard L. Horwitz, David E. Moore, POTTER ANDERSON & CORROON LLP, Wilmington, DE. Steven E. Feldman, Louise T. Walsh, Philip D. Segrest, Jr., Sherry L. Rollo, HUSCH BLACKWELL, LLP, Chicago IL.

     Attorneys for Defendants Apotex, Inc. and Apotex Corp.

John C. Phillips, Jr., Megan C. Haney, PHILLIPS, GOLDMAN & SPENCE, P.A., Wilmington, DE. Eric C. Cohen, Jeremy C. Daniel, KATTEN MUCHIN ROSENMAN LLP, Chicago, IL.

     Attorneys for Defendant Sun Pharma Global FZE.

## MEMORANDUM OPINION

March 28, 2014
Wilmington, Delaware

*[signature]*

**STARK, U.S. District Judge:**

Presently before the Court are the Motion for Summary Judgment of Invalidity Under 35 U.S.C. § 103 for Obviousness (D.I. 330) and Motion for Summary Judgment of Invalidity Under 35 U.S.C. § 112 for Inadequate Written Description and Failure to Enable the Full Scope of the Claims (D.I. 303), both filed by Defendants Apotex Corp., Apotex, Inc., Teva Pharmaceuticals USA, Inc., Mylan Pharmaceuticals, Inc., and Sun Pharma Global FZE's (collectively, "Defendants"). Also pending is the Motion for Summary Judgment of Infringement (D.I. 333) filed by Plaintiffs Warner Chilcott Company, LLC and Hoffmann-La Roche Inc. (collectively, "Plaintiffs").

For the reasons discussed below, the Court will grant Defendants' Motion for Summary Judgment of Invalidity Under 35 U.S.C. § 103 and deny as moot the remaining motions.

## I.    BACKGROUND

On September 26, 2008, Plaintiffs brought suit (D.I. 1) alleging that Defendant Teva's abbreviated new drug application ("ANDA") infringed U.S. Patent No. 7,192,938 (the "'938 patent") (D.I. 336 Ex. 2). On January 24, 2011, Plaintiffs filed another action against Teva (C.A. No. 11-81-LPS), which is now consolidated with the earlier action,[1] asserting infringement of U.S. Patent No. 7,718,634 (the "'634 patent"). The '938 and '634 patents ("patents-in-suit") are continuations from the same parent application, U.S. Application No. 10/430,007, and relate to methods for treating or preventing osteoporosis or postmenopausal osteoporosis using a monthly

---

[1]Plaintiffs' case against Apotex Corp. and Apotex, Inc. was consolidated with the action against Teva in September 2009. (D.I. 34) The case against Mylan Pharmaceuticals Inc. was consolidated with the instant action in July 2010. (D.I. 88) The case against Sun Pharma Global, Inc. was consolidated in November 2010 (D.I. 104) and, in July 2011, the parties stipulated to substitute Sun Pharma Global FZE for Sun Pharma Global, Inc. (D.I. 219).

1

**A22**

dose of a pharmaceutically acceptable salt of risedronic acid, a nitrogen-containing bisphosphonate ("NCBP"). It is undisputed that osteoporosis is a disorder of abnormal bone resorption and bone loss. (*Id.* at col.1, ll.34-43)

The Court construed the disputed claim terms. (D.I. 290) Trial was set to begin on July 23, 2012, but, at the request of most of the parties (D.I. 319), the Court cancelled trial after a decision was issued by the Honorable Stanley R. Chesler of the District of New Jersey invalidating claims 1-8 of the '634 patent[2] (D.I. 322). Subsequently, the parties requested the opportunity to file the pending motions (D.I. 323), on which the Court heard oral argument on December 14, 2012 (D.I. 392) ("Tr.").

## II.    LEGAL STANDARDS

A grant of summary judgment is appropriate only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). If the moving party has carried its burden, the nonmovant must then "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587 (quoting Fed. R. Civ. P. 56(e)). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). If the Court is able to determine that "there is

_____

[2]Claims 1-8 of the '634 patent are not asserted in this case. They cover once monthly dosing of ibandronate for treatment of osteoporosis, whereas the asserted claims in the instant action cover dosing of risedronate.

2

**A23**

no genuine issue as to any material fact" and that the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005); *see also* Fed. R. Civ. P. 56(c).

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## III. DISCUSSION

### A. Defendants' Motion for Summary Judgment Under 35 U.S.C. § 103

A patent is invalid if the differences between the invention and the prior art are such that the invention would have been obvious to one of ordinary skill in the art at the time of the invention. *See* 35 U.S.C. § 103; *see also In re O'Farrell*, 853 F.2d 894, 904 (Fed. Cir. 1988). Obviousness is a question of law based on factual determinations, including: "(1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) evidence of secondary factors, known as objective indicia of non-obviousness." *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1007 (Fed. Cir. 2009).

3

**A24**

In May 2012, Judge Chesler of the District of New Jersey reviewed the '634 patent and granted summary judgment of invalidity under 35 U.S.C. § 103. *See Hoffmann-La Roche Inc. v. Apotex Inc.*, 2012 WL 1637736, at *1 (D.N.J. May 7, 2012) ("*Hoffman*"). Claims 1-8 of the '634 patent were asserted in *Hoffmann* and claimed a once monthly dosage of ibandronate for the treatment of osteoporosis. *See id.* at *3. The prior art before the *Hoffman* Court included: Lunar News Spring 1999,[3] Ravn 1996,[4] U.S. Patent Nos. 6,432,932 ("Daifotis"), 6,468,559 ("Chen"), 5,616,560 ("Geddes"), Riis,[5] U.S. Patent Application No. 2003/0118634 ("Schofield"), and Krause 2001.[6] *See id.* at *4.

Judge Chesler concluded that the asserted claims consisted of three elements: (1) oral administration of ibandronate, (2) once monthly dosing for the treatment of osteoporosis, and (3) a 150 mg dose. *See id.* The Court found that the Lunar News article disclosed the first two elements of the claims, while the remaining prior art established that a person of ordinary skill in the art would have found the 150 mg dose obvious. *See id.* at *10.

In terms of dosage, Ravn 1996 disclosed that daily 2.5 mg and 5 mg doses of ibandronate were effective in women with postmenopausal osteoporosis. *See id.* at *4. Daifotis claimed the

---

[3] *Update: Bisphosphonates*, Lunar News (Spring 1999).

[4] P. Ravn et al., *The effect on bone mass and bone markers of different doses of ibandronate: A new bisphosphonate for prevention and treatment of postmenopausal osteoporosis: A 1-year, randomized, double-blind, placebo-controlled dose-finding study*, 19 Bone 527 (1996).

[5] B.J. Riis et al., *Ibandronate: A Comparison of Oral Daily Dosing Versus Intermittent Dosing in Postmenopausal Osteoporosis*, 16 J. of Bone and Mineral Research 1871 (2001).

[6] Krause et al., *Roche, GlaxoSmithKline in Drug Pact*, 260 Chemical Market Reporter 10 (2001).

4

**A25**

use of bisphosphonates dosed weekly or biweekly to inhibit bone resorption. *See id.* at *5. Daifotis further taught that a weekly dose of ibandronate could be effective in doses between 35 mg and 50 mg. *See id.* at *6. Moreover, Daifotis revealed that "'the administration of a bisphosphonate at a high relative dosing frequency causes less adverse gastrointestinal effects, particularly esophageal effects, compared to the administration of a low relative dosage at a high relative dosing frequency,'" and highlighted this finding as "'surprising in view of the teachings suggesting that adverse gastrointestinal effects would be expected to increase as a function of increasing bisphosphonate dosage.'" *Id.* at *5 (quoting Daifotis at col. 3 1.58- col. 4 1.6). The Court found that a person of ordinary skill in the art would observe that the 35 mg weekly dose disclosed in Daifotis corresponded to the 5 mg daily dose disclosed in Ravn 1996. *See id.* at *6.

Riis disclosed that "preclinical data with ibandronate provided evidence that a total dose administered over a defined period provides equivalent results irrespective of the dosing schedule, providing that the dose used is efficacious." *See id.* at *5. That is, Riis taught the "total dose concept." *See id.* Hence, the *Hoffman* Court held that the combination of the daily 5 mg dose disclosed in Ravn 1996, the weekly 35 mg dose disclosed in Daifotis, and the Riis total dose concept rendered a once monthly dose of 150 mg obvious. *See id.* at *6 n.6.

Schofield stated that bisphosphonates administered at longer intervals, including weekly, biweekly, and monthly dosages, could treat osteoporosis. *See id.* at *6. Like Riis, then, Schofield disclosed the total dose concept. Judge Chesler recognized the parties before him presented a battle of experts over whether Schofield's daily dose of between 5 and 10 mg extrapolated to a 150 mg monthly dose, but determined that this battle was irrelevant because even without the Schofield reference, Ravn 1996, Daifotis, and Riis were sufficient to render

5

**A26**

obvious the choice of a 150 mg monthly dose. *See id.*

Still more prior art supported Judge Chesler's conclusions. He explained that Chen claimed a preferred embodiment of a once monthly dosage form of bisphosphonates useful in the treatment of osteoporosis. *See id.* at *7. Likewise, Krause 2001 and Geddes discussed a once monthly dosage of bisphosphonates to treat osteoporosis. Thus, the *Hoffman* Court found that, based on the prior art, there was a reasonable expectation of success with respect to the treatment of osteoporosis with a once monthly dose of ibandronate at 150 mg. *See id.*

In an attempt to demonstrate that genuine issues of material fact remained to be adjudicated in connection with obviousness, plaintiffs in the *Hoffman* action argued that Schnitzer 2001[7] taught away from the claimed invention. *See id.* at *9. Schnitzer 2001 stated that "there is evidence that the desired reductions in bone turnover are not maintained if dosing intervals are longer than 1 or 2 weeks." *Id.* at *10 n.13. This is known as the "osteoclast life cycle theory." *Id.* Judge Chesler rejected plaintiffs' reliance on the osteoclast life cycle theory because "a skilled artisan would have understood Riis 2001 to have superceded the views about intermittent dosing with ibandronate expressed in Schnitzer." *Id.* at *10 (citing *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 36 (1966)).

In the end, the *Hoffman* Court found a "mere . . . scintilla" of evidence in support of plaintiff's position. *Id.* at *20 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 266 (1986)). Given this minimal showing by plaintiffs, and moreover, the lack of material dispute as to the content of the prior art, the scope of the patent claims, and the level of ordinary skill in the

---

[7]Thomas J Schnitzer, *Update on alendronate for osteoporosis: once-weekly dosing*, 2 Expert Opin. Pharmacother. 1461 (2001).

art, the Court concluded that defendants had met the high burden of proving by clear and convincing evidence that claims 1-8 of the '634 patent were obvious and, thus, invalid. *See id*. at *21-22.

Here, Defendants, like the defendants in the New Jersey *Hoffman* action, contend that the patents-in-suit are obvious because the prior art discloses the three elements of the asserted claims: (1) oral administration of risedronate for the treatment of osteoporosis, (2) once monthly, (3) at a dose of 150 mg. (D.I. 331 at 13-16 ) Plaintiffs oppose summary judgment of obviousness by arguing that the once monthly dosing regime was not well accepted at the time of invention and, at that time, the 150 mg dose amount was unknown to persons of ordinary skill in the art. (D.I. 353 at 3; Tr. at 36) Having reviewed the record provided by the parties and considered the parties' arguments, the Court concludes that Defendants have met their burden of proving, by clear and convincing evidence, that the prior art discloses that a once monthly 150 mg dosage of risedronate effectively and safely treats osteoporosis, rendering the '938 and '634 patents obvious (even after considering evidence of secondary considerations of nonobviousness). No reasonable finder of fact could conclude otherwise.

Dr. Mazess' 2000 Lunar News article discloses the first element of the claimed invention: the use of risedronate as an effective treatment of osteoporosis. (D.I. 336 Ex. 12, *Update: Bisphosphonates*, Lunar News (Winter 2000) (stating that "risedronate has met all standards for efficacy . . . for prevention and treatment of osteoporosis . . .")) Plaintiffs observe that at the time Mazess' Lunar News article was published, risedronate was not yet approved by the FDA for the prevention or treatment of osteoporosis (D.I. 353 at 8) – but such approval is not an element of the claims at issue and is not relevant here. *Cf. Hoffmann-La Roche*, 2012 WL 1637736, at *9,

7

**A28**

n.9. Schofield similarly states that risedronate may be effective to treat and prevent bone loss. (D.I. 336 Ex. 18 at [0037])

Lunar News and Schofield also disclose the second element: once monthly administration. Lunar News states that "[w]eekly, or even monthly, dosing if done properly could foster long-term compliance as well as minimiz[e] side effects." (D.I. 336 Ex. 12) Likewise, Schofield discloses daily, weekly, or monthly dosages. (D.I. 336 Ex. 18 at [0037]) Undesirable side effects associated with more frequent dosing – such as requiring patients to take the drug without food and then to stand or be seated upright for half an hour – would have motivated those skilled in the art to pursue a dosing regimen that required taking the drug as infrequently as possible. (*See, e.g.*, D.I. 357 at ¶ 17) (stating that undesirable side effects motivated those skilled in art to move away from daily dosing treatments to weekly dosages)[8]

Plaintiffs attempt, but fail, to create a genuine issue of material fact with evidence suggesting that one of ordinary skill in the art would reject monthly dosing because it was believed that the two-week osteoclast life cycle required dosing at least once every two weeks for effective osteoclast inhibition. (D.I. 353 at 3-4; D.I. 357 at ¶ 65) However, the prior art discloses that bisphosphonates were effective treatments for osteoporosis, even when dosed in intervals exceeding two weeks. For example, Riis presented evidence that dosing bisphosphonates at intervals of up to nine weeks was as effective as daily administration. (D.I. 336 Ex. 9) Indeed, Riis stated that "a total dose administered over a defined period provides equivalent results irrespective of the dosing schedule." (*Id.*) *Cf. Hoffmann-La Roche*, 2012 WL

---

[8]The level of ordinary skill in the art is not disputed. (D.I. 331 at 17; D.I. 353 at 18)

1637736, at *13 (stating that there is no dispute that Riis teaches this, as "it is a direct quote").[9]

Provisional Application 60/370501 further supports the conclusion that monthly dosages of other NCBPs are effective even when given in longer intervals. (D.I. 332 Ex. 3 (claiming monthly dose of 280 mg alendronate to treat osteoporosis))

Prior art studies confirmed that risedronate, an NCBP, is effective in preventing bone loss even when given at long intervals. For example, the 1997 Delmas study "determine[d] the effectiveness and safety of the bisphosphonate risedronate in preventing bone loss." (D.I. 336 Ex. 23, PD Delmas et al., *Bisphosphonate risedronate prevents bone loss in women with artificial menopause due to chemotherapy of breast cancer: a double-blind, placebo-controlled study*, 15 J. of Clinical Oncology 955, 955 (1997)) Delmas concluded that "[r]isedronate appears to be a safe treatment that prevents both trabecular and cortical bone loss in women," even with dosing intervals longer than one month. (*Id.*)

A 2001 study further supports the conclusion that high intermittent doses of risedronate are effective. (D.I. 366 Ex. 22, R. Zegels et al., *Effect of High Doses of Oral Risedronate (20 mg/day) on Serum Parathyroid Hormone Levels and Urinary Collagen Cross-link Excretion in Postmenopausal Women With Spinal Osteoporosis*, 28 Bone 108 (2001)) Zegels administered 20 mg of risedronate each day for 14 days and observed that bone resorption markers decreased for up to 50 days. (*Id.* at 110) The Zegels authors hypothesized that the total amount of risedronate,

---

[9]In affirming Judge Chesler's denial of plaintiffs' motion for a preliminary injunction, the Federal Circuit stated: "[i]t was not clear error for the district court to find that the cited references disclose every claim limitation and that while uncertainties remained, the field was trending towards intermittent dosing based on the [Riis] total dosing concept, including a one-monthly dose of 150 mg." *Hoffmann-La Roche v. Apotex*, 2012 WL 4829204, at *4 (Fed. Cir. Oct. 11, 2012).

9

280 mg, rather than the 20 mg daily dosing, was the driving factor in reduced bone resorption. The authors supported this expectation by citing two other studies stating that bisphosphonates are similarly effective whether administered intermittently or taken daily. (*Id.* at 111) (citing M. Dooley et al., *Ibandronate*, 57 Drugs 101 (1999) and J-Y L Reginster et al., *Bisphosphonates for the treatment of osteoporosis*, in Osteoporosis: Diagnosis and Management 123 (1998))

Turning to the third element of the claims, the prior art also renders the choice of a 150 mg dose of risedronate obvious. Schofield discloses a daily risedronate dose of from about 5 to 10 mg. (D.I. 336 Ex. 18 at [0037]) Schofield also states that "[e]quivalent doses can be given every other day, twice a week, weekly, biweekly or monthly" and provides a weekly equivalent dose of 35 mg, seven times the daily dose. (D.I. 336 Ex. 18 at [0042])[10] Daifotis similarly disclosed a 5 mg daily dose of bisphosphonate, extrapolated to 35 mg per week. (D.I. 336 Ex. 20) Plaintiffs' own expert recognizes that one of ordinary skill in the art might expect risedronate dosing to scale linearly, so that the daily 5 mg dosage could be extrapolated to a monthly dosage of 150 mg. (D.I. 372 Ex. 4 at 78 (stating that linear scaling of risedronate is not unreasonable, merely unknown); D.I. 359 at ¶ 20 (stating that some bisphosphonates scale linearly)) Moreover, Plaintiffs' expert recognizes that "[a]s of May 2002, it was known that risedronate pharmacokinetics after a single-dose oral administration of 2.5 mg to 30 mg were linear." (D.I. 359 ¶ 24) The disclosure in Riis that long term intermittent dosing provides equivalent results as compared to daily dosing, and the linear scaling disclosed in Schofield and Daifotis, render the specific dose of 150 mg obvious.

---

[10]While Plaintiffs point out, correctly, that during prosecution the patentees overcame rejections based on Schofield, it nonetheless is true that Schofield teaches that the subsequent maintenance doses are effective in treating and preventing osteoporosis.

10

**A31**

Defendants have presented clear and convincing evidence that the prior art demonstrates that high doses of risedronate are safe and effective. (D.I. 336 at ¶¶ 83-84 (discussing studies demonstrating that high dosages of bisphosphonates are safe and effective)) For example, Dr. Yates cites to Patent Application WO 01/15703, which states that "bisphosphonate at a high relative dosage at a low relative dosing frequency causes *less* adverse gastrointestinal effects." (*Id.* at ¶ 82 (emphasis added)) Additionally, a 2001 study stated that 160 mg of another bisphosphonate, alendronate, given weekly was "safe and well tolerated." (*Id.* Ex. 30) Notwithstanding Plaintiffs' expert's conclusory statements that one of ordinary skill in the art would be concerned that high doses might be ineffective or unsafe (D.I. 359 at ¶ 25), the prior art would lead a finder of fact to conclude that such a person would have reasonably expected a high dose to be effective and safe.[11]

Plaintiffs urge the Court to deny summary judgment because there is a battle of experts over whether the prior art was generally accepted. (Tr. at 45-48) Plaintiffs rely on expert testimony from Drs. John P. Bilezikian, David Y. Mitchell, and Anastasia G. Daifotois to support the contention that a person of ordinary skill in the art would not believe a once-monthly risedronate dose would effectively treat osteoporosis. (D.I. 353 at 4) All three experts rely on Schnitzer 2001 to support the assertion that a person of ordinary skill in the art would not have believed that a dosing interval longer than the two-week osteoclast life cycle would be effective. (D.I. 357 ¶ 66; D.I. 358 ¶ 17; D.I. 359 ¶¶ 34-36; D.I. 354 Ex. 9, Thomas J Schnitzer, *Update on alendronate for osteoporosis: once-weekly dosing*, 2 Expert Opin. Pharmacother. 1461 (2001))

---

[11]*Hoffmann* concluded that the prior art, including Schofield, was "sufficient to give the skilled artisan a reasonable expectation of safety with a 150 mg dose." 2012 WL 1637736, at *17.

11

However, Dr. Bilezikian, citing Riis, stops short of stating that longer dosing beyond the two-week osteoclast life cycle would not be effective and opines, instead, that it is "less effective" than daily dosing. (D.I. 357 ¶¶ 53, 68) Dr. Daifotis states in conclusory fashion that the Riis total dose concept was not accepted by those of ordinary skill in the art. (D.I. 358 ¶ 12) *See generally Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1001 (Fed. Cir. 2008) ("Conclusory expert assertions cannot raise triable issues of material fact on summary judgment."). Similarly, Dr. Mitchell states that a person of ordinary skill in the art would not have a reasonable basis to expect monthly dosing of all bisphosphonates to be safe and effective, but he provides no support. (D.I. 359 ¶ 16) Notably, none of the experts cites to a study dated after Riis discrediting the total dose concept. *See Graham*, 383 U.S. at 36 (stating that after appearance of relevant prior art, "unsuccessful attempts to reach a solution to the problems . . . before that time [become] wholly irrelevant"). Even Plaintiffs admit that "Riis would have been understood by a [person of ordinary skill in the art] in May 2002 as a reference that showed *some* antiresorptive effect over longer dose-free intervals." (D.I. 353 at 15) (emphasis in original)

Riis, Delmas, and Zegels provided one of ordinary skill in the art with a reasonable expectation of success with respect to longer dosing periods of bisphosphonates to treat osteoporosis. "For obviousness under § 103, all that is required is a reasonable expectation of success." *In re O'Farrell*, 853 F.2d 894, 903-04 (Fed. Cir. 1988) ("Obviousness does not require absolute predictability of success. Indeed, for many inventions that seem quite obvious, there is no absolute predictability of success until the invention is reduced to practice. There is always at least a possibility of unexpected results, that would then provide an objective basis for showing that the invention, although apparently obvious, was in law nonobvious."); *see also Merck & Co.,*

12

**A33**

*Inc. v. Teva Pharms., USA, Inc.*, 395 F.3d 1364, 1375 (Fed. Cir. 2005) (invalidating patent

claiming weekly dose of alendronate, stating "to the extent the district court finds [patentee's]

weekly-dosing idea non-obvious because it went against prevailing wisdom, the court must still

explain why [patentee] and not Dr. Mazess [of Lunar News] should get credit for the idea . . . .

[Patentee's] idea added nothing to what came before . . . .").

Secondary considerations support the Court's conclusion that the patents-in-suit are

invalid as obvious. Simultaneous invention is evidence that one of ordinary skill in the art would

have considered it obvious to combine elements of the prior art. *See Nat'l Steel Car, Ltd. v.*

*Canadian Pac. Ry., Ltd.*, 357 F.3d 1319, 1338 (Fed. Cir. 2004). Here, there is evidence of

simultaneous invention. (*See* D.I. 331 at 18; D.I. 332 Exs. 2 & 3)

Plaintiffs' evidence of the commercial success of once-a-month Actonel® fails to raise a

genuine issue of material fact. Judge Chesler rejected a similar argument in *Hoffman*, stating that

"this Court does not find this commercial success to have much value as an indicator of

nonobviousness . . . because others were legally barred from commercially testing the Lunar

News ideas." *Hoffmann-La Roche Inc.*, 2012 WL 1637736, at *18. P&G's U.S. Patent No.

5,583,122, claiming the risedronate compound, would have discouraged development of

risedronate products. *See Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1377

(Fed. Cir. 2005) (stating that commercial success was weak evidence of nonobviousness because

market entry was barred by others due to patent claiming alendronate); *see also* Tr. at 29;

*Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 740 (Fed. Cir. 2013) ("Where 'market entry

by others was precluded [due to blocking patents], the inference of non-obviousness of [the

asserted claims], from evidence of commercial success, is weak.' This principle applies

13

**A34**

forcefully to the present case.") (quoting *Merck*, 395 F.3d at 1376).

Nor does Plaintiffs' evidence of long-felt need create a genuine issue of material fact. Long-felt need is evaluated from the date of the closest prior art. *See Graham*, 383 U.S. at 36. Lunar News proposed a monthly dose of risedronate to treat osteoporosis in 2000, only two years before the May 2002 priority date of the patents. Any long-felt need prior to 2000 is not relevant.

The Court finds that Defendants have met their burden of presenting clear and convincing evidence that allows this Court to conclude that one of ordinary skill in the art would consider the patents-in-suit obvious. In particular, Lunar News, Schofield, Riis, Delmas, Zegels, and Daifotis disclose the three elements of the patents-in-suit: oral administration of risedronate for the treatment of osteoporosis, administered monthly, at a dose of 150 mg. As a whole, the prior art discloses the efficacy and safety of high doses of risedronate, rendering the patents-in-suit obvious. Plaintiffs have failed to rebut this conclusion and have not presented evidence that raises a genuine issue of material fact. Thus, the Court will grant Defendants' motion.[12]

**B.      Defendants' Motion for Summary Judgment Under 35 U.S.C. § 112**

In light of the Court's decision to grant Defendants summary judgment of invalidity due to obviousness, the Court will deny as moot their motion for summary judgment of invalidity under Section 112.

---

[12]In another related case, the District of New Jersey found claims 1-10 of U.S. Patent No. 7,410,957 (the "'957 patent") invalid as obvious, relying on essentially the same analysis and prior art. *See Hoffmann-La Roche Inc. v. Apotex Inc.*, 2012 WL 4661588, at *9 (D.N.J. Oct. 1, 2012). The '957 patent arises from the same patent family as the '938 and '634 patents and claims a method for treating osteoporosis with 150 mg of ibandronate. The Federal Circuit also found a similar patent invalid as obvious, based in part on Lunar News. *See Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1377 (Fed. Cir. 2005). The *Merck* patent, U.S. Patent No. 5,994,329, claimed a "less-than-daily administration" of a bisphosphonate compound, alendronate, for the treatment of osteoporosis.

### C.     Plaintiffs' Motion for Summary Judgment of Infringement

In light of the Court's decision to grant Defendants summary judgment of invalidity, the Court will deny as moot Plaintiffs' motion for summary judgment of infringement.

### IV.     CONCLUSION

An appropriate Order follows.

# TAB 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| WARNER CHILCOTT COMPANY, LLC and HOFFMANN-LA ROCHE INC., <br><br> Plaintiffs, <br><br> v. <br><br> TEVA PHARMACEUTICALS USA, INC., <br><br> Defendant. | C.A. No. 08-627-LPS <br> C.A. No. 11-81-LPS |
| WARNER CHILCOTT COMPANY, LLC and HOFFMANN-LA ROCHE INC., <br><br> Plaintiffs, <br><br> v. <br><br> APOTEX, INC. and APOTEX CORP., <br><br> Defendants. | C.A. No. 09-143-LPS <br> (consolidated with C.A. No. 08-627-LPS) |
| WARNER CHILCOTT COMPANY, LLC and HOFFMANN-LA ROCHE INC., <br><br> Plaintiffs, <br><br> v. <br><br> MYLAN PHARMACEUTICALS, INC., <br><br> Defendant. | C.A. No. 10-285-LPS <br> (consolidated with C.A. No. 08-627-LPS) |

**A37**

WARNER CHILCOTT COMPANY, LLC  :
and HOFFMANN-LA ROCHE INC.,       :
                                                 :
              Plaintiffs,                    :
                                                 :          C.A. No. 09-61-LPS
      v.                                      :          (consolidated with C.A. No. 08-627-LPS)
                                                 :
SUN PHARMA GLOBAL FZE,       :
                                                 :
              Defendant.                   :

---

## ORDER

At Wilmington this 28th day of March, 2014, consistent with the Memorandum Opinion issued this date, IT IS HEREBY ORDERED that:

1. Defendants' Motion for Summary Judgment of Invalidity Under 35 U.S.C. § 103 (D.I. 330) is GRANTED.

2. Defendants' Motion for Summary Judgment of Invalidity Under 35 U.S.C. § 112 (D.I. 303) is DENIED AS MOOT.

3. Plaintiffs' Motion for Summary Judgment of Infringement (D.I. 333) is DENIED AS MOOT.

4. The Clerk of Court is directed to enter judgment AGAINST Plaintiffs and FOR Defendants and to CLOSE these consolidated cases.

_____
UNITED STATES DISTRICT JUDGE

# TAB 5

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

WARNER CHILCOTT COMPANY, LLC,
and HOFFMANN-LA ROCHE INC.,

               Plaintiffs,

        v.

TEVA PHARMACEUTICALS USA, INC.,

               Defendant.

:      C. A. No. 08-627-LPS
:      C. A. No. 11-81-LPS
:      (CONSOLIDATED)

WARNER CHILCOTT COMPANY, LLC,
and HOFFMANN-LA ROCHE INC.,

               Plaintiffs,

        v.

APOTEX, INC. and APOTEX CORP.,

               Defendants.

:      C. A. No. 09-143-LPS
:      C. A. No. 10-1111-LPS

WARNER CHILCOTT COMPANY, LLC,
and HOFFMANN-LA ROCHE INC.,

               Plaintiffs,

        v.

MYLAN PHARMACEUTICALS, INC.,

               Defendant.

:      C. A. No. 10-285-LPS
:      C. A. No. 11-236-LPS

**A39**

WARNER CHILCOTT COMPANY, LLC,    :
and HOFFMANN-LA ROCHE INC.,    :
    :
        Plaintiffs,    :
    :    C. A. No. 09-61-LPS
    v.    :    C. A. No. 10-1085-LPS
    :
SUN PHARMA GLOBAL FZE,    :
    :
        Defendant.    :

### JUDGMENT IN A CIVIL CASE

At Wilmington this 1st day of **April, 2014**.

For the reasons set forth in the Court's Memorandum Opinion and Order dated

March 28, 2014 (D.I. 400, 401);

IT IS ORDERED AND ADJUDGED that judgment be and is hereby entered in

favor of Defendants and against Plaintiffs.

_____
UNITED STATES DISTRICT JUDGE


_____
(By) Deputy Clerk

2

**A40**

# TAB 6

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WARNER CHILCOTT COMPANY, LLC, and HOFFMANN-LA ROCHE INC., | : : : | |
| Plaintiffs, | : : | C. A. No. 08-627-LPS |
| v. | : : | C. A. No. 11-81-LPS (CONSOLIDATED) |
| TEVA PHARMACEUTICALS USA, INC., | : : | |
| Defendant. | : | |

| | | |
|---|---|---|
| WARNER CHILCOTT COMPANY, LLC, and HOFFMANN-LA ROCHE INC., | : : : | |
| Plaintiffs, | : : | C. A. No. 09-143-LPS |
| v. | : : | C. A. No. 10-1111-LPS |
| APOTEX, INC. and APOTEX CORP., | : : | |
| Defendants. | : | |

| | | |
|---|---|---|
| WARNER CHILCOTT COMPANY, LLC, and HOFFMANN-LA ROCHE INC., | : : : | |
| Plaintiffs, | : : | C. A. No. 10-285-LPS |
| v. | : : | C. A. No. 11-236-LPS |
| MYLAN PHARMACEUTICALS, INC., | : : | |
| Defendant. | : | |

**A41**

WARNER CHILCOTT COMPANY, LLC,    :
and HOFFMANN-LA ROCHE INC.,      :
                                 :
              Plaintiffs,        :
                                 :    C. A. No. 09-61-LPS
      v.                         :    C. A. No. 10-1085-LPS
                                 :
SUN PHARMA GLOBAL FZE,           :
                                 :
              Defendant.         :

## JUDGMENT IN A CIVIL CASE

At Wilmington this 1st day of **April, 2014**.

For the reasons set forth in the Court's Memorandum Opinion and Order dated

March 28, 2014 (D.I. 400, 401);

IT IS ORDERED AND ADJUDGED that judgment be and is hereby entered in

favor of Defendants and against Plaintiffs.

_____
UNITED STATES DISTRICT JUDGE


_____
(By) Deputy Clerk

2

**A42**

# TAB 7

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WARNER CHILCOTT COMPANY, LLC, and HOFFMANN-LA ROCHE INC., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | C. A. No. 08-627-LPS |
| v. | : | C. A. No. 11-81-LPS |
| | : | (CONSOLIDATED) |
| TEVA PHARMACEUTICALS USA, INC., | : | |
| | : | |
| Defendant. | : | |

---

| | | |
|---|---|---|
| WARNER CHILCOTT COMPANY, LLC, and HOFFMANN-LA ROCHE INC., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | C. A. No. 09-143-LPS |
| v. | : | C. A. No. 10-1111-LPS |
| | : | |
| APOTEX, INC. and APOTEX CORP., | : | |
| | : | |
| Defendants. | : | |

---

| | | |
|---|---|---|
| WARNER CHILCOTT COMPANY, LLC, and HOFFMANN-LA ROCHE INC., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | C. A. No. 10-285-LPS |
| v. | : | C. A. No. 11-236-LPS |
| | : | |
| MYLAN PHARMACEUTICALS, INC., | : | |
| | : | |
| Defendant. | : | |

---

**A43**

WARNER CHILCOTT COMPANY, LLC,  :
and HOFFMANN-LA ROCHE INC.,     :
                                :
              Plaintiffs,        :
                                :        C. A. No. 09-61-LPS
      v.                         :        C. A. No. 10-1085-LPS
                                :
SUN PHARMA GLOBAL FZE,           :
                                :
              Defendant.         :

## JUDGMENT IN A CIVIL CASE

At Wilmington this 15 day of **April, 2014.**

For the reasons set forth in the Court's Memorandum Opinion and Order dated

March 28, 2014 (D.I. 400, 401);

IT IS ORDERED AND ADJUDGED that judgment be and is hereby entered in

favor of Defendants and against Plaintiffs.

_____
UNITED STATES DISTRICT JUDGE


_____
(By) Deputy Clerk

2

**A44**

# TAB 8

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WARNER CHILCOTT COMPANY, LLC, and HOFFMANN-LA ROCHE INC., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | C. A. No. 08-627-LPS |
| v. | : | C. A. No. 11-81-LPS |
| | : | (CONSOLIDATED) |
| TEVA PHARMACEUTICALS USA, INC., | : | |
| | : | |
| Defendant. | : | |

_____

| | | |
|---|---|---|
| WARNER CHILCOTT COMPANY, LLC, and HOFFMANN-LA ROCHE INC., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | C. A. No. 09-143-LPS |
| v. | : | C. A. No. 10-1111-LPS |
| | : | |
| APOTEX, INC. and APOTEX CORP., | : | |
| | : | |
| Defendants. | : | |

_____

| | | |
|---|---|---|
| WARNER CHILCOTT COMPANY, LLC, and HOFFMANN-LA ROCHE INC., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | C. A. No. 10-285-LPS |
| v. | : | C. A. No. 11-236-LPS |
| | : | |
| MYLAN PHARMACEUTICALS, INC., | : | |
| | : | |
| Defendant. | : | |

_____

**A45**

WARNER CHILCOTT COMPANY, LLC,      :
and HOFFMANN-LA ROCHE INC.,         :
                                     :
                   Plaintiffs,       :
                                     :   C. A. No. 09-61-LPS
         v.                          :   C. A. No. 10-1085-LPS
                                     :
SUN PHARMA GLOBAL FZE,               :
                                     :
                   Defendant.        :

## JUDGMENT IN A CIVIL CASE

At Wilmington this $15$ day of **April, 2014**.

For the reasons set forth in the Court's Memorandum Opinion and Order dated

March 28, 2014 (D.I. 400, 401);

     IT IS ORDERED AND ADJUDGED that judgment be and is hereby entered in

favor of Defendants and against Plaintiffs.

_____
UNITED STATES DISTRICT JUDGE


_____
(By) Deputy Clerk

2

**A46**

# TAB 9

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

WARNER CHILCOTT COMPANY, LLC,   :
and HOFFMANN-LA ROCHE INC.,   :
      :
   Plaintiffs,   :
      :   C. A. No. 08-627-LPS
   v.   :   C. A. No. 11-81-LPS
      :   (CONSOLIDATED)
TEVA PHARMACEUTICALS USA, INC.,   :
      :
   Defendant.   :

---

WARNER CHILCOTT COMPANY, LLC,   :
and HOFFMANN-LA ROCHE INC.,   :
      :
   Plaintiffs,   :
      :   C. A. No. 09-143-LPS
   v.   :   C. A. No. 10-1111-LPS
      :
APOTEX, INC. and APOTEX CORP.,   :
      :
   Defendants.   :

---

WARNER CHILCOTT COMPANY, LLC,   :
and HOFFMANN-LA ROCHE INC.,   :
      :
   Plaintiffs,   :
      :   C. A. No. 10-285-LPS
   v.   :   C. A. No. 11-236-LPS
      :
MYLAN PHARMACEUTICALS, INC.,   :
      :
   Defendant.   :

---

WARNER CHILCOTT COMPANY, LLC,  :
and HOFFMANN-LA ROCHE INC.,  :
                           :
                Plaintiffs,  :
                           :     C. A. No. 09-61-LPS
        v.                   :     C. A. No. 10-1085-LPS
                           :
SUN PHARMA GLOBAL FZE,       :
                           :
                Defendant.  :

## JUDGMENT IN A CIVIL CASE

At Wilmington this 15 day of **April, 2014**.

For the reasons set forth in the Court's Memorandum Opinion and Order dated

March 28, 2014 (D.I. 400, 401);

IT IS ORDERED AND ADJUDGED that judgment be and is hereby entered in

favor of Defendants and against Plaintiffs.

_____
UNITED STATES DISTRICT JUDGE


_____
(By) Deputy Clerk

2

**A48**

# TAB 10

US007192938B2

(12) **United States Patent**
Bauss et al.

(10) **Patent No.:** US 7,192,938 B2
(45) **Date of Patent:** *Mar. 20, 2007

(54) **METHOD OF TREATMENT USING BISPHOSPHONIC ACID**

(75) Inventors: **Frieder Bauss**, Neuhofen (DE); **Bernhard Pichler**, Ketsch (DE); **Stephen Turley**, Bottmingen (CH)

(73) Assignee: **Hoffmann-La Roche Inc.**, Nutley, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/998,849**

(22) Filed: **Nov. 29, 2004**

(65) **Prior Publication Data**

US 2005/0075319 A1     Apr. 7, 2005

**Related U.S. Application Data**

(63) Continuation of application No. 10/430,007, filed on May 6, 2003.

(30) **Foreign Application Priority Data**

May 10, 2002   (EP)   ................................. 02010136

(51) **Int. Cl.**
*A61K 31/675* (2006.01)
*A61K 31/66* (2006.01)

(52) **U.S. Cl.** ........................ **514/89**; 514/102; 514/108

(58) **Field of Classification Search** ................. 514/108
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,962,432 A | 6/1976 | Schmidt-Dünker | |
| 4,054,598 A | 10/1977 | Blum et al. | |
| 4,267,108 A | 5/1981 | Blum et al. | |
| 4,327,039 A | 4/1982 | Blum et al. | |
| 4,407,761 A | 10/1983 | Blum et al. | |
| 4,621,077 A | 11/1986 | Rosini et al. | |
| 4,624,947 A | 11/1986 | Blum et al. | |
| 4,666,895 A | 5/1987 | Bosies et al. | |
| 4,705,651 A | 11/1987 | Staibano | |
| 4,719,203 A | 1/1988 | Bosies et al. | |
| 4,746,654 A | 5/1988 | Breliere et al. | |
| 4,761,406 A | 8/1988 | Flora et al. | |
| 4,777,163 A | 10/1988 | Bosies et al. | |
| 4,812,311 A | 3/1989 | Uchtman | |
| 4,876,248 A | 10/1989 | Breliere et al. | |
| 4,922,007 A | 5/1990 | Kieczykowski et al. | |

| | | | |
|---|---|---|---|
| 4,927,814 A | 5/1990 | Gall et al. | |
| 4,970,335 A | 11/1990 | Isomura et al. | |
| 4,971,958 A | 11/1990 | Bosies et al. | |
| 5,002,937 A | 3/1991 | Bosies et al. | |
| 5,018,651 A | 5/1991 | Hull et al. | |
| 5,019,651 A | 5/1991 | Kieczkowski | |
| 5,206,253 A | 4/1993 | Bosies et al. | |
| 5,344,825 A | 9/1994 | Khanna et al. | |
| 5,356,887 A | 10/1994 | Brenner | |
| 5,358,941 A | 10/1994 | Bechard et al. | |
| 5,431,920 A | 7/1995 | Bechard | |
| 5,462,932 A | 10/1995 | Brenner et al. | |
| 5,488,041 A | 1/1996 | Barbier et al. | |
| 5,882,656 A | 3/1999 | Bechard et al. | |
| 5,994,329 A | 11/1999 | Daifotis et al. | |
| 6,124,314 A | 9/2000 | Cameron et al. | |
| 6,143,326 A | 11/2000 | Mockel et al. | |
| 6,294,196 B1 | 9/2001 | Gabel et al. | |
| 6,419,955 B1 | 7/2002 | Rolf-Dieter et al. | |
| 6,432,932 B1 | 8/2002 | Daifotis et al. | |
| 6,468,559 B1 | 10/2002 | Chen et al. | |
| 6,544,967 B2 | 4/2003 | Daifotis et al. | |
| 6,573,252 B1 | 6/2003 | Del Soldato | |
| 6,638,920 B2 | 10/2003 | Thompson | |
| 6,680,307 B1 * | 1/2004 | Bauss et al. ................. 514/102 | |
| 6,692,764 B2 | 2/2004 | Katdare et al. | |
| 6,699,850 B2 | 3/2004 | Scolnick et al. | |
| 6,770,289 B2 | 8/2004 | Uria | |
| 6,838,584 B2 | 1/2005 | Blizzard et al. | |
| 7,008,640 B2 | 3/2006 | Watanabe et al. | |
| 2001/0051616 A1 | 12/2001 | Karpf et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

CA       2308532       12/2000

(Continued)

OTHER PUBLICATIONS

Merck & Co., NJ, USA, Merck Index 13th, 2001, No. 4899.

(Continued)

*Primary Examiner*—Raymond J. Henley, III
(74) *Attorney, Agent, or Firm*—George W. Johnston; Patricia S. Rocha-Tramaloni; David E. Wildman

(57) **ABSTRACT**

The present invention refers to a pharmaceutical composition of a bisphosphonic acid or salt thereof, and an excipient thereof, and a method of treating disorder characterized by pathologically increased bone resorption comprising orally administering at least 150% of the expected efficious daily dose of a bisphosphonic acid or a pharmaceutically acceptable salt thereof and one or more pharmaceutically acceptable excipients thereof and administering the dose at a period of one two or three consecutive days per month.

**30 Claims, No Drawings**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2002/0006441 | A1 | 1/2002 | Rolf-Dieter et al. |
| 2003/0118634 | A1 | 6/2003 | Schofield et al. |
| 2003/0139378 | A1 | 7/2003 | Daifotis et al. |
| 2003/0175340 | A1 | 9/2003 | McCallister et al. |
| 2003/0195171 | A1 | 10/2003 | Daifotis et al. |
| 2003/0225039 | A1 | 12/2003 | Bauss et al. |
| 2004/0087550 | A1 | 5/2004 | Zanetti et al. |
| 2004/0097469 | A1 | 5/2004 | Little et al. |
| 2004/0147484 | A1 | 7/2004 | Boyd et al. |
| 2005/0070504 | A1 | 3/2005 | Burgio, Jr. et al. |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2149052 | 3/2003 |
| EP | 022 751 | 1/1981 |
| EP | 170 228 | 2/1986 |
| EP | 197 478 | 10/1986 |
| EP | 252 504 | 1/1988 |
| EP | 252 505 | 1/1988 |
| EP | 258 618 | 3/1988 |
| EP | 273 190 | 7/1988 |
| EP | 350 002 | 1/1990 |
| EP | 1 135 140 | 8/2005 |
| GB | 2 153 225 | 8/1985 |
| WO | WO 96/17616 | 6/1996 |
| WO | WO 00/61111 | 10/2000 |
| WO | WO 01/01991 | 1/2001 |
| WO | WO 01/15703 | 3/2001 |
| WO | WO 01/76592 | 10/2001 |
| WO | WO 01/89494 A2 | 11/2001 |
| WO | WO 01/89494 A3 | 11/2001 |
| WO | WO 01/97788 A2 | 12/2001 |
| WO | WO 01/97788 A3 | 12/2001 |
| WO | WO 02/00204 | 1/2002 |
| WO | WO 2004/067063 | 8/2004 |

## OTHER PUBLICATIONS

Pharmaceutical Dosage Forms, 2nd Edition, 1989, vol. 1, p. 34.

Giron, D. Thermochimica Acta 248-1-59, Elsevier Science B.V., 1995, pp. 1-59.

Goodman & Gilman, Pharmacological Basis of Therapeutics, Ninth Edition, vol. 1, McGraw-Hill, pp. 47,58.

King, Robert E., Pharmaceutical Preparations and Their Manufacturing, Farmacia Practica de Remington, VII pp. 1912-1913.

Giron, D., Journal of Thermal Analysis and Calorimetry, vol. 64, Budapest-2001, p. 38.

Farmacia Remington, Chapter 76-Preformulation, 17 edition, 1987.

Ringe et al., Rheumatology (Oxford), 42(6):743-9 (2003) (PMID:12730532 Abstract).

Schimmer et al., Clin Ther., 25(1):19-34 (2003) (PMID:12637110 Abstract).

Body et al., Support Care Cancer, 10(5):399-407 (2002) (PMID:12136223 Abstract).

Bergner et al., Nephrol Dial Transplant, 17(7):1281-5 (2002) (PMID:12105253 Abstract).

Body et al., J. Clin. Oncol.,16(12):3890-9 (1998) (PMID:9850035 Abstract).

Quimby et al., J. Org. Chem., 32, pp. 4111-4114 (1967).

RUS, B.J., et al ,J. of Bone and Mineral Res., (2001) 16(10), pp. 1871-1878.

Delmas, P.D. et al, Calcified Tissue Intern (2003) 72(4), p. 332.

Chapurlat, R.D., et al, Expert Opinion on Pharmacotherapy, England (2003) 4(3), pp. 391-396.

Hyldstrup et al., Calcified Tissue Int., 53, pp. 297-300 (1993).

Bauss et al., J. Rheumatol., 29, pp. 990-998 (2002).

Monier-Faugere t al., J. Bone Miner. Res., 14, pp. 1768-2778 (1999).

Mazess, Lunar News, pp. 1 and 23 (1996).

Mazess, Lunar News, pp. 1 and 31 (1996).

Nies, A.S., and Spielberg, S.P. Principles of Therapeutics, In Hardman, J.G., and L.E. Limited (Eds.), Goodman & Gilman's the pharmacological bases of therapeutics, ninth edition, pp. 43-62, New York: McGraw-Hill (1996).

* cited by examiner

US 7,192,938 B2

1

## METHOD OF TREATMENT USING BISPHOSPHONIC ACID

### PRIORITY TO RELATED APPLICATIONS

This application is a Continuation of Ser. No. 10/430,007, filed May 6, 2003, which is now pending.

### FIELD OF THE INVENTION

The present invention refers to the use of bisphosphonic acids, especially of (1-hydroxy-3-(N-methyl-N-pentyl)aminopropylidene-1,1-bisphosphonic acid (ibandronic acid) or pharmaceutically acceptable salts thereof for the manufacture of pharmaceutical compositions for the prevention or the treatment of disorders characterized by pathologically increased bone resorption, especially for the prevention and treatment of osteoporosis.

### BACKGROUND OF THE INVENTION

Bones serve mainly as a support, and consequently bone is frequently regarded as a simple building material. However, bone is a complicated biomaterial adapted to a wide variety of requirements, stimuli and noxae to which it is exposed. Endoprostheses are available as substitutes for bones and joints. However, endoprostheses, even when biomechanically highly refined, do not have an active effect on the environmental and load factors.

A variety of disorders in humans and mammals involve or are associated with abnormal bone resorption. Such disorders include, but are not limited to, osteoporosis, Paget's disease, periprosthetic bone loss or osteolysis, and hypercalcemia of malignancy and metastatic bone disease. The most common of these disorders is osteoporosis, which in its most frequent manifestation occurs in postmenopausal women. Because osteoporosis, as well as other disorders associated with bone loss, are chronic conditions, it is believed that appropriate therapy will generally require chronic treatment.

Bisphosphonates, i.e. bisphosphonic acids or pharmaceutically acceptable salts thereof, are synthetic analogs of the naturally occurring pyrophosphate. Due to their marked affinity for solid-phase calcium phosphate, bisphosphonates bind strongly to bone mineral. Pharmacologically active bisphosphonates are well known in the art and are potent inhibitors of bone resorption and are therefore useful in the treatment and prevention of diseases involving abnormal bone resorption, especially osteoporosis, Paget's disease, hypercalcemia of malignancy, and metastatic and metabolic bone diseases.

Bisphosphonates as pharmaceutical agents are described for example in EP-A-170,228; EP-A-197,478; EP-A-22, 751; EP-A-252,504; EP-A-252,505; EP-A-258,618; EP-A-350,002; EP-A-273,190; and WO-A-90/00798, each of which are incorporated herein by reference.

Pharmaceutical forms of currently marketed bisphosphonates are oral formulations (tablets or capsules) or solutions for intravenous injection or infusion. They are systemically well tolerated when administered at therapeutic doses. However, bisphosphonates as a class are irritant to skin and mucous membranes and when given orally on a continuous basis may result in digestive tract side effects, e.g., esophageal adverse events or gastrointestinal disturbances. As a consequence, and due to their low oral bioavailability, the oral route of administration has, to date, had to follow inconvenient recommendations of use for the patient.

2

Bisphosphonates can be classified into two groups with different modes of action. Ibandronate belongs to the more potent nitrogen-containing bisphosphonates[Russell 1999 Russell R G G, Rogers M J. Bisphosphonates: From the laboratory to the clinic and back again. Bone 25(1):97–106 (1999); Rogers M J, Gordon S, Benford H L, Coxon F P, Luckman S P, Monkkonen J, Frith J C. Cellular Molecular mechanisms of action of bisphosphonates. Cancer 88 (12) Suppl:2961–2978 (2000)]. Ibandronate is one of the most potent bisphosphonates currently under clinical development in osteoporosis and metastatic bone diseases. In animal models of bone resorption, ibandronate is 2, 10, 50 and 500 times more potent than risedronate, alendronate, pamidronate, and clodronate respectively[Mühlbauer R. C., F. Bauss, R. Schenk, M. Janner, E. Bosies, K. Strein, and H. Fleisch. BM 21.0955 a potent new bisphosphonate to inhibit bone resorption. J. Bone Miner. Res. 6: 1003–1011 (1991)].

Ibandronate inhibits bone resorption without any impairment of mineralization (Mühlbauer et al Mühlbauer R. C., F. Bauss, R. Schenk, M. Janner, E. Bosies, K. Strein, and H. Fleisch. BM 21.0955 a potent new bisphosphonate to inhibit bone resorption. J. Bone Miner. Res. 6: 1003–1011 (1991).). It has been shown to decrease osteoclastic activity, thus inhibiting bone destruction. At high doses it also reduces the number of osteoclasts (Mühlbauer et al. Mühlbauer R. C., F. Bauss, R. Schenk, M. Janner, E. Bosies, K. Strein, and H. Fleisch. BM 21.0955 a potent new bisphosphonate to inhibit bone resorption. J. Bone Miner. Res. 6: 1003–1011 (1991)).

As described, bisphosphonates are accepted as providing strong efficacy in the management of osteoporosis. However, given the administration restrictions related to low oral bioavailability and potential for gastro-intestinal effects, there is a clear opportunity for regimens which offer improved convenience and flexibility, leading to a higher level of compliance and superior patient management/satisfaction. Intermitted regimens such as, for example, once weekly administration have been described in the art.

### SUMMARY OF THE INVENTION

It has now been found that the prevention or the treatment of disorders characterized by pathologically increased bone resorption such as osteoporosis, can be improved by a monthly administration of 50 to 250 mg of a bisphosphonate or pharmaceutical acceptable salt thereof, especially by a monthly administration of ibandronate, i.e., ibandronic acid or a pharmaceutically acceptable salt thereof.

The present invention is thus concerned with the use of a bisphosphonic acid or a pharmaceutical acceptable salt thereof, especially with the use of ibandronic acid or a pharmaceutical acceptable salt thereof, for the preparation of pharmaceutical compositions for the prevention or the treatment of disorders characterized by pathologically increased bone resorption, wherein the medicament comprises about 50 to 250 mg, preferably about 100 to 150 mg, of a bisphosphonic acid or a acceptable salt thereof; and orally administered in a period of one, two or three consecutive days per month.

Monthly oral treatment by administration of at least 120%, especially of 120% to 200%, of the expected efficacious daily dose offers incremental patient benefits with respect to convenience and compliance as well as superior results. Prior to the completion of the ibandronate clinical development program, no bisphosphonate had prospectively demonstrated fracture reduction efficacy with a drug-free interval beyond daily administration. In summary, it is quite unexpected that fracture reduction benefit can be derived

US 7,192,938 B2

3

from a monthly administration of an oral bisphosphonate with a single or multiple tablet administration scheme.

Accordingly, the present invention relates to the use of bisphosphonic acids or pharmaceutically acceptable salts, especially ibandronic acid or pharmaceutically acceptable salts thereof for the manufacture of a medicament for the prevention or treatment of disorders characterized by pathologically increased bone resorption, e.g. osteoporosis, wherein the medicament comprises at least 120% of the expected efficacious daily dose of a bisphosphonic acids or acceptable salts thereof and is administered on one, two or three consecutive days per month.

More preferably the invention comprises the use of ibandronic acid or pharmaceutically acceptable salts thereof for the manufacture of a medicament for the prevention or the treatment of disorders characterized by pathologically increased bone resorption wherein the medicament

a) comprises about 100 to about 150 mg of ibandronic acid or a pharmaceutically acceptable salt thereof and

b) is orally administered in a period of one, two or three consecutive days per month.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The term "bisphosphonic acid" means compounds characterized by two phosphonate groups linked by phosphoether bonds to a central (geminal) carbon atom. Such a P—C—P structure is represented by compound I (see, page 6). The use of a specific nomenclature in referring to the bisphosphonate or bisphosphonates is not meant to limit the scope of the present invention, unless specifically indicated.

The term "pharmaceutically acceptable" as used herein means that the salts or chelating agents are acceptable from a toxicity viewpoint.

The term "pharmaceutically acceptable salt" refers to ammonium salts, alkali metal salts such as potassium and sodium (including mono, di- and tri-sodium) salts (which are preferred), alkaline earth metal salts such as calcium and magnesium salts, salts with organic bases such as dicyclohexylamine salts, N-methyl-D-glucamine, and salts with amino acids such as arginine, lysine, and so forth.

The term "disorders characterized by pathologically increased bone resorption" refers to medically defined conditions with or without identifiable cause (such as post-menopausal osteoporosis, idiopathic juvenile osteoporosis, Klinefelter's syndrome; male osteoporosis; osteoporosis due to nutritional factors; organ transplant related osteoporosis; immobilization associated osteoporosis; inflammatory condition and cortico-steroid induced osteoporosis).

The term "one, two or three consecutive days per month" means administration of one to three dose proportional or non-dose proportional tablets on one, two or three consecutive days of the month, preferably on one day per month. As used herein, the term "month" is used in accordance with the generally accepted meaning as a measure of time amounting to approximately four (4) weeks, approximately 30 days, or approximately $\frac{1}{12}$ Of a calendar year.

The term "medicament" refers to a pharmaceutical composition. The term encompasses single or multiple administration schemes.

Preferably, the medicament is administered on one day per month. Preferably, the medicament is administered as a single dose, however, the scope of the present invention includes pharmaceutical compositions administered as multiple sub-doses such as on two consecutive day per month or on three consecutive days per month.

4

Preferably, the medicament comprises at least 100%, preferably 120% to 200% of the efficacious dose of bisphosphonic acids or pharmaceutically acceptable salts thereof, more preferably of ibandronic acid or pharmaceutically acceptable salts thereof.

The term "efficacious dose" refers to about 50 to about 250 mg, more preferably to about 100 to about 150 mg, of a bisphosphonate or a pharmaceutically acceptable salt thereof, for example, of ibandronic acid or a pharmaceutically acceptable salt thereof. As noted, the efficacious dose may be a single dose or multiple sub-doses. For example, if the efficacious dose is 150 mg, the dose may be one (1) 150 mg dose, two (2) 75 mg sub-doses administered on one day or on two consecutive days, or three (3) 50 mg sub-doses administered on one day or on two or three consecutive days; if the efficacious dose is 100 mg, the dose may include one (1) 100 mg dose, two (2) 50 mg sub-doses administered on one day or two consecutive days, preferably on two consecutive days.

"Bisphosphonic acids and pharmaceutically acceptable salts thereof" as pharmaceutical agents are described for example in U.S. Pat. Nos. 4,509,612; 4,666,895; 4,719,203; 4,777,163; 5,002,937 and 4,971,958 and in European Patent Applications Nos. 252,504 and 252,505, herein incorporated by reference for such description.

Methods for the preparation of bisphosphonic acids and pharmaceutically acceptable salts thereof may be found in, e.g., U.S. Pat. Nos. 3,962,432; 4,054,598; 4,267,108; 4,327,039; 4,407,761; 4,621,077; 4,624,947; 4,746,654; 4,970,335; 5,019,651; 4,761,406; 4,876,248; in J. Org. Chem. 32, 4111 (1967) and European Patent Application 252,504, herein incorporated by reference. The pharmaceutically acceptable salts of bisphosphonic acids may also be employed in the instant invention. Examples of base salts of bisphosphonic acids include ammonium salts, alkali metal salts such as potassium and sodium (including mono, di- and tri-sodium) salts (which are preferred), alkaline earth metal salts such as calcium and magnesium salts, salts with organic bases such as dicyclohexylamine salts, N-methyl-D-glucamine, and salts with amino acids such as arginine, lysine, and so forth. Non-toxic, physiologically acceptable salts are preferred. The salts may be prepared by methods known in the art, such as described in European Patent Application 252,504 or in U.S. Pat. No. 4,922,077, incorporated herein by reference.

In this invention, the medicament comprises 100 to 150 mg of a ibandronic acid or a pharmaceutically acceptable salt thereof. The pharmaceutical composition comprises at least 150% of a bisphosphonic acid or a pharmaceutically acceptable salt thereof, and one or more pharmaceutically acceptable excipients thereof. In one embodiment, the bisphosphonic acid is ibandronic acid. Preferably, the medicament is administered as a single dose.

In a preferred embodiment of the present invention, the term "bisphosphonate" of the present invention corresponds to compounds of general formula

$$P(O)(OH)_2 \diagdown \!\!\!\!\diagup A \atop P(O)(OH)_2 \diagup \!\!\!\!\diagdown X \qquad \text{(I)}$$

wherein A and X are independently selected from the group consisting of hydrogen, hydroxy, halogen, amino, SH, phe-

US 7,192,938 B2

5

nyl, alkyl, mono- or dialkylamino, mono- or dialkylaminoalkyl, alkoxy, thioalkyl, thiophenyl, and aryl or heteroaryl moieties selected from the group consisting of phenyl, pyridyl, furanyl, pyrrolidinyl, imidazolyl, and benzyl, wherein the aryl or heteroaryl moiety is optionally substituted with alkyl.

In the foregoing chemical formula, A can include X, and X include A such that the two moieties can form part of the same cyclic structure.

The foregoing chemical formula is also intended to encompass carbocyclic, aromatic and heteroaromatic structures for the A and/or X substituents, e.g. naphthyl, quinolyl, isoquinolyl, adamantyl, and chlorophenylthio.

Preferred structures are those in which A is selected from the group consisting of hydrogen, hydroxy, and halogen, an X is selected from the group consisting of alkyl, halogen, thiophenyl, thioalkyl and dialkylaminoalkyl.

More preferred structures are those in which A is selected from the group consisting of hydrogen, hydroxy, and Cl and X is selected from the group consisting of alkyl, Cl, chlorophenylthio and dialkylaminoalkyl.

The preferred bisphosphonic acid or pharmaceutically acceptable salt is selected from the group consisting of alendronate, cimadronate, clodronate, tiludronate, etidronate, ibandronate, incadronate, minodronate, neridronate, olpadronate, risedronate, pamidronate, piridronate, zolendronate, EB-1053 or acceptable salts thereof, e.g., ibandronic acid, monosodium salt, monohydrate.

Ibandronic acid (1-hydroxy-3-(N-methyl-N-pentyl)aminopropylidene-1,1-bisphosphonic acid) or physiologically compatible salts thereof are particularly preferred, e.g., ibandronic acid, monosodium salt, monohydrate.

The bisphosphonates and pharmaceutically acceptable salts may be administered alone or in combination with other bone active drugs, either in fixed combinations or separately both physically and in time, including hormones, such as a steroid hormone, e.g., an estrogen; a partial estrogen agonist, or estrogen-gestagen combination; a calcitonin or analogue or derivative thereof, e.g., salmon, eel or human calcitonin parathyroid hormone or analogues thereof, e.g., PTH (1-84), PTH (1-34), PTH (1-36), PTH (1-38), PTH (1-31) or PPTS 893; a SERM (Selective Estrogen Receptor Modulator), e.g., raloxifene, lasofoxifene, TSE-434, FC1271, tibolone, vitamin D or an analog. Such additional bone active drugs may be administered more frequently than the bisphosphonate.

Appropriate pharmaceutical compositions are known in the art and have been described e.g., in U.S. Pat. Nos. 6,143,326 and 6,294,196, herein incorporated by reference.

For the preparation of tablets, coated tablets, drageés or hard gelatine capsules, the compounds of the present invention may be admixed with pharmaceutically inert, inorganic or organic excipients. Examples of suitable excipients for tablets, drageés or hard gelatine capsules include lactose, maize starch or derivatives thereof, talc or stearic acid or salts thereof.

The pharmaceutical compositions may also contain preserving agents, solubilizing agents, stabilizing agents, wetting agents, emulsifiers, sweeteners, colorants, odorants, salts for the variation of osmotic pressure, buffers, coating agents or antioxidants. They may also contain other therapeutically valuable agents. Preferably, the pharmaceutical composition is a film coated tablet wherein the tablet core comprises 50 to 200 mg of a bisphosphonic acid or a pharmaceutically acceptable salt thereof as defined above and one or more pharmaceutically acceptable excipients selected from the group consisting of lactose, polyvinylpyr-

6

rolidone, microcrystalline cellulose, crospovidone, stearic acid, silicon dioxide and the tablet core comprises one or more pharmaceutically acceptable excipients selected from the group consisting of hydroxypropyl methylcellulose, titanium dioxide, talc and polyethylene glycol 6000. These compositions are known in the art and described for example in U.S. Pat. Nos. 6,143,326 and 6,294,196.

Another aspect of the present invention is a method for treating, reducing or preventing disorders characterized by pathologically increased bone resorption comprising to a mammal administration of an effective amount of bisphosphonic acids or acceptable salts thereof. In particular, the invention refers to a method for treating, reducing or preventing disorders characterized by pathologically increased bone resorption comprising oral administration of an effective amount of a bisphosphonic acid or a pharmaceutically acceptable salt thereof, wherein approximately 50 to 250 mg bisphosphonic acid or a pharmaceutically acceptable salt thereof are administered on one, two or three consecutive days per month. As noted above, the effective amount of bisphosphonic acid or pharmaceutically acceptable salt thereof may be administered as a single dose or as multiple sub-doses.

Preferably, in the method comprises administration of about 50 to 250 mg, preferably about 100 to 150 mg, of a bisphosphonate or a pharmaceutically acceptable salt thereof on one, two or three consecutive days per month. While the method includes administration of the dose through multiple sub-dosing, the preferred method provides a single dose. Examples for administration of the dose through multiple sub-dosing are as follows, if the efficacious dose is 150 mg, the dose may be two (2) 75 mg sub-doses administered on one day or on two consecutive days, or three (3) 50 mg sub-doses administered on one day or on two or three consecutive days; if the efficacious dose is 100 mg, the dose may be two (2) 50 mg sub-doses administered on one day or two consecutive days, preferably on two consecutive days. The preferred bisphosphonate is ibandronate or a pharmaceutically acceptable salt thereof, e.g., ibandronic acid, monosodium salt, monohydrate.

Preferably, in the method according to the present invention, the bisphosphonic acid is selected from the group consisting of alendronate, cimadronate, clodronate, tiludronate, etidronate, ibandronate, incadronate, minodronate, neridronate, olpadronate, risedronate, pamidronate, piridronate, zolendronate, EB-1053 or pharmaceutical acceptable salts thereof. More preferably, the bisphosphonic acid is ibandronate or a pharmaceutically acceptable salt thereof, e.g. ibandronic acid, monosodium salt, monohydrate.

The invention will now be explained with reference to exemplified embodiments.

EXAMPLES

Example 1

Pharmaceutical Composition

The Example shows the composition of a 50 mg tablet. The composition and preparation of these tablets is known in the art and described for example in U.S. Pat. Nos. 6,143,326 and 6,294,196.

Other compositions may be prepared by adjusting the ingredients according to the amount of bisphosphonate, e.g. ibandronic acid, monosodium salt, monohydrate.

US 7,192,938 B2

7      8

| 50 mg film-coated tablet | |
| --- | --- |
| Components | mg per tablet |
| Tablet core: | |
| Ibandronic acid, monosodium salt, monohydrate | 56.250 |
| Lactose monohydrate | 92.750 |
| Povidone K 25 | 5.000 |
| Microcrystalline cellulose | 30.000 |
| Crospovidone | 10.000 |
| Purified stearic acid | 4.000 |
| Colloidal silicon dioxide | 2.000 |
| Tablet coat: | |
| Hydroxypropyl methylcellulose | 5.1425 |
| Titanium dioxide | 2.4650 |
| Talc | 0.8925 |
| Polyethylene glycol 6,000 | 1.5000 |
| Final weight: | 210.000 |

What is claimed is:

1. A method for treating or inhibiting osteoporosis comprising commencing treatment by orally administering to a subject in need of such treatment, a first dose, on a single day, of a pharmaceutical composition comprising from about 100 mg to about 150 mg of bisphosphonic acid or an amount of a pharmaceutically acceptable salt thereof that is equivalent to about 100 mg to about 150 mg of said bisphosphonic acid and continuing said treatment by orally administering, once monthly on a single day, a pharmaceutical composition comprising from about 100 mg to about 150 mg of bisphosphonic acid or an amount of a pharmaceutically acceptable salt thereof that is equivalent to from about 100 mg to about 150 mg of bisphosphonic acid.

2. The method according to claim 1, wherein the pharmaceutical composition comprises about 100 mg of bisphosphonic acid or an amount of a pharmaceutically acceptable salt thereof that is equivalent to about 100 mg of bisphosphonic acid.

3. The method according to claim 1, wherein the pharmaceutical composition comprises about 150 mg of bisphosphonic acid or an amount of a pharmaceutically acceptable salt thereof that is equivalent to about 150 mg of bisphosphonic acid.

4. The method of claim 1, wherein the pharmaceutical composition comprises 100 mg of bisphosphonic acid or an amount of a pharmaceutically acceptable salt thereof that is equivalent to 100 mg of bisphosphonic acid.

5. The method of claim 1 wherein the pharmaceutical composition comprises 150 mg of bisphosphonic acid or an amount of a pharmaceutically acceptable salt thereof that is equivalent to 150 mg of bisphosphonic acid.

6. The method of claim 1 wherein said bisphosphonic acid is risedronic acid or a pharmaceutically acceptable salt thereof.

7. The method of claim 2 wherein said bisphosphonic acid is risedronic acid or a pharmaceutically acceptable salt thereof.

8. The method of claim 3 wherein said bisphosphonic acid is risedronic acid or a pharmaceutically acceptable salt thereof.

9. The method of claim 5 wherein said bisphosphonic acid is risedronic acid or a pharmaceutically acceptable salt thereof.

10. The method of claim 1 wherein said pharmaceutical composition is a solid pharmaceutical composition.

11. The method of claim 3 wherein said pharmaceutical composition is a solid pharmaceutical composition.

12. The method of claim 5 wherein said pharmaceutical composition is a solid pharmaceutical composition.

13. The method of claim 6 wherein said pharmaceutical composition is a solid pharmaceutical composition.

14. The method of claim 8 wherein said pharmaceutical composition is a solid pharmaceutical composition.

15. The method of claim 9 wherein said pharmaceutical composition is a solid pharmaceutical composition.

16. A method for treating or inhibiting osteoporosis consisting of orally administering to a subject in need of such treatment, once monthly, a pharmaceutical composition comprising from about 100 mg to about 150 mg of bisphosphonic acid or an amount of a pharmaceutically acceptable salt thereof that is equivalent to about 100mg to about 150mg of said bisphosphonic acid.

17. The method according to claim 16, wherein the pharmaceutical composition comprises about 100 mg of bisphosphonic acid or an amount of a pharmaceutically acceptable salt thereof that is equivalent to about 100 mg of bisphosphonic acid.

18. The method according to claim 16, wherein the pharmaceutical composition comprises about 150 mg of bisphosphonic acid or an amount of a pharmaceutically acceptable salt thereof that is equivalent to about 150 mg of bisphosphonic acid.

19. The method of claim 16 wherein the pharmaceutical composition comprises 100 mg of bisphosphonic acid or an amount of a pharmaceutically acceptable salt thereof that is equivalent to 100 mg of bisphosphonic acid.

20. The method of claim 16 wherein the pharmaceutical composition comprises 150 mg of bisphosphonic acid or an amount of a pharmaceutically acceptable salt thereof that is equivalent to 150 mg of bisphosphonic acid.

21. The method of claim 16 wherein said bisphosphonic acid is risedronic acid or a pharmaceutically acceptable salt thereof.

22. The method of claim 17 wherein said bisphosphonic acid is risedronic acid or a pharmaceutically acceptable salt thereof.

23. The method of claim 18 wherein said bisphosphonic acid is risedronic acid or a pharmaceutically acceptable salt thereof.

24. The method of claim 20 wherein said bisphosphonic acid is risedronic acid or a pharmaceutically acceptable salt thereof.

25. The method of claim 16 wherein said pharmaceutical composition is a solid pharmaceutical composition.

26. The method of claim 18 wherein said pharmaceutical composition is a solid pharmaceutical composition.

27. The method of claim 20 wherein said pharmaceutical composition is a solid pharmaceutical composition.

28. The method of claim 16 wherein said pharmaceutical composition is a solid pharmaceutical composition.

29. The method of claim 18 wherein said pharmaceutical composition is a solid pharmaceutical composition.

30. The method of claim 20 wherein said pharmaceutical composition is a solid pharmaceutical composition. once monthly on a single day, a pharmaceutical composition comprising from about 100 mg to about 150 mg of bisphosphonic acid acceptable salt thereof that is equivalent to from about 100 mg to about 150 mg of bisphosphonic acid.

\* \* \* \* \*

# UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO.  : 7,192,938 B2       Page 1 of 1
APPLICATION NO. : 10/998849
DATED    : March 20, 2007
INVENTOR(S)  : Bauss et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 8, Claim 28, line 54, delete "16" and insert --21-- therefor.

Column 8, Claim 29, line 56, delete "18" and insert --23-- therefor.

Column 8, Claim 30, line 58, delete "20" and insert --24-- therefor.

Column 8, Claim 30, lines 61-65, delete "once monthly on a single day, a pharmaceutical composition comprising from about 100 mg to about 150 mg of bisphosphonic acid acceptable salt thereof that is eguivalent to from about 100 mg to about 150 mg of bisphosphonic acid."

Signed and Sealed this

Nineteenth Day of June, 2007

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

**A116**

# TAB 11

US007718634B2

(12) **United States Patent**
Bauss et al.

(10) Patent No.: **US 7,718,634 B2**
(45) Date of Patent: *May 18, 2010

(54) **METHOD OF TREATMENT USING BISPHOSPHONIC ACID**

(75) Inventors: **Frieder Bauss**, Neuhofen (DE);
**Bernhard Pichler**, Ketsch (DE);
**Stephen Turley**, Bottmingen (CH)

(73) Assignee: **Hoffman-La Roche Inc.**, Nutley, NJ
(US)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 0 days.

This patent is subject to a terminal dis-
claimer.

(21) Appl. No.: **12/139,587**

(22) Filed: **Jun. 16, 2008**

(65) **Prior Publication Data**

US 2008/0249069 A1    Oct. 9, 2008

**Related U.S. Application Data**

(63) Continuation of application No. 10/430,007, filed on
May 6, 2003, now Pat. No. 7,410,957.

(30) **Foreign Application Priority Data**

May 10, 2002    (EP)    .................................. 02010136

(51) **Int. Cl.**
*A61K 31/675*    (2006.01)
(52) **U.S. Cl.** ..................................................... **514/108**
(58) **Field of Classification Search** .................. 514/108
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,962,432 A | 6/1976 | Schmidt-Dünker |
| 4,054,598 A | 10/1977 | Blum et al. |
| 4,267,108 A | 5/1981 | Blum et al. |
| 4,327,039 A | 4/1982 | Blum et al. |
| 4,407,761 A | 10/1983 | Blum et al. |
| 4,621,077 A | 11/1986 | Rosini et al. |
| 4,624,947 A | 11/1986 | Blum et al. |
| 4,666,895 A | 5/1987 | Bosies et al. |
| 4,705,651 A | 11/1987 | Staibano |
| 4,719,203 A | 1/1988 | Bosies et al. |
| 4,746,654 A | 5/1988 | Breliere et al. |
| 4,761,406 A | 8/1988 | Flora et al. |
| 4,777,163 A | 10/1988 | Bosies et al. |
| 4,812,311 A | 3/1989 | Uchtman |
| 4,876,248 A | 10/1989 | Beliere et al. |
| 4,922,007 A | 5/1990 | Kieczykowski et al. |
| 4,927,814 A | 5/1990 | Gall et al. |
| 4,970,335 A | 11/1990 | Isomura et al. |
| 4,971,958 A | 11/1990 | Bosies et al. |
| 5,002,937 A | 3/1991 | Bosies et al. |
| 5,018,651 A | 5/1991 | Hull et al. |
| 5,019,651 A | 5/1991 | Kieczykowski |
| 5,206,253 A | 4/1993 | Bosies et al. |
| 5,344,825 A | 9/1994 | Khanna et al. |
| 5,356,887 A | 10/1994 | Brenner |

| | | | |
|---|---|---|---|
| 5,358,941 A | 10/1994 | Bechard et al. |
| 5,431,920 A | 7/1995 | Bechard |
| 5,462,932 A | 10/1995 | Brenner et al. |
| 5,488,041 A | 1/1996 | Barbier et al. |
| 5,622,721 A | 4/1997 | Dansereau et al. |
| 5,730,715 A | 3/1998 | Sage et al. |
| 5,882,656 A | 3/1999 | Bechard et al. |
| 5,965,547 A | 10/1999 | Goodship et al. |
| 5,994,329 A | 11/1999 | Daifotis et al. |
| 6,015,801 A | 1/2000 | Daifotis et al. |
| 6,124,314 A | 9/2000 | Cameron et al. |
| 6,143,326 A | 11/2000 | Möckel et al. |
| 6,225,294 B1 | 5/2001 | Daifotis et al. |
| 6,294,196 B1 | 9/2001 | Gabel et al. |
| 6,331,533 B1 | 12/2001 | Harvey et al. |
| 6,333,316 B1 | 12/2001 | Daifotis et al. |
| 6,419,955 B1 | 7/2002 | Rolf-Dieter et al. |
| 6,432,932 B1 | 8/2002 | Daifotis et al. |
| 6,455,514 B2 | 9/2002 | Du Mesnil et al. |
| 6,468,559 B1 | 10/2002 | Chen et al. |
| 6,456,443 B2 | 11/2002 | Daifotis et al. |
| 6,544,967 B2 | 4/2003 | Daifotis et al. |
| 6,572,874 B1 | 6/2003 | Harrison et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2308532 | 12/2000 |

(Continued)

OTHER PUBLICATIONS

Quimby et al., J. Org. Chem., 32, pp. 4111-4114 (1967).

(Continued)

*Primary Examiner*—Raymond J Henley, III
(74) *Attorney, Agent, or Firm*—George W. Johnston; Patricia
S. Rocha-Tramaloni; David E. Wildman

(57) **ABSTRACT**

The present invention refers to a pharmaceutical composition
of a bisphosphonic acid or salt thereof, and an excipient
thereof, and a method of treating disorder characterized by
pathologically increased bone resorption comprising orally
administering at least 150% of the expected efficious daily
dose of a bisphosphonic acid or a pharmaceutically accept-
able salt thereof and one or more pharmaceutically acceptable
excipients thereof and administering the dose at a period of
one two or three consecutive days per month.

**10 Claims, No Drawings**

US 7,718,634 B2

Page 2

### U.S. PATENT DOCUMENTS

| 6,573,252 | B1 | 6/2003 | Del Soldato |
| 6,638,920 | B2 | 10/2003 | Thompson |
| 6,680,307 | B1 | 1/2004 | Bauss et al. |
| 6,692,764 | B2 | 2/2004 | Katdare et al. |
| 6,699,850 | B2 | 3/2004 | Reszka et al. |
| 6,750,213 | B2 | 6/2004 | DiNinno et al. |
| 6,770,289 | B2 | 8/2004 | Uria |
| 6,793,934 | B1 | 9/2004 | Burnside et al. |
| 6,838,584 | B2 | 1/2005 | Blizzard et al. |
| 7,008,640 | B2 | 3/2006 | Watanabe et al. |
| 7,410,957 | B2 * | 8/2008 | Bauss et al. ................ 514/108 |
| 2001/0036936 | A1 | 11/2001 | Day et al. |
| 2001/0051616 | A1 | 12/2001 | Karpf et al. |
| 2002/0006441 | A1 | 1/2002 | Gabel et al. |
| 2003/0118634 | A1 | 6/2003 | Schofield et al. |
| 2003/0139378 | A1 | 7/2003 | Daifotis et al. |
| 2003/0175340 | A1 | 9/2003 | McCallister et al. |
| 2003/0181421 | A1 | 9/2003 | Horowitz et al. |
| 2003/0195171 | A1 | 10/2003 | Daifotis et al. |
| 2003/0225039 | A1 | 12/2003 | Bauss et al. |
| 2004/0087550 | A1 | 5/2004 | Zanetti et al. |
| 2004/0097469 | A1 | 5/2004 | Little et al. |
| 2004/0147484 | A1 | 7/2004 | Boyd et al. |
| 2005/0070504 | A1 | 3/2005 | Burgio, Jr. et al. |
| 2005/0165039 | A1 | 7/2005 | Meissner et al. |

### FOREIGN PATENT DOCUMENTS

| CA | 2149052 | 3/2003 | |
| EP | 022 751 | 1/1981 | |
| EP | 170 228 | 2/1986 | |
| EP | 197 478 | 10/1986 | |
| EP | 252 504 | 1/1988 | |
| EP | 252 505 | 1/1988 | |
| EP | 258 618 | 3/1988 | |
| EP | 273 190 | 7/1988 | |
| EP | 282 320 | 9/1988 | |
| EP | 350 002 | 1/1990 | |
| EP | 1 135 140 | 8/2005 | |
| GB | 2 153 225 | 8/1985 | |
| WO | WO 93/11786 | 6/1993 | |
| WO | WO 94/00129 | 1/1994 | |
| WO | WO 95/29679 | 11/1995 | |
| WO | WO 96/17616 | 6/1996 | |
| WO | WO 96/19998 | 7/1996 | |
| WO | WO 97/39755 | 10/1997 | |
| WO | WO 99/04773 | 2/1999 | |
| WO | WO 99/18972 | 4/1999 | |
| WO | WO 00/21540 | 4/2000 | |
| WO | WO 00/21541 | 4/2000 | |
| WO | WO 00/61111 | 10/2000 | |
| WO | WO 00/61230 | 10/2000 | |
| WO | WO 00/71104 | 11/2000 | |
| WO | WO 01/01991 | 1/2001 | |
| WO | WO 01/15703 | 3/2001 | |
| WO | WO 01/28524 | 4/2001 | |
| WO | WO 01/32185 | 5/2001 | |
| WO | WO 01/76592 | A1 | 10/2001 |
| WO | WO 01/82903 | 11/2001 | |
| WO | WO 01/85217 | 11/2001 | |
| WO | WO 01/89494 | A2 | 11/2001 |
| WO | WO 01/89494 | A3 | 11/2001 |
| WO | WO 01/97788 | A2 | 12/2001 |
| WO | WO 01/97788 | A3 | 12/2001 |
| WO | WO 02/00204 | 1/2002 | |
| WO | WO 02/32377 | 4/2002 | |
| WO | WO 03/095029 | 11/2003 | |
| WO | WO 2004/056373 | 7/2004 | |
| WO | WO 2004/067063 | 8/2004 | |

### OTHER PUBLICATIONS

Riis, B.J., et al., J. of Bone and Mineral Res., (2001) 16(10), pp. 1871-1878.

Delmas, P.D. et al, Calcified Tissue Intern (2003) 72(4), pp. 332.

Chapurlat, R.D., et al, Expert Opinion on Pharmacotherapy, England (2003) 4(3), pp. 391-396.

Hyldstrup et al., Calcified Tissue Int., 53, pp. 297-300 (1993).

Mazess, Lunar News, pp. 1 and 23 (1996).

Mazess, Lunar News, pp. 1 and 31 (1996).

Ringe et al., Rheumatology (Oxford), 42(6):743-9 (2003) (PMID:12730532 Abstract).

Schimmer et al., Clin Ther., 25(1):19-34 (2003) (PMID:12637110 Abstract).

Body et al., Support Care Cancer, 10(5):399-407 (2002) (PMID:12136223 Abstract).

Bergner et al., Nephrol Dial Transplant, 17(7):1281-5 (2002) (PMID:12105253 Abstract).

Body et al., J. Clin. Oncol.,16(12):3890-9 (1998) (PMID:9850035 Abstract).

Merck & Co., NJ, USA, Merck Index 13th, 2001, No. 4899.

Pharmaceutical Dosage Forms, 2nd Edition, 1989, vol. 1, pp. 34.

Giron, D., Thermochimica Acta 248-1-59, Elsevier Science B.V., 1995, pp. 1-59.

Goodman & Gilman, Pharmacological Basis of Therapeutics, Ninth Edition, vol. 1, McGraw-Hill, pp. 47,58.

King,R.E., Pharmaceutical Preparations and Their Manufacturing, Farmacia Practica de Remington, VII, pp. 1912-1913.

Giron, D., Journal of Thermal Analysis and Calorimetry, vol. 64, Budapest-2001, pp. 38.

Farmacia Remington, Chapter 76—Preformulation, 17 edition, 1987.

Monier-Faugere t al., J. Bone Miner. Res., 14, pp. 1768-2778 (1999).

Nies, A.S., and Spielberg, S.P., Principles of Therapeutics, In Hardman, J.G., and L.E. Limited (Eds.), Goodman & Gilman's the pharmacological bases of therapeutics, ninth edition, pp. 43-62, New York: McGraw-Hill (1996).

Pharmaceutical Dosage Forms, 2nd Edition, 1989, vol. 1, pp. 34.

Therapeutic Dictionary of Washington University, (1995), pp. 596, Woodley M et al. (only in Cyrillic).

Harris St et al., Jour. Amer. Med. Assoc., (1999) 282(14), pp. 1344-1352.

Watts et al., Bone, (1999) 24(1) pp. 65-68.

Encyclopaedia of Medicaments M.RLS, (2001) 337, only in Cyrillic.

Encyclopaedia of Medicaments M.RLS, (2001) 151, only in Cyrillic.

Seedor et al., J. Bone Min. Res., (1991) 6(4) pp. 339-346.

Bauss et al., Bone, (1995) 17, 597, Abstract.

Bauss et al., J. Bone Min. Res., (1996) 11, Suppl 1, 336, M618, Abstract.

Bauss et al., Osteoporos Int., (2004) 15, pp. 423-433, Abstract.

Bell et al., Endocrine, 6, pp. 203-206 (1997).

Berenson et al., Clinical Cancer Research, 7, pp. 478-485 (2001).

Black, D., Twenty-Third Annual Meeting of the ASBMR, 2001.

Filipponi et al., Journal of Bone and Mineral Research, 10, pp. 697-703 (1995).

Fleisch, H., Osteoporosis International, 6, pp. 166-170 (1996).

Krause, C., Chemical Market Reporter, Dec. 17, 2001 at 10.

Mazess, Lunar News 27 (Spring 1999).

Mazess, Lunar News 32 (Winter 2000).

Rosen, C.J., Rev. Endocrine & Metabolic Disorders, 1, pp. 35-43 (2001).

Smith et al., J. Bone and Mineral Research, Abstract A370, p. 402 (1999).

Thiebaud et al., American Journal of Medicine, 103, pp. 298-307 (1997).

Muhlbauer et al., Journal of Bone and Mineral Research, 6, pp. 1003-1011 (1991).

Mazess, Lunar News (Spring 1997).

Kabachnik et al., Russian Chemical Reviews, 43, pp. 733-744 (1974) (Translated from Uspekhi Khimii, 43, 1554-1574 (1974).

Statement of Law and Facts Alleging Obviousness of U.S. Patent 7,192,938 by Generic Pharmaceutical Company.

2003 PDR Monograph for Fosamax®.

2003 PDR Monograph for Actonel®.

2003 PDR Monograph for Skelid®.

Lindsay et al., Osteoporosis International, vol. 13 Suppl. 1, Apr. 2002, Abstract P41SA, p. S16.

Felsenberg et al., Osteoporosis International, vol. 13 Suppl. 1, Apr. 2002, Abstract P42SU, p. S16-S17.

Bonefos®, International prescribing information, Revised Mar. 17, 2006.

Brown et al., Calcif. Tissue Int., 71, pp. 103-111 (2002).

Schnitzer et al., Aging Clin. Exp. Res., 12, pp. 1-12 (2000).

Bauss et al., Journal of Rheumatology, vol. 29, No. 10, pp. 2200-2208 (2002).

Bergner et al., Nephrology Dialysis Transplantation, vol. 170, pp. 1281-1285 (2002).

Bidstrup et al., Bone, vol. 26, No. 3:33S, Supplement (2000), Abstract B23.

Compact Oxford English Dictionary definition of the term 'once'.

Dooley et al., Drugs, vol. 57(1), pp. 101-108 (1999).

Epstein, Current Osteoporosis Reports, vol. 4, pp. 14-20 (2006).

Peterson, "Trends-in-Medicine", American Society for Bone and Mineral Research, San Antonio, Texas at pp. 1-6 (2002).

Recker et al., 26th Annual Meeting of the American Society for Bone and Mineral Research, Abstract F406 (2004).

Rote Liste 2000, Rote Liste® Service GmbH, Frankfurt/Germany, Paragraph 68018 (2000).

Smith, S.Y., Bone, vol. 32, No. 1, pp. 45-55 (2003).

Tanko et al., Bone, vol. 32, pp. 421-426 (2003).

Zeke, Andrew, Declaration of.

Bauss et al., Drugs Fut., 19(1), pp. 13 (1994).

Abstracts from the 5th Workshop on Bisphosphonates, Bone, vol. 26, No. 3 Supplement, pp. 27S-42S (2000).

Bone et al., Clinical Therapeutics, 22(1), pp. 15-28 (2000).

Burgio et al., Clinical Pharmacology & Therapeutics, 71(2), at P32, Abstract No. MPI-104 (2002).

Delmas et al., IOF World Congress on Osteoporosis, Lisbon, Portugal, May 10-14; Osteoporosis International, vol. 13, Supplement 1, 2002, published Apr. 2002, p. S15.

Fleisch, Annals in Medicine, 29, 55, pp. 55-62 (1997).

Hochberg et al., Journal of Clinical Endocrinology & Metabolism, 84(4), pp. 1586-1592 (2002).

Kendler et al., Osteoporosis Int., 13 (Suppl. 1), S 32 (Abstract P92SA) (Apr. 2002).

Lalla et al., Journal of Bone and Mineral Research, 11 (Suppl 1), p. S336, Abstract M617 (1996).

Liberman et al., New England Journal of Medicine, 333(22), pp. 1437-1443 (1995).

Ravn et al., Bone, 19/5, pp. 527-533 (1996).

Storm et al., N.E. J. Med., 322, pp. 1265-1271 (1990).

Watts et al., N.E. J. Med., 323, pp. 73-79 (1990).

Guidelines for preclinical and clinical evaluation of agents used in the prevention of postmenopausal osteoporosis, Division of Metabolic and Endocrine Drug Products, Food and Drug Admin., (Apr. 1994); available at http://www.fda.gov/cder/guidanceosteo.pdf.

Guidelines for preclinical evaluation and clinical trials in osteoporosis, World Health Organization, Geneva (1998).

Etidronate disodium (Didronel) prescribing information.

Electronic Orange Book (http://www.fda.gov/cder/ob/default.htm), listing of tiludronate sodium (Skelid).

Reginster et al., Arthritis and Rheumatism, 35, pp. 967-974 at 973 (1992).

Statement of Law and Facts Alleging Invalidity of U.S. Patent 7,410,957 made by Generic Pharmaceutical Company (#1).

Statement of Law and Facts Alleging Invalidity of U.S. Patent 7,410,957 made by Generic Pharmaceutical Company (#2).

Statement of Law and Facts Alleging Invalidity of U.S. Patent 7,410,957 made by Generic Pharmaceutical Company (#3).

Statement of Law and Facts Alleging Invalidity of U.S. Patent 7,410,957 made by Generic Pharmaceutical Company (#4).

Statement of Law and Facts Alleging Invalidity of U.S. Patent 7,410,957 made by Generic Pharmaceutical Company (#5).

Statement of Law and Facts Alleging Invalidity of U.S. Patent 7,410,957 made by Generic Pharmaceutical Company (#6).

Statement of Law and Facts Alleging Invalidity of U.S. Patent 7,410,957 made by Generic Pharmaceutical Company (#7).

Statement of Law and Facts Alleging Invalidity of U.S. Patent 7,410,957 made by Generic Pharmaceutical Company (#8).

Opposition Brief filed against EP 1506041 B1 by Gedeon Richter Plc.

Opposition Brief filed against EP 1506041 B1 by Generics Ltd.

Opposition Brief filed against EP 1506041 B1 by Laboratorios Liconsa, S.A.

Opposition Brief filed against EP 1506041 B1 by Pliva Hrvatska.

Opposition Brief filed against EP 1506041 B1 by Ratiopharm GmbH.

Opposition Brief filed against EP 1506041 B1 by Synthon.

Opposition Brief filed against EP 1506041 B1 by Alfred Tiefenbacher (GmbH & Co. KG).

Opposition Brief filed against EP 1506041 B1 by Teva Pharmaceutical Industries Ltd.

Apotex Answer and Counterclaims filed Oct. 25, 2007 in Case 2:07-cv-04417, United States District Court D.N.J.

Apotex Answer and Counterclaims filed Jan. 12, 2009 in Case 2:08-cv-04053, United States District Court D.N.J.

Cobalt Answer and Counterclaims Nov. 28, 2007 in Case 2:07-cv-04540, United States District Court D.N.J.

Last Office Action in U.S. Appl. No. 10/321,208, date mailed Sep. 20, 2006.

Last Office Action in U.S. Appl. No. 10/897,897, date mailed Jul. 26, 2007.

Last Office Action in U.S. Appl. No. 11/390,227, dated mailed Aug. 22, 2007.

Last Office Action in U.S. Appl. No. 11/725,896, date mailed Jan. 25, 2008.

Apotex Alleged Bases of Invalidity of US 7,192,938 from Notice Letter dated Jan. 19, 2009.

Sun Alleged Bases of Invalidity of US 7,192,938 from Notice Letter dated Dec. 12, 2008.

Teva Alleged Bases of Invalidity of US 7,192,938 from Notice Letter dated Aug. 12, 2008.

Thiebaud, D. et al, Osteoporosis 1996, Proceedings of the 1996 World Congress on Osteoporosis, International Congress Series, No. 1118, May 1996 p. 321-325.

Hortobagyi, G. N., et al., Efficacy of Pamidronate in Reducing Skeletal Complications in Patients with Breast Cancer and Lytic Bone Metastases, The New England Journal of Medicine (1996) 335:1785-1791.

Ali, S M. et al., Safety and Efficacy of Bisphosphonates Beyond 24 Months in Cancer Patients, Journal of Clinical Oncology (2001), vol. 19, No. 14, pp. 3434-3437.

Mylan Alleged Bases of Invalidity of U.S. Appl. No. 7,192,938 from Notice Letter dated Feb. 23, 2010.

Menssen, H.D. et al, Jour of Clin. Onc, 20:9 (2002)2353-2359 "Effects of Long-Term Intravenous Ibandronate Therapy on Skeletal-Related Events, Survival, and Bone Resorption Markers in Patients with Advanced Multiple Myeloma".

Fleisch, H et al, Endocrine Reviews, 19:1 (1988) 80-100 "Bisphosphonates: Mechanisms of Action".

* cited by examiner

US 7,718,634 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# METHOD OF TREATMENT USING BISPHOSPHONIC ACID

## PRIORITY TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 10/430,007, filed May 6, 2003, now allowed; which claims the benefit of European Application No. 02010136.6, filed May 10, 2002. The entire contents of the above-identified applications are hereby incorporated by reference.

## FIELD OF THE INVENTION

The present invention refers to the use of bisphosphonic acids, especially of (1-hydroxy-3-(N-methyl-N-pentyl)amino-propylidene-1,1-bisphosphonic acid (ibandronic acid) or pharmaceutically acceptable salts thereof for the manufacture of pharmaceutical compositions for the prevention or the treatment of disorders characterized by pathologically increased bone resorption, especially for the prevention and treatment of osteoporosis.

## BACKGROUND OF THE INVENTION

Bones serve mainly as a support, and consequently bone is frequently regarded as a simple building material. However, bone is a complicated biomaterial adapted to a wide variety of requirements, stimuli and noxae to which it is exposed. Endoprostheses are available as substitutes for bones and joints. However, endoprostheses, even when biomechanically highly refined, do not have an active effect on the environmental and load factors.

A variety of disorders in humans and mammals involve or are associated with abnormal bone resorption. Such disorders include, but are not limited to, osteoporosis, Paget's disease, periprosthetic bone loss or osteolysis, and hypercalcemia of malignancy and metastatic bone disease. The most common of these disorders is osteoporosis, which in its most frequent manifestation occurs in postmenopausal women. Because osteoporosis, as well as other disorders associated with bone loss, are chronic conditions, it is believed that appropriate therapy will generally require chronic treatment.

Bisphosphonates, i.e. bisphosphonic acids or pharmaceutically acceptable salts thereof, are synthetic analogs of the naturally occurring pyrophosphate. Due to their marked affinity for solid-phase calcium phosphate, bisphosphonates bind strongly to bone mineral. Pharmacologically active bisphosphonates are well known in the art and are potent inhibitors of bone resorption and are therefore useful in the treatment and prevention of diseases involving abnormal bone resorption, especially osteoporosis, Paget's disease, hypercalcemia of malignancy, and metastatic and metabolic bone diseases.

Bisphosphonates as pharmaceutical agents are described for example in EP-A-170,228; EP-A-197,478; EP-A-22,751; EP-A-252,504; EP-A-252,505; EP-A-258,618; EP-A-350,002; EP-A-273,190; and WO-A-90/00798, each of which are incorporated herein by reference.

Pharmaceutical forms of currently marketed bisphosphonates are oral formulations (tablets or capsules) or solutions for intravenous injection or infusion. They are systemically well tolerated when administered at therapeutic doses. However, bisphosphonates as a class are irritant to skin and mucous membranes and when given orally on a continuous basis may result in digestive tract side effects, e.g., esophageal adverse events or gastrointestinal disturbances. As a consequence, and due to their low oral bioavailability, the oral route of administration has, to date, had to follow inconvenient recommendations of use for the patient.

Bisphosphonates can be classified into two groups with different modes of action. Ibandronate belongs to the more potent nitrogen-containing bisphosphonates [Russell 1999 Russell R G G, Rogers M J. Bisphosphonates: From the laboratory to the clinic and back again. Bone 25(1):97-106 (1999); Rogers M J, Gordon S, Benford H L, Coxon F P, Luckman S P, Monkkonen J, Frith J C. Cellular Molecular mechanisms of action of bisphosphonates. Cancer 88 (12) Suppl:2961-2978 (2000)]. Ibandronate is one of the most potent bisphosphonates currently under clinical development in osteoporosis and metastatic bone diseases. In animal models of bone resorption, ibandronate is 2, 10, 50 and 500 times more potent than risedronate, alendronate, pamidronate, and clodronate respectively [Mühlbauer R. C., F. Bauss, R. Schenk, M. Janner, E. Bosies, K. Strein, and H. Fleisch. B M 21.0955 a potent new bisphosphonate to inhibit bone resorption. J. Bone Miner. Res. 6: 1003-1011 (1991)].

Ibandronate inhibits bone resorption without any impairment of mineralization (Mühlbauer et al Mühlbauer R. C., F. Bauss, R. Schenk, M. Janner, E. Bosies, K. Strein, and H. Fleisch. BM 21.0955 a potent new bisphosphonate to inhibit bone resorption. J. Bone Miner. Res. 6: 1003-1011 (1991).). It has been shown to decrease osteoclastic activity, thus inhibiting bone destruction. At high doses it also reduces the number of osteoclasts (Mühlbauer et al. Mühlbauer R. C., F. Bauss, R. Schenk, M. Janner, E. Bosies, K. Strein, and H. Fleisch. BM 21.0955 a potent new bisphosphonate to inhibit bone resorption. J. Bone Miner. Res. 6: 1003-1011 (1991)).

As described, bisphosphonates are accepted as providing strong efficacy in the management of osteoporosis. However, given the administration restrictions related to low oral bioavailability and potential for gastro-intestinal effects, there is a clear opportunity for regimens which offer improved convenience and flexibility, leading to a higher level of compliance and superior patient management/satisfaction. Intermitted regimens such as, for example, once weekly administration have been described in the art.

## SUMMARY OF THE INVENTION

It has now been found that the prevention or the treatment of disorders characterized by pathologically increased bone resorption such as osteoporosis, can be improved by a monthly administration of 50 to 250 mg of a bisphosphonate or pharmaceutical acceptable salt thereof, especially by a monthly administration of ibandronate, i.e., ibandronic acid or a pharmaceutically acceptable salt thereof.

The present invention is thus concerned with the use of a bisphosphonic acid or a pharmaceutical acceptable salt thereof, especially with the use of ibandronic acid or a pharmaceutical acceptable salt thereof, for the preparation of pharmaceutical compositions for the prevention or the treatment of disorders characterized by pathologically increased bone resorption, wherein the medicament comprises about 50 to 250 mg, preferably about 100 to 150 mg, of a bisphosphonic acid or a acceptable salt thereof, and orally administered in a period of one, two or three consecutive days per month.

Monthly oral treatment by administration of at least 120%, especially of 120% to 200%, of the expected efficacious daily dose offers incremental patient benefits with respect to convenience and compliance as well as superior results. Prior to the completion of the ibandronate clinical development program, no bisphosphonate had prospectively demonstrated fracture reduction efficacy with a drug-free interval beyond daily administration. In summary, it is quite unexpected that

3

fracture reduction benefit can be derived from a monthly administration of an oral bisphosphonate with a single or multiple tablet administration scheme.

Accordingly, the present invention relates to the use of bisphosphonic acids or pharmaceutically acceptable salts, especially ibandronic acid or pharmaceutically acceptable salts thereof for the manufacture of a medicament for the prevention or treatment of disorders characterized by pathologically increased bone resorption, e.g. osteoporosis, wherein the medicament comprises at least 120% of the expected efficacious daily dose of a bisphosphonic acids or acceptable salts thereof and is administered in one, two or three consecutive days per month.

More preferably the invention comprises the use of ibandronic acid or pharmaceutically acceptable salts thereof for the manufacture of a medicament for the prevention or the treatment of disorders characterized by pathologically increased bone resorption wherein the medicament

a) comprises about 100 to about 150 mg of ibandronic acid or a pharmaceutically acceptable salt thereof and

b) is orally administered in a period of one, two or three consecutive days per month.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The term "bisphosphonic acid" means compounds characterized by two phosphonate groups linked by phosphoether bonds to a central (geminal) carbon atom. Such a P—C—P structure is represented by compound I (see, page 6). The use of a specific nomenclature in referring to the bisphosphonate or bisphosphonates is not meant to limit the scope of the present invention, unless specifically indicated.

The term "pharmaceutically acceptable" as used herein means that the salts or chelating agents are acceptable from a toxicity viewpoint.

The term "pharmaceutically acceptable salt" refers to ammonium salts, alkali metal salts such as potassium and sodium (including mono, di- and tri-sodium) salts (which are preferred), alkaline earth metal salts such as calcium and magnesium salts, salts with organic bases such as dicyclohexylamine salts, N-methyl-D-glucamine, and salts with amino acids such as arginine, lysine, and so forth.

The term "disorders characterized by pathologically increased bone resorption" refers to medically defined conditions with or without identifiable cause (such as post-menopausal osteoporosis, idiopathic juvenile osteoporosis, Klinefelter's syndrome; male osteoporosis; osteoporosis due to nutritional factors; organ transplant related osteoporosis; immobilization associated osteoporosis; inflammatory condition and cortico-steroid induced osteoporosis).

The term "one, two or three consecutive days per month" means administration of one to three dose proportional or non-dose proportional tablets on one, two or three consecutive days of the month, preferably on one day per month. As used herein, the term "month" is used in accordance with the generally accepted meaning as a measure of time amounting to approximately four (4) weeks, approximately 30 days, or approximately $\frac{1}{12}$ of a calendar year.

The term "medicament" refers to a pharmaceutical composition. The term encompasses single or multiple administration schemes.

Preferably the medicament is administered on one day per month. Preferably, the medicament is administered as a single dose, however, the scope of the present invention includes

4

pharmaceutical compositions administered as multiple sub-doses such as on two consecutive day per month or on three consecutive days per month.

Preferably, the medicament comprises at least 100%, preferably 120% to 200% of the efficacious dose of bisphosphonic acids or pharmaceutically acceptable salts thereof, more preferably of ibandronic acid or pharmaceutically acceptable salts thereof.

The term "efficacious dose" refers to about 50 to about 250 mg, more preferably to about 100 to about 150 mg, of a bisphosphonate or a pharmaceutically acceptable salt thereof, for example, of ibandronic acid or a pharmaceutically acceptable salt thereof. As noted, the efficacious dose may be a single dose or multiple sub-doses. For example, if the efficacious dose is 150 mg, the dose may be one (1) 150 mg dose, two (2) 75 mg sub-doses administered on one day or on two consecutive days, or three (3) 50 mg sub-doses administered on one day or on two or three consecutive days; if the efficacious dose is 100 mg, the dose may include one (1) 100 mg dose, two (2) 50 mg sub-doses administered on one day or two consecutive days, preferably on two consecutive days.

"Bisphosphonic acids and pharmaceutically acceptable salts thereof" as pharmaceutical agents are described for example in U.S. Pat. Nos. 4,509,612; 4,666,895; 4,719,203; 4,777,163; 5,002,937 and 4,971,958 and in European Patent Applications Nos. 252,504 and 252,505, herein incorporated by reference for such description.

Methods for the preparation of bisphosphonic acids and pharmaceutically acceptable salts thereof may be found in, e.g., U.S. Pat. Nos. 3,962,432; 4,054,598; 4,267,108; 4,327,039; 4,407,761; 4,621,077; 4,624,947; 4,746,654; 4,970,335; 5,019,651; 4,761,406; 4,876,248; in J. Org. Chem. 32, 4111 (1967) and European Patent Application 252,504, herein incorporated by reference. The pharmaceutically acceptable salts of bisphosphonic acids may also be employed in the instant invention. Examples of base salts of bisphosphonic acids include ammonium salts, alkali metal salts such as potassium and sodium (including mono, di- and tri-sodium) salts (which are preferred), alkaline earth metal salts such as calcium and magnesium salts, salts with organic bases such as dicyclohexylamine salts, N-methyl-D-glucamine, and salts with amino acids such as arginine, lysine, and so forth. Non-toxic, physiologically acceptable salts are preferred. The salts may be prepared by methods known in the art, such as described in European Patent Application 252,504 or in U.S. Pat. No. 4,922,077, incorporated herein by reference.

In this invention, the medicament comprises 100 to 150 mg of a ibandronic acid or a pharmaceutically acceptable salt thereof. The pharmaceutical composition comprises at least 150% of a bisphosphonic acid or a pharmaceutically acceptable salt thereof, and one or more pharmaceutically acceptable excipients thereof. In one embodiment, the bisphosphonic acid is ibandronic acid. Preferably, the medicament is administered as a single dose.

In a preferred embodiment of the present invention, the term "bisphosphonate" of the present invention corresponds to compounds of general formula

$$P(O)(OH)_2$$
$$P(O)(OH)_2 \diagdown A$$
$$X$$

(I)

5

wherein A and X are independently selected from the group consisting of A hydroxy, hydroxy, halogen, amino, SH, phenyl, alkyl, mono- or dialkylamino, mono- or dialkylaminoalkyl, alkoxy, thioalkyl, thiophenyl, and aryl or heteroaryl moieties selected from the group consisting of phenyl, pyridyl, furanyl, pyrrolidinyl, imidazolyl, and benzyl, wherein the aryl or heteroaryl moiety is optionally substituted with alkyl.

In the foregoing chemical formula, A can include X, and X include A such that the two moieties can form part of the same cyclic structure.

The foregoing chemical formula is also intended to encompass carbocyclic, aromatic and heteroaromatic structures for the A and/or X substituents, e.g. naphthyl, quinolyl, isoquinolyl, adamantyl, and chlorophenylthio.

Preferred structures are those in which A is selected from the group consisting of hydrogen, hydroxy, and halogen, an X is selected from the group consisting of alkyl, halogen, thiophenyl, thioalkyl and dialkylaminoalkyl.

More preferred structures are those in which A is selected from the group consisting of hydrogen, hydroxy, and Cl and X is selected from the group consisting of alkyl, Cl, chlorophenylthio and dialkylaminoalkyl.

The preferred bisphosphonic acid or pharmaceutically acceptable salt is selected from the group consisting of alendronate, cimadronate, clodronate, tiludronate, etidronate, ibandronate, incadronate, minodronate, neridronate, olpadronate, risedronate, pamidronate, piridronate, zolendronate, EB-1053 or acceptable salts thereof, e.g., ibandronic acid, monosodium salt, monohydrate.

Ibandronic acid (1-hydroxy-3-(N-methyl-N-pentyl)aminopropylidene-1,1-bisphosphonic acid) or physiologically compatible salts thereof are particularly preferred, e.g., ibandronic acid, monosodium salt, monohydrate.

The bisphosphonates and pharmaceutically acceptable salts may be administered alone or in combination with other bone active drugs, either in fixed combinations or separately both physically and in time, including hormones, such as a steroid hormone, e.g., an estrogen; a partial estrogen agonist, or estrogen-gestagen combination; a calcitonin or analogue or derivative thereof, e.g., salmon, eel or human calcitonin parathyroid hormone or analogues thereof, e.g., PTH (1-84), PTH (1-34), PTH (1-36), PTH (1-38), PTH (1-31)NH2 or PPTS 893; a SERM (Selective Estrogen Receptor Modulator), e.g., raloxifene, lasofoxifene, TSE-434, FC1271, tibolone, vitamin D or an analog. Such additional bone active drugs may be administered more frequently than the bisphosphonate.

Appropriate pharmaceutical compositions have been described in the art and have been described e.g., in U.S. Pat. Nos. 6,143,326 and 6,294,196, herein incorporated by reference.

For the preparation of tablets, coated tablets, dragees or hard gelatine capsules, the compounds of the present invention may be admixed with pharmaceutically inert, inorganic or organic excipients. Examples of suitable excipients for tablets, dragees or hard gelatine capsules include lactose, maize starch or derivatives thereof, talc or stearic acid or salts thereof.

The pharmaceutical compositions may also contain preserving agents, solubilizing agents, stabilizing agents, wetting agents, emulsifiers, sweeteners, colorants, odorants, salts for the variation of osmotic pressure, buffers, coating agents or antioxidants. They may also contain other therapeutically valuable agents. Preferably, the pharmaceutical composition is a film coated tablet wherein the tablet core comprises 50 to 200 mg of a bisphosphonic acid or a pharmaceutically acceptable salt thereof as defined above and one or more pharma-

6

ceutically acceptable excipients selected from the group consisting of lactose, polyvinylpyrrolidone, microcrystalline cellulose, crospovidone, stearic acid, silicon dioxide and the tablet core comprises one or more pharmaceutically acceptable excipients selected from the group consisting of hydroxypropyl methylcellulose, titanium dioxide, talc and polyethylene glycol 6000. These compositions are known in the art and described for example in U.S. Pat. Nos. 6,143,326 and 6,294,196.

Another aspect of the present invention is a method for treating, reducing or preventing disorders characterized by pathologically increased bone resorption comprising to a mammal administration of an effective amount of bisphosphonic acids or acceptable salts thereof. In particular, the invention refers to a method for treating, reducing or preventing disorders characterized by pathologically increased bone resorption comprising oral administration of an effective amount of a bisphosphonic acid or a pharmaceutically acceptable salt thereof, wherein approximately 50 to 250 mg bisphosphonic acid or a pharmaceutically acceptable salt thereof are administered on one, two or three consecutive days per month. As noted above, the effective amount of bisphosphonic acid or pharmaceutically acceptable salt thereof may be administered as a single dose or as multiple sub-doses.

Preferably, in the method comprises administration of about 50 to 250 mg, preferably about 100 to 150 mg, of a bisphosphonate or a pharmaceutically acceptable salt thereof on one, two or three consecutive days per month. While the method includes administration of the dose through multiple sub-dosing, the preferred method provides a single dose. Examples for administration of the dose through multiple sub-dosing are as follows, if the efficacious dose is 150 mg, the dose may be two (2) 75 mg sub-doses administered on one day or on two consecutive days, or three (3) 50 mg sub-doses administered on one day or on two or three consecutive days; if the efficacious dose is 100 mg, the dose may be two (2) 50 mg sub-doses administered on one day or two consecutive days, preferably on two consecutive days. The preferred bisphosphonate is ibandronate or a pharmaceutically acceptable salt thereof, e.g., ibandronic acid, monosodium salt, monohydrate.

Preferably, in the method according to the present invention, the bisphosphonic acid is selected from the group consisting of alendronate, cimadronate, clodronate, tiludronate, etidronate, ibandronate, incadronate, minodronate, neridronate, olpadronate, risedronate, pamidronate, piridronate, zolendronate, EB-1053 or pharmaceutical acceptable salts thereof. More preferably, the bisphosphonic acid is ibandronate or a pharmaceutically acceptable salt thereof, e.g. ibandronic acid, monosodium salt, monohydrate.

The invention will now be explained with reference to exemplified embodiments.

EXAMPLES

Example 1

Pharmaceutical Composition

The Example shows the composition of a 50 mg tablet. The composition and preparation of these tablets is known in the art and described for example in U.S. Pat. Nos. 6,143,326 and 6,294,196.

Other compositions may be prepared by adjusting the ingredients according to the amount of bisphosphonate, e.g. ibandronic acid, monosodium salt, monohydrate.

US 7,718,634 B2

7

| 50 mg film-coated tablet | |
| --- | --- |
| Components | mg per tablet |
| **Tablet core:** | |
| Ibandronic acid, monosodium salt, monohydrate | 56.250 |
| Lactose monohydrate | 92.750 |
| Povidone K 25 | 5.000 |
| Microcrystalline cellulose | 30.000 |
| Crospovidone | 10.000 |
| Purified stearic acid | 4.000 |
| Colloidal silicon dioxide | 2.000 |
| **Tablet coat:** | |
| Hydroxypropyl methylcellulose | 5.1425 |
| Titanium dioxide | 2.4650 |
| Talc | 0.8925 |
| Polyethylene glycol 6,000 | 1.5000 |
| Final weight: | 210.000 |

What is claimed is:

1. A method for treating or inhibiting postmenopausal osteoporosis in a postmenopausal woman in need of treatment or inhibition of postmenopausal osteoporosis by administration of a pharmaceutically acceptable salt of ibandronic acid, comprising:

   (a) commencing the administration of the pharmaceutically acceptable salt of ibandronic acid by orally administering to the postmenopausal woman, on a single day, a first dose in the form of a tablet, wherein the tablet comprises an amount of the pharmaceutically acceptable salt of ibandronic acid that is equivalent to about 150 mg of ibandronic acid; and

   (b) continuing the administration by orally administering, once monthly on a single day, a tablet comprising an amount of the pharmaceutically acceptable salt of ibandronic acid that is equivalent to about 150 mg of ibandronic acid.

2. The method of claim 1, wherein the pharmaceutically acceptable salt is a sodium salt of ibandronic acid.

3. The method of claim 2 wherein the pharmaceutically acceptable sodium salt is a monosodium salt of ibandronic acid.

4. The method of claim 3 wherein the pharmaceutically acceptable monosodium salt of ibandronic acid is a monohydrate.

8

5. A method for treating or inhibiting postmenopausal osteoporosis in a postmenopausal woman in need of treatment or inhibition of postmenopausal osteoporosis by administration of a pharmaceutically acceptable salt of ibandronic acid, consisting essentially of orally administering to the postmenopausal woman, once monthly on a single day, a tablet comprising an amount of the pharmaceutically acceptable salt of ibandronic acid that is equivalent to about 150 mg of ibandronic acid.

6. The method of claim 5, wherein the pharmaceutically acceptable salt is a sodium salt of ibandronic acid.

7. The method of claim 6 wherein the pharmaceutically acceptable sodium salt is a monosodium salt of ibandronic acid.

8. The method of claim 7 wherein the pharmaceutically acceptable monosodium salt of ibandronic acid is a monohydrate.

9. A method for treating or inhibiting postmenopausal osteoporosis in a postmenopausal woman in need of treatment or inhibition of postmenopausal osteoporosis by administration of a pharmaceutically acceptable salt of risedronic acid, comprising:

   (a) commencing the administration of the pharmaceutically acceptable salt of risedronic acid by orally administering to the postmenopausal woman, on a single day, a first dose in the form of a tablet, wherein the tablet comprises an amount of the pharmaceutically acceptable salt of risedronic acid that is equivalent to about 150 mg of risedronic acid; and

   (b) continuing the administration by orally administering, once monthly on a single day, a tablet comprising an amount of the pharmaceutically acceptable salt of risedronic acid that is equivalent to about 150 mg of risedronic acid.

10. A method for treating or inhibiting postmenopausal osteoporosis in a postmenopausal woman in need of treatment or inhibition of postmenopausal osteoporosis by administration of a pharmaceutically acceptable salt of risedronic acid, consisting essentially of orally administering to the postmenopausal woman, once monthly on a single day, a tablet comprising an amount of the pharmaceutically acceptable salt of risedronic acid that is equivalent to about 150 mg of risedronic acid.

\* \* \* \* \*