**Nos. 2014-1439, -1441, -1444, -1445, -1446**

# United States Court of Appeals
# for the Federal Circuit

———— ◆ ————

WARNER CHILCOTT COMPANY, LLC, and HOFFMANN-LA ROCHE INC.,

*Plaintiffs-Appellants,*

v.

TEVA PHARMACEUTICALS USA, INC.,

*Defendant-Appellee,*

AND

*(Caption Continued Inside)*

*Appeals from the United States District Court for the District of Delaware in Nos. 1:08-cv-00627-LPS, 1:11-cv-00081-LPS, 1:09-cv-00061-LPS, 1:09-cv-00143-LPS, and 1:10-cv-00285-LPS, Judge Leonard P. Stark.*

## NON-CONFIDENTIAL JOINT BRIEF OF THE APPELLEES

James Galbraith
Maria Luisa Palmese
A. Antony Pfeffer
Peter L. Giunta
KENYON & KENYON LLP
One Broadway
New York, NY 10004
Telephone: 212-425-7200
*Counsel for Appellee*
*Teva Pharmaceuticals USA, Inc.*

Edgar H. Haug
Richard E. Parke
Richard F. Kurz
FROMMER LAWRENCE & HAUG LLP
745 Fifth Avenue
New York, New York 10151
Telephone: 212-588-0800
*Counsel for Appellee*
*Mylan Pharmaceuticals Inc.*

Steven E. Feldman
Philip D. Segrest, Jr.
James P. White
Daniel R. Cherry
Sherry L. Rollo
Samuel A. Brown
HUSCH BLACKWELL LLP
120 S. Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Telephone: 312-655-1500
*Counsel for Appellees*
*Apotex Inc. and Apotex Corp.*

Eric C. Cohen
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street
Chicago, Illinois 60661
Telephone: 312-902-5200
*Counsel for Appellee*
*Sun Pharma Global, FZE.*

(CAPTION CONTINUED)


APOTEX CORP. and APOTEX INC.,

*Defendants-Appellees,*

AND

MYLAN PHARMACEUTICALS INC.,

*Defendant-Appellee,*

AND

SUN PHARMA GLOBAL FZE,

*Defendant-Appellee.*

_____

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Warner Chilcott & Hoffmann-La Roche v. Teva, Sun, Apotex, and Mylan

No. 14-1439, -1441, -1444, -1445, -1445

# CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Apotex, Inc., and Apotex Corp. certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:

Apotex, Inc., and Apotex Corp.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Apotex, Inc., and Apotex Corp.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Apotex Holdings, Inc. is the parent company of Apotex Corp. and of Apotex Pharmaceuticals Holdings,

Inc., which is the parent company of Apotex, Inc.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Steven E. Feldman, Philip D. Segrest, Jr., James P. White, Daniel R. Cherry, Sherry L. Rollo, Louise T. Walsh, Hartwell P. Morse, and

Samuel A. Brown, all of Husch Blackwell LLP; Richard L. Horwitz and David E. Moore of Potter Anderson & Corroon LLP; Richard W.

Riley, Arthur M. Dresner, Ian Scott, Richard T. Ruzich, Vincent L. Capuano, and Laura A. Vogel of Duane Morris LLP.

| July 14, 2014 | /s/ Philip D. Segrest, Jr. |
| Date | Signature of counsel |
| | Philip D. Segrest, Jr. |
| | Printed name of counsel |

Please Note: All questions must be answered
cc:  Philip D. Segrest, Jr.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Warner Chilcott Company, LLC v. Mylan Pharmaceuticals Inc.

Nos. 2014-1439, 2014-1446

## CERTIFICATE OF INTEREST

Counsel for Appellee Mylan Pharmaceuticals Inc. certifies the following (use "None" if applicable; use extra sheets if necessary):

1. The full name of every party or amicus represented by me is:  Mylan Pharmaceuticals Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  Mylan Pharmaceuticals Inc.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:  Mylan Pharmaceuticals Inc. is a wholly-owned subsidiary of Mylan Inc.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

FROMMER LAWRENCE & HAUG LLP:  Edgar H. Haug, Richard E. Parke, and Richard F. Kurz

MORRIS JAMES LLP:  Richard K. Herrmann and Mary B. Matterer

| | |
|---|---|
| July 14, 2014 | /s/ Richard E. Parke |
| Date | Richard E. Parke |
| | FROMMER LAWRENCE & HAUG LLP |
| | Attorneys for Appellee |
| | Mylan Pharmaceuticals Inc. |

FORM 9.  Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Warner Chilcotte Company LLC _____ v. Sun Pharma Global FZE _____

No. 14-1439

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
Sun Pharma Global FZE ___ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

Sun Pharma Global FZE

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Sun Pharma Global FZE

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Sun Pharma Global FZE is a wholly owned subsidiary of Sun Pharma Global, Inc., which in turn is a wholly owned subsidiary of Sun Pharmaceutical Industries, Ltd. Sun Pharmaceutical Industries, Ltd. does not have a parent corporation and no pubicly held corporation owns 10% or more of its stock.

4. ☐  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Eric C. Cohen, Jeremy Daniel, Katten Muchin Rosenman LLP;  John Phillips, Megan Haney, Phillips Goldman & Spence, P.A.;  Brian E. Farnan, Farnan LLP.

| June 9, 2014 | s/ Eric C. Cohen |
|---|---|
| Date | Signature of counsel |
| | Eric C. Cohen |
| | Printed name of counsel |

Please Note: All questions must be answered
cc: counsel of record for the parties _____

# CERTIFICATE OF INTEREST
## FOR TEVA PHARMACEUTICALS USA, INC

Counsel for the Appellee, Teva Pharmaceuticals USA, Inc. certifies the following (use "None" if applicable; use extra sheets if necessary):

1. The full name of every party or amicus represented by me is:

Teva Pharmaceuticals USA, Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Teva Pharmaceuticals USA, Inc.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Teva Pharmaceuticals USA, Inc. which is owned 100% by Orvet UK Unlimited, which in turn is owned 100% by Teva Pharmaceutical Industries Ltd. Teva Pharmaceutical Industries Ltd. Is the only publicly-traded company in the ownership chain of Teva Pharmaceuticals USA, Inc. Teva Pharmaceuticals Industries Ltd. Has no parent corporation and no publicly held corporation owns 10% or more of its stock.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:
KENYON & KENYON LLP, One Broadway, New York, New York 10004:
    James Galbraith, Maria Luisa Palmese, A. Antony Pfeffer,
    Peter L. Giunta, Vincent J. Rubino;
YOUNG, CONAWAY, STARGATT, & TAYLOR, LLP, Rodney Square,
    100 North King Street, Wilmington, Delaware 19801: Karen Pascale.

July 14, 2014                  /s/ A. Antony Pfeffer
Date                            Signature of counsel

                                  A. Antony Pfeffer
                                  Printed Name of Counsel

# TABLE OF CONTENTS

*Page*

Certificates of Interest ................................................................. i

Table of Contents ........................................................................ v

Table of Authorities ................................................................. viii

Statement of Related Cases ....................................................... xi

Appellees' Jurisdictional Statement .......................................... 1

Appellees' Statement of the Issues ............................................ 3

Statement of the Case ................................................................ 4

I.   Using Longer Dosing Intervals To Address Inconvenient Dosing Restrictions For Bisphosphonates Was Well Known. ....................................... 5

II.  P&G, The Developer Of Risedronate, Also Filed A Prior Art Patent Application Disclosing A Monthly Dosing Regimen. ....................................... 9

III. The Prior Art Also Provided A Reasonable Expectation Of Success For A Dose-Free Interval Of A Month. ................................................... 12

IV.  It Is Undisputed That The Level Of Ordinary Skill In The Art Is High. ......... 14

V.   Roche Filed Patent Applications For Monthly Dosing Of Ibandronate, Which Led To The Patent Claims Here In Suit. ............................................. 15

Summary of the Argument ......................................................... 17

Argument ..................................................................................... 20

I.   The District Court Properly Granted Summary Judgment Of Invalidity. ........ 20

     A.   Summary Judgment Is Appropriate Where A Factual Dispute Is Not Genuine And Supported Only By Experts' Conclusory Opinions And Differing Interpretations Of Undisputed Facts. ............................................. 20

B.    The Claimed Invention Would Have Been Obvious. ............................23

C.    Appellants' Arguments About Uncertainty Of Safety And Efficacy
      Are Unavailing.................................................................................25

      1.    Appellants' "Uncertainty" Arguments Do Not Raise A
            Genuine Issue Of Material Fact. .......................................................25

      2.    Appellants' "Bioavailability" Arguments Do Not Raise A
            Genuine Issue Of Material Fact. .......................................................28

      3.    Appellants' "Retention On Bone" Theory Does Not Raise A
            Material Issue Of Fact.......................................................................31

      4.    Appellants' Denigration Of Their Own Riis Study Does Not
            Raise A Genuine Issue Of Material Fact. ..........................................32

      5.    Appellants' Safety Concern Arguments Do Not Raise A
            Genuine Issue Of Material Fact. .......................................................33

D.    No Secondary Consideration Creates A Genuine Issue Of Material
      Fact Precluding Summary Judgment.......................................................37

      1.    The Patents In Suit Satisfied No Long Felt Need Concerning
            "Onerous Dosing Restrictions," And The District Court
            Properly Analyzed This Factor Under Graham. ...............................37

      2.    Witnesses' Conclusory Assertions Of "Skepticism" That Were
            Not Reflected In The Prior Art And Their Own
            Contemporaneous Publications, Raise No Genuine Issue Of
            Material Fact. ...................................................................................39

      3.    There Was Ample Evidence Of Simultaneous Invention................41

E.    The Recent Federal Circuit Ibandronate Decision Supports
      Obviousness. ..........................................................................................42

II.    Appellants Are Jurisdictionally Barred And Collaterally Estopped From
       Challenging The District Court's Conclusions Of Invalidity. ..........................47

A.      No Jurisdiction Exists To Review Final Judgments Not Specified
        In Timely Notices Of Appeal For Three Of Eight Civil Actions...........48

B.      Because Of Those Final Judgments Of Invalidity, Plaintiffs Are
        Also Estopped To Assert The '634 Patent Against Teva......................55

C.      Plaintiffs Are Also Collaterally Estopped To Deny The Facts
        Compelling The Conclusion That The '938 Patent Is Invalid for
        Obviousness, Because Patentees Identified No Difference Between
        The Two That Is Material To Patentability. ..........................................56

Conclusion ...........................................................................................................58

Certificate of Service ..........................................................................................59

Certificate of Compliance ....................................................................................61

**Confidential Material Omitted**

The material on page 9 described certain research by P&G and its research partner concerning risedronate; on page 29 is Dr. Mitchell's testimony about a reasonable expectation of linear bioavailability; on page 30 is Dr. Mitchell's testimony about determining bioavailability; on page 32 is named inventor Freider Bauss's testimony describing the Riis 2001 study and Dr. Bilezikian's declaration statement about renal impairment; on page 35-36 is Dr. Bilezikian's and Dr. Mitchell's testimony about renal impairment; on page 41 and 47 concerns research by P&G's and its research partner about monthly risedronate.

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................ 21, 22

*Applied Cos. v. United States*,
144 F.3d 1470 (Fed. Cir. 1998) ............................................. 40

*Arthur A. Collins, Inc. v. Northern Telecom Ltd.*,
216 F.3d 1042 (Fed. Cir. 2000) ........................................ 22, 32

*Becker v. Montgomery*,
532 U.S. 757 (2001) ............................................................ 51

*Blonder-Tongue Labs., Inc. v. Univ. of Illinois Found.*,
402 U.S. 313 (1971) ........................................................ 48, 55

*Bourns, Inc. v. United States*,
537 F.2d 486 (Ct. Cl. 1976) ................................................. 56

*Bowles v. Russell*,
551 U.S. 205 (2007) .............................................. 48, 49, 50, 51

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ........................................................ 22, 32

*Cable Elec. Prods., Inc. v. Genmark, Inc.*,
770 F.2d 1015 (Fed. Cir. 1985) ..................................... 21, 23, 33

*Graham v. John Deere Co. of Kansas City*,
383 U.S. 1 (1966) ...................................... 21, 37, 38, 39, 46

*Hallco Mfg. Co., Inc. v. Foster*,
256 F.3d 1290 (Fed. Cir. 2001) ............................................. 54

*Harris Truck Lines, Inc. v. Cherry Meat Packers, Inc.*,
371 U.S. 215  (1962) ........................................................... 50

*Hoffmann-La Roche Inc. v. Apotex Inc.*,
    No. 07-4417 *et al.*,
    2012 WL 869572 (D.N.J. Mar. 14, 2012)
    ("***Hoffmann-La Roche I***") ................................................................ xi, 11, 15, 24

*Hoffmann-La Roche, Inc. v. Apotex, Inc.*,
    496 F. App'x 46 (Fed. Cir. 2012)
    ("***Hoffmann-La Roche II***") .............................................................................. xi

*Hoffmann-La Roche Inc. v. Apotex Inc.*,
    No. 07-4417 *et al.*,
    2012 WL 1637736 (D.N.J. May 7, 2012)
    **("*Hoffmann-La Roche III*")** .................................................................. xi, 20, 32

*Hoffmann-La Roche Inc. v. Apotex Inc.*,
    748 F.3d 1326 (Fed. Cir. 2014),
    *reh'g & reh'g en banc denied*,
    No. 13-1128, ECF No. 87 (Fed. Cir. July 11, 2014)
    **("*Hoffmann-La Roche IV*")** .................... xi, 1, 3, 4, 5, 11, 13, 15, 20, 21, 24, 27,
    ................................................................ 30, 31, 33, 38, 42, 43, 44, 45, 46, 47

*Imperial Tobacco Ltd. v. Philip Morris, Inc.*,
    899 F.2d 1575 (Fed. Cir. 1990)...........................................................................40

*In re Merck & Co.*,
    800 F.2d 1091 (Fed. Cir. 1986)...........................................................................42

*In re O'Farrell*,
    853 F.2d 894 (Fed. Cir. 1988)...........................................................................30

*Invitrogen Corp. v. Clontech Labs., Inc.*,
    429 F.3d 1052 (Fed. Cir. 2005).........................................................................22

*Jet, Inc. v. Sewage Aeration Sys.*,
    223 F.3d 1360 (Fed. Cir. 2000).........................................................................54

*Lockwood v. American Airlines, Inc.*,
    107 F.3d 1565 (Fed. Cir. 1997).........................................................................22

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)...........................................................................................22

*Merck & Co. v. Teva Pharms. USA, Inc.,*
    395 F.3d 1364 (Fed. Cir. 2005).....................5, 6, 7, 21, 26, 27, 34, 37, 39, 43, 46

*Mississippi Chem. Corp. v. Swift Agr. Chems. Corp.,*
    717 F.2d 1374 (Fed. Cir. 1983)...........................................................55

*Nat'l Steel Co. v. Canadian Pacific Ry., Ltd.,*
    357 F.3d 1319 (Fed. Cir. 2004)...........................................................42

*Ohio Willow Wood Co. v. Alps S., LLC,*
    735 F.3d 1333 (Fed. Cir. 2013)...........................................................56

*Petersen Mfg. Co., Inc. v. Central Purchasing* Inc.,
    740 F.2d 1541 (Fed. Cir. 1984)...........................................................23

*Pfizer, Inc. v. Apotex, Inc.,*
    480 F.3d 1348 (Fed. Cir. 2007)...........................................................30

*Sitrick v. Dreamworks, LLC,*
    516 F.3d 993 (Fed. Cir. 2008)............................................................36

*Spraytex, Inc. v. DJS&T,*
    96 F.3d 1377 (Fed. Cir. 1996).......................................................48, 53

*Stevenson v. Sears, Roebuck & Co.,*
    713 F.2d 705 (Fed. Cir. 1983)............................................................55

*Torres v. Oakland Scavenger Co.,*
    487 U.S. 312 (1988)...............................................................48, 49, 51

*Tyco Healthcare Grp. LP v. Mutual Pharm. Co.,*
    642 F.3d 1370 (Fed. Cir. 2011)...........................................................21

*Westwood Chem., Inc. v. United States,*
    525 F.2d 1367 (1975)....................................................................57

## RULES

FED. R. CIV. P. 54(b) ....................................................................53

# STATEMENT OF RELATED CASES

*Hoffmann-La Roche Inc. v. Apotex Inc.*, 748 F.3d 1326 (Fed. Cir. 2014) ("*Hoffmann-La Roche IV*"), *reh'g & reh'g en banc denied*, No. 13-1128, ECF No. 87 (Fed. Cir. July 11, 2014), affirmed the New Jersey district court's summary judgment, *Hoffmann-La Roche Inc. v. Apotex Inc.*, No. 07-4417 *et al.*, 2012 WL 1637736 (D.N.J. May 7, 2012) ("*Hoffmann-La Roche III*"), that certain claims of U.S. Patent No. 7,410,957 ("the '957 patent") and U.S. Patent No. 7,718,634 ("the '634 patent") are invalid. The '634 patent is one of the patents in this appeal. That related case also included an earlier denial of a preliminary injunction. *Hoffmann-La Roche Inc. v. Apotex Inc.*, No. 07-4417 *et al.*, 2012 WL 869572, *6 (D.N.J. Mar. 14, 2012) ("*Hoffmann-La Roche I*"), *aff'd*, 496 F. App'x 46 (Fed. Cir. 2012) ("*Hoffmann-La Roche II*").

Counsel for defendants are unaware of any other cases pending in this or any other court that could directly affect or be directly affected by the ruling in this case.

## APPELLEES' JURISDICTIONAL STATEMENT

Although the patents in suit were owned by Hoffmann-La Roche Inc. ("Roche"), the suits below were originally brought by The Procter & Gamble Company ("P&G"), then the owner of the Actonel® brand for its risedronate products, as licensee of Roche on U.S. Patent No. 7,192,938 ("the '938 patent") and the '634 patent. (A124–32, A178–84, A194–201.) During the course of litigation, P&G sold its Actonel® product line to Warner Chilcott Company, LLC ("Warner Chilcott"), and Warner Chilcott was substituted for P&G as a named plaintiff. (A619–20.) Warner Chilcott was subsequently purchased by Actavis, which had been one of the defendants in the ibandronate litigation that led to the related claims for monthly administration of Roche's ibandronate product being held invalid. ECF No. 44 at 58 (Ex. 6, Leitzinger Decl. ¶18); *Hoffmann-La Roche IV*, 748 F.3d at 1326.

On March 28, 2014, the district court entered a memorandum opinion (A20–A36) and order (A37–38) granting summary judgment of obviousness, denying the other pending motions as moot, and directing the clerk to enter judgment and "CLOSE these consolidated cases" (A38). The clerk then entered eight separate final judgments, one in each of the eight pending cases. (*See* A39–48; the other three judgments below are not in the record on appeal.) On April 1, 2014, the district court entered judgment in Civil Action Nos. 08-cv-627-LPS,

09-cv-61-LPS, 09-cv-143-LPS, 10-cv-285-LPS, 11-cv-81-LPS, 10-cv-1111-LPS, 11-cv-236-LPS, and 10-cv-1085-LPS. (A39–48.) Appellants Warner Chilcott and Roche filed notices of appeal in the first five cases (A13159–85), but not in the latter three, the latter three involving claims of infringement of U.S. Patent No. 7,718,634 against defendants Apotex Corp. and Apotex, Inc. ("Apotex") (10-cv-1111-LPS), Mylan Pharmaceuticals Inc. ("Mylan") (11-cv-236-LPS), and Sun Pharm Global FZE ("Sun") (10-cv-1085-LPS), respectively. Accordingly, this Court does not have jurisdiction over appeals from those judgments.

## APPELLEES' STATEMENT OF THE ISSUES

1.    Whether the district court correctly concluded that appellees were entitled to summary judgment that the asserted claims of U.S. Patent Nos. 7,192,938 and 7,718,634 (the '938 and '634 patents, respectively) to a risedronate monthly dosing schedule were invalid because the claimed invention would have been obvious, where the district court applied substantially the same legal standard and analysis that this Court used in affirming summary judgment of obviousness of ibandronate monthly dosing claims from the same '634 patent and another patent in its family in *Hoffmann-La Roche IV*, 748 F.3d at 1335, and the patents in suit contain no disclosure specific to risedronate other than a passing reference to risedronate as one of many bisphosphonates in an undifferentiated list.

2.    Whether this Court has jurisdiction to review the judgments in favor of Apotex, Sun, and Mylan with respect to the '634 patent, because appellants did not timely file notices of appeal from those judgments.

3.    Whether appellants are collaterally estopped to deny the invalidity of the asserted claims of both the '634 and the '938 patents.

## STATEMENT OF THE CASE

Risedronate is one of several drugs in the bisphosphonate class that is used to treat osteoporosis. The claims of the patents in suit essentially cover once-per-month dosing of 150 mg of risedronate to treat osteoporosis, which is exactly 30 times the prior art daily dose. Except for substituting risedronate for ibandronate, another bisphosphonate, the claims at issue here are, for all intents and purposes, identical to the claims adjudicated in *Hoffmann-La Roche IV*. Moreover, the risedronate claims here are based on the same patent specification as the ibandronate claims (the '634 patent being common to both actions).

This Court has already adjudicated the ibandronate claims, finding them invalid over prior art that is the same in substance as the prior art relied on by the district court in this case. *See Hoffmann-La Roche IV*, 748 F.3d at 1335 ("Accordingly, we uphold the judgment of the district court that claims 1–8 of the '634 patent and claims 1–10 of the '957 patent would have been obvious in light of the prior art and are therefore invalid.").

At the time of the alleged invention, it was already well known that many bisphosphonates, including risedronate, were safe and effective for treating osteoporosis (A9306–42 ¶¶ 18, 37); that certain issues associated with bisphosphonates as a class, including from daily administration of such bisphosphonates, could be addressed by administering in larger doses less

frequently (A9318–20 ¶¶ 34–38); and that a weekly dose of seven times the daily

dose of risedronate was as safe and effective as daily administration (A9320 ¶ 37).

*See also Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1373 (Fed. Cir.

2005) ("These claims read in light of the specification, and the July 1996 article,

both indicate—and it has been conceded as known in the art at the time—that for

treating or preventing osteoporosis a once-weekly dosage at seven times the daily

dose would be as effective as seven daily doses." (footnote omitted)).  The prior art

also taught monthly administration of risedronate, suggested a dose of 150 mg, and

provided the person of ordinary skill in the art with motivation to use that regimen

and with a reasonable expectation of success in doing so.[1]

## I.     USING LONGER DOSING INTERVALS TO ADDRESS INCONVENIENT DOSING RESTRICTIONS FOR BISPHOSPHONATES WAS WELL KNOWN.

Both the prior art and the background sections in the specifications of the

patents in suit recognized that oral bisphosphonate therapy required that the patient

take the drug (i) while fasting, (ii) before the first food of the day, (iii) with a full

glass of water, (iv) then wait at least 30 minutes before consuming anything other

---

[1] The district court's decision is the third time that intermittent dosing regimens using bisphosphonates have been found obvious.  *See Hoffmann-La Roche IV*, 748 F.3d at 1335 (affirming summary judgment that once-monthly dosing of ibandronate was obvious); *Merck*, 395 F.3d at 1377 (vacating judgment entered after bench trial, and holding that once-weekly dosing of the bisphosphonate alendronate was obvious).

than water, and (v) then remain upright for at least 30 minutes after swallowing the tablet and until the first food of the day.  (A9316 ¶ 26; A11529–34; A4368–69; A4366-67; A9497–99 at A9498; A9420–44 at A9432–33, A9439; A11622–43 at A11634, 41; A12020–39 ¶ [0009]; A11972–93 at A11983–84.)  *See also Hoffmann-La Roche IV*, 748 F.3d at 1328 ("As a result of the side effects and to improve the bioavailability of the drug, patients taking bisphosphonates must adhere to a dosing regimen that requires a bisphosphonate tablet to be taken in a fasting state at least 30 minutes before eating or drinking."); *Merck*, 395 F.3d at 1366 ("The medications thus require rigorous dosing instructions: a patient must take the medicine on an empty stomach and remain upright and fasting for thirty minutes after ingestion.").  These dosing restrictions addressed certain issues in daily administration regimens concerning esophageal irritation.  (A9318–20 ¶¶ 33–38.)

These dosing restrictions, however, raised concerns about patient compliance.  (A112; A120; A4367; A4369.)  Long before these patents, researchers had suggested a response to these concerns: administer bisphosphonates at a relatively higher dose, but with a longer period between doses.  (A9318–20 ¶¶ 33–38.)  For example, in April and July 1996, the publication *Lunar News* discussed the compliance problem and suggested extending the dosing interval for the bisphosphonate alendronate from once-daily to once-weekly at about seven times

the daily dose.  (A4366–69.)  Merck, the owner of the Fosamax® (alendronate)

franchise (A9318 ¶ 33), thereafter recognized that because (i) the "efficacy of

bisphosphonates was related to the total dose . . . administered over time rather

than to the frequency of dosing" (the "total dose concept") and (ii) the frequency of

exposure was more important than the total dose in dealing with esophageal

irritation.  Thus, better results could be achieved by dosing once-weekly at seven

times the daily amount.  (A9319 ¶ 35.)  *Merck*, 395 F.3d at 1373–74 ("The '329

patent, both articles, and the prevailing knowledge of those skilled in the art,

recognized that to the extent 'dosing problems' were related to repetitive irritation

of the esophagus (from patients getting pills stuck in their throats), taking fewer

pills each week could reduce the attending GI problems.").

Accordingly, Merck's prior art U.S. Patent No. 5,994,329 (the '329 patent,

referenced *supra*) disclosed and claimed regimens including weekly, biweekly, and

twice-monthly (including two consecutive days per month) dosing of bisphospho-

nates, at proportionately higher dosages.  (A11671–91.)  The '329 patent taught

that increasing dosage at proportionately less frequent intervals was applicable to

bisphosphonates generally, specifically reciting a long list that included

alendronate, ibandronate, and risedronate.  (A11686.)  This Court later relied on

the April and July 1996 *Lunar News* articles (among other references) in holding

the '329 patent claims invalid.  *Merck*, 395 F.3d at 1375 (Fed. Cir. 2005) ("In

short, the district court clearly erred in distinguishing the claimed invention from the two *Lunar News* articles offered as section 103 prior art.").

In early 2000, the FDA approved once-weekly administration of alendronate at seven times the daily dose, and within two years that product was the market leader among all osteoporosis treatments. (A9319 ¶ 36.) That same year, the FDA also approved risedronate's 5 mg daily dose as safe and effective. (A9320 ¶ 37.) Furthermore, in early 2002, before the priority date for the patents in suit, published clinical research showed that once-weekly risedronate administration at seven times the daily dose was safe and effective for treatment of osteoporosis. (A9320 ¶ 37; A9449 #604.)

In reporting on the FDA's review of daily and weekly risedronate, *Lunar News* in 2000 explained that monthly dosing of risedronate also "could foster long-term compliance as well as minimizing side-effects." (A9498.) This is the central concept of the asserted claims of the patents in suit: administering risedronate "monthly" for "treatment of osteoporosis." (A112–13 col.2, ℓ.41–col.3, ℓ.21; A120–21 col.2, ℓ.43–col.3, ℓ.24.) As the district court correctly concluded, there is no genuine dispute that *Lunar News* discloses the first element of these claims: the use of risedronate to treat osteoporosis. (A28.) The district court also correctly concluded that there is no genuine dispute that *Lunar News* discloses the second element of these claims: once-monthly administration. (A29.)

*Confidential Material Redacted*

## II. P&G, THE DEVELOPER OF RISEDRONATE, ALSO FILED A PRIOR ART PATENT APPLICATION DISCLOSING A MONTHLY DOSING REGIMEN.

While Roche was developing ibandronate, P&G was engaged in its own research on the drug risedronate (A9318 ¶ 33), a bisphosphonate compound it had patented in U.S. Patent No. 5,583,122. (A134–45.) In the course of that research, P&G █████████████████████████████████████████████████ ████████████████████████ at around the same time that Roche filed the patents in suit. (A8912–13.) P&G filed a patent application, U.S. Pub. No. 2003/0118634 ("Schofield"), which is prior art to the patents in suit and which disclosed monthly dosing of ibandronate and risedronate. (A11693–98.)

Schofield discloses administering bisphosphonates, particularly risedronate, as a tablet. (A11696 ¶ [0037].) Like the prior art '329 patent, Schofield discloses its method using any bisphosphonate chosen from among several, including risedronate, ibandronate, and alendronate. (A11696 ¶ [0029].) Schofield discloses that a "maintenance dose" (A11695 ¶ [0014]) "may be given every day, every other day, twice a week, weekly, bi-weekly, once a month, or every other month." (A11695 ¶ [0023].) Schofield further discloses using the "maintenance dose" of risedronate in an "effective amount" to increase bone mass. (A11695 ¶ [0014].) That is, Schofield discloses that the maintenance dose alone is effective. (A9328 ¶ 55.) Schofield also explains that this regimen "may be continued indefinitely."

– 9 –

(A11695 ¶ [0025].)  As the district court recognized, Schofield taught once-monthly administration of risedronate to treat osteoporosis.  (A29.)

Schofield's preferred maintenance dose for risedronate is "from about 5 to about 10" mg per day or the "equivalent" dose for longer-interval regimens. (A11693–98 ¶ [0037].)  Example 1 provides the "equivalent" weekly dose, 35 mg, or seven times the by-then FDA-approved daily dose of 5 mg.  (A11697 ¶ [0042].) The person of ordinary skill would have recognized that the "equivalent" monthly dose is 30 times the daily dose, or 150 mg.  (A9328 ¶ 55.)  Appellants do not dispute—and the district court held that there is no genuine issue about the fact— that Schofield's maintenance dose suggested a monthly dosing regimen of 150 mg risedronate.  (A31.)

Schofield also discloses using a "loading dose" (A11695 ¶ [0013]), which is an initial higher dose administered at the beginning of a course of treatment, before administering the maintenance dose in "a separate administration regimen for the bisphosphonate."  (A11695 ¶ [0022]; *see* A9328 ¶ 56.)  Schofield states that the loading dose "decreases bone turnover and increases bone mass at a **faster** rate leading to **faster** fracture reduction."  (A11694 ¶ [0007] (emphasis added).)  This comparative statement suggests that a maintenance dose alone would be effective in treating osteoporosis, although perhaps less quickly than a maintenance dose preceded by the loading dose.  (A9328 ¶ 56.)  Appellants nowhere disputed

appellees' expert Dr. Yates's opinion that "the skilled person would have recognized that after a relatively short time the effect of the initial loading dose would become insignificant compared to the effect of the repeated monthly doses, and that the therapeutic benefit would be attributable principally to the maintenance dose." (A9329 ¶ 57.)

During prosecution of the patents in suit, the examiner cited Schofield. (*E.g.*, A4780–86 at A4783.) In response, the patentees amended their claims to exclude the possibility of a loading dose. (*E.g.*, A4910, A4913, A4906–909, A4888–90.[2]) However, the amendment does not change the fact, which is not genuinely disputed, that Schofield discloses to one of ordinary skill in the art that the maintenance dose alone would be effective to treat osteoporosis. (A9327–29 ¶¶ 54–56.) Moreover, as the district court noted, "Schofield discloses daily, weekly, or monthly dosages." (A29.) This Court has similarly observed that Schofield taught doses equivalent to the daily amounts "that 'can be given every other day, twice a week, weekly, biweekly or monthly.'" *Hoffmann-La Roche IV*, 748 F.3d at 1330. The district court in the ibandronate case in New Jersey also noted the close similarity between the claimed monthly regimen and Schofield in denying an injunction. *Hoffmann-La Roche I*, 2012 WL 869572, at *6

---

[2] This amendment's pages are out of order in the file history; this citation lists the pages in their correct sequence.

("Schofield's treatment method for the maintenance period is very, very close to the claimed method.").

### III.  THE PRIOR ART ALSO PROVIDED A REASONABLE EXPECTATION OF SUCCESS FOR A DOSE-FREE INTERVAL OF A MONTH.

Appellants cannot dispute that *Lunar News* and Schofield each disclose the once-monthly administration of risedronate.  Appellants' collateral attack on these references relies on a two-week "osteoclast life cycle" theory.  (Blue Br. at 7–8, 20–21.)  According to appellants, this life cycle represented a maximum interval that researchers believed could be employed in bisphosphonate therapy.  (Blue Br. at 7–8, 20–21.)  Regardless of any such supposed theory, however, the prior art— including *Lunar News* 2000 (A9497–99) and Schofield (A11693–98)—both taught once-monthly dosing.  Furthermore, the disclosures of the patents in suit add nothing to those prior art disclosures.

By the priority date of the patents in suit, several published studies negated the two-week osteoclast life cycle theory.  (A9330–36.)  Accordingly, by then the state of the art was that the two-week osteoclast life cycle did **not** limit the scope of the total dose concept (i.e., the understanding being that the total dose administered over a defined period provides equivalent results irrespective of the dosing schedule).  (A26.)

– 12 –

These published studies include:

- Riis 2001 reported administering 20 mg ibandronate every other day for 24 days, followed by a dose-free interval of **nine weeks**.  (A11921–28.)

- Delmas 1997 reported administering 30 mg of risedronate daily for two weeks, followed by a dose-free interval of **ten weeks**.  (A11938–45.)

- Zegels 2001 reported administering 20 mg of risedronate daily for 14 days, followed by a dose-free interval of **six weeks**.  (A11931–35.)

Each study describes a bisphosphonate regimen with a dose-free interval much longer than the two-week osteoclast life cycle.  Moreover, each interval is longer than the one-month interval claimed in the patents in suit.  The district court discussed these studies in concluding that the discredited two-week osteoclast life cycle theory did not raise a genuine issue of material fact.  (A26–27, A29–30.) This Court recently reached the same conclusion in *Hoffmann-La Roche IV*, 748 F.3d at 1331 ("Any doubt about the efficacy of oral ibandronate dosing that may have been created by Schnitzer's speculation was put to rest by an article published in 2001 by Riis . . . ."); *see also id.* at 1331–32 ("Riis confirmed the total-dose concept whereby 'the efficacy of ibandronate depends on the total oral dose given rather than on the dosing schedule.'").

The district court correctly relied on Riis, Delmas, and Zegels as showing that bisphosphonate therapy, including with risedronate, can be effective using long dosing intervals.  (A33–34.)  As the district court observed, the patentees do not cite any study "dated after Riis discrediting the total dose concept."  (A33.)

Thus, these references showed that the osteoclast life cycle theory was incorrect, and taught that bisphosphonates, including risedronate, could be administered with dose-free intervals that included the monthly intervals taught by *Lunar News* (A9497–99) and Schofield (A11693–98).

Taken as whole, the prior art discloses every aspect of the claimed invention and provides the motivation for making it. *Lunar News* (A9497–99) and Schofield (A11693–98) each disclose once-monthly dosing, the rationale for using the regimen, and the appropriate dose. Scientific studies including Riis 2001 (A11921–28), Delmas 1997 (A11938–45), and Zegels 2001 (A11931–35), discussed above, provide hard data showing that the total dose concept applies over long intervals, and applies specifically to risedronate. (A9321–24, A9331–36.)

## IV. IT IS UNDISPUTED THAT THE LEVEL OF ORDINARY SKILL IN THE ART IS HIGH.

The parties did not dispute that the level of skill in the art is high. The person of ordinary skill would have been a Ph.D. or M.D. medical researcher with several years of experience with bone diseases, and a familiarity with the relevant literature, and preclinical and clinical studies of bisphosphonates. (A9311 ¶ 13.)

## V.  ROCHE FILED PATENT APPLICATIONS FOR MONTHLY DOSING OF IBANDRONATE, WHICH LED TO THE PATENT CLAIMS HERE IN SUIT.

Just as Merck owned the patent on alendronate and P&G owned the patent on risedronate, Roche owned the U.S. Patent No. 4,927,814 on the drug ibandronate. *See Hoffmann-La Roche I*, 2012 WL 869572, at *1.  While Merck researched alendronate dosing regimens (A9318–19 ¶ 34), and P&G researched risedronate dosing regimens that led to developing the drug at issue here, monthly Actonel® (A9318 ¶ 33), Roche pursued research on dosing regimens, including monthly dosing of ibandronate, that led to its Boniva product® that was at issue in *Hoffmann-La Roche IV*, 748 F.3d at 1327–28.

The patents in suit both issued from the same parent application, which claims a priority date of May 10, 2002.  (A110; A117.)  The disclosures of the patents in suit are directed almost entirely towards an ibandronate regimen.  (*See generally* A112–15; A120–23.)  The patents contain no data showing safety or efficacy of once-monthly risedronate.  (*Id.*)  Further, outside of the claims risedronate is mentioned only three times in each patent, twice as part of a laundry list of 15 bisphosphonates that could be "selected," and once in the "Background of the Invention."  (A112, col.2 ℓℓ.9–14; A114, col.5 ℓℓ.22–28, col.6 ℓℓ.43–50, col.2 ℓℓ.9–17; A120, col.2 ℓℓ.11–16; A122, col.5 ℓℓ.24–30, col.6 ℓℓ.42–51, col.2 ℓℓ.11–19.)  These lists of bisphosphonates are substantially similar to the lists of equivalent bisphosphonates that Merck included in the prior art '329 patent

– 15 –

(A11686 col.11, ℓℓ.55–59), and P&G included in the Schofield application

(A11696 ¶ [0029]):

| The '329 patent | Schofield | Patents in Suit |
|---|---|---|
| Preferred are bisphosphonates selected from the group consisting of alendronate, cimadronate, clodronate, tiludronate, etidronate, ibandronate, risedronate, piridronate, pamidronate, zolendronate, pharmaceutically acceptable salts thereof, and mixtures thereof. | Preferred bisphosphonates are selected from the group consisting of risedronate, ibandronate, pamidronate, alendronate, cimadronate, tiludronate, zolendronate, clodronate, piridronate, pharmaceutically-acceptable salts thereof and mixtures thereof. | The preferred bisphosphonic acid or pharmaceutically acceptable salt is selected from the group consisting of alendronate, cimadronate, clodronate, tiludronate, etidronate, ibandronate, incadronate, minodronate, neridronate, olpadronate, risedronate, pamidronate, piridronate, zolendronate, EB-1053 or acceptable salts thereof, e.g., ibandronic acid, monosodium salt, monohydrate. |
| (A11686 col.11,ℓℓ.55–59) | (A11696 ¶ [0029]) | (A112 col.5, ℓℓ.24–30) |

Such lists in the patents in suit are the only basis that the patents in suit provide in

their specifications for including the asserted claims, which are specific to

risedronate.

The asserted claims also recite, or recite ranges that include, a dosage of 150

mg.  (A9310 at ¶ 11.)  The parties treated all the claims as equivalent for purposes

of the summary judgment proceedings, and appellants have again done so in their

appeal brief.

## SUMMARY OF THE ARGUMENT

The claimed subject matter of monthly dosing 150 mg of the bisphosphonate risedronate would have been obvious to one of ordinary skill in the art because it was taught in prior art references that included the *Lunar News* Winter 2000 publication and the Schofield published patent application. This Court has already held invalid substantially similar claims in this same patent family for monthly dosing 150 mg of the bisphosphonate ibandronate. The patents in suit contain no disclosure about risedronate beyond what is said about ibandronate. The patentees solved no problem concerning risedronate. Instead, because the patentees' employer owned ibandronate, the detailed disclosures in these patents relate almost exclusively to ibandronate. Appellants have identified no bases for reaching any different result here than the result that this Court reached with respect to the claims for ibandronate.

Contrary to appellants' argument, no concerns over issues such as linear bioavailability, retention on the bone, or safety concerns raise a genuine issue of material fact. First, such concerns are irrelevant, because the prior art including the Winter 2000 *Lunar News* publication and the Schofield application disclosed monthly dosing of risedronate. Moreover, whether the alleged existence of such

– 17 –

concerns would have generated doubts about *Lunar News* and Schofield does not help appellees, because nothing in these patents would overcome those concerns.

No secondary considerations can preserve validity here. The dosing restrictions associated with bisphosphonates do not reflect a long felt need that the patented regimen first met. Instead, those restrictions were what motivated the *Lunar News* author to propose monthly dosing of risedronate, and to place that concept in the prior art. Schofield, likewise, taught monthly dosing. Moreover, appellants' assertion of skepticism in the field is not reflected in the prior art, and the alleged secret doubts of its hired experts would not have affected a person of ordinary skill in the art. Moreover, evidence of simultaneous invention supports the district court's conclusion of obviousness, because at the same time that Roche was developing its ibandronate product (and the patents in suit), P&G was independently developing the monthly risedronate product that is the reference listed drug here, and Merck had conceived a monthly oral version of its alendronate product.

Additionally, appellants' claims must fail because they did not file timely notices of appeal designating three of the eight separate final judgments entered below. The failure to perfect those appeals is jurisdictional as to those judgments, which bar claims on the '634 patent against Sun, Apotex, and Mylan. Further-

more, appellants are collaterally estopped from continuing to assert the validity of those same patent claims against Teva.  Because appellants have identified no difference between the claims of the '938 patent and the '634 patent that are material to patentability, appellants are also collaterally estopped to re-litigate the issue of the validity of these substantially similar claims.

# ARGUMENT

## I. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT OF INVALIDITY.

Summary judgment of invalidity for obviousness was properly granted for the claimed monthly dosing regimen of 150 mg risedronate. In reaching this result the district court concluded that there was no genuine issue of material fact that the prior art (i) taught once-monthly dosing of risedronate at 150 mg and (ii) provided a reasonable expectation of success that the regimen would be safe and effective in treating postmenopausal osteoporosis. (A31–33.) The district court correctly applied the law, and recognized that the material facts are undisputed and any allegedly disputed facts are not material. In doing so, the district court was informed by the prior decision in *Hoffmann-La Roche III*, affirmed shortly thereafter in *Hoffmann-La Roche IV*. The district court, however, also independently analyzed the relevance of the prior art to the claims at issue here, and properly found them obvious. Appellants' arguments to the contrary have no merit.

### A. Summary Judgment Is Appropriate Where A Factual Dispute Is Not Genuine And Supported Only By Experts' Conclusory Opinions And Differing Interpretations Of Undisputed Facts.

Summary judgment of obviousness may be granted in cases involving any technical subject matter, including pharmaceutical patents. *E.g.*, *Hoffmann-La*

*Roche IV*, 748 F.3d 1326 (monthly bisphosphonate dosing regimen); *Merck*, 395 F.3d 1364 (weekly bisphosphonate dosing regimen); *Bayer Healthcare v. Watson Pharms., Inc.*, 713 F.3d 1369, 1371 (Fed. Cir. 2013) (pharmaceutical formulation and dosing regimen); *Tyco Healthcare Grp. LP v. Mutual Pharm. Co.*, 642 F.3d 1370 (Fed. Cir. 2011) (pharmaceutical formulation).

A review of the grant of summary judgment of invalidity for obviousness "requires review of the evidence relevant to the factual inquiries of *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966), including evidence relevant to the secondary considerations, in order to determine whether any genuine issue exists as to facts material to reaching a conclusion of obviousness." *Cable Elec. Prods., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1021 (Fed. Cir. 1985). "If not, and if viewing that evidence in a light most favorable to the nonmovant and drawing in favor thereof all inferences as are reasonable, the moving party is entitled to judgment as a matter of law, the grant of summary judgment will be affirmed." *Id.*

"[T]he mere existence of **some** alleged factual dispute" does not preclude summary judgment; instead, there must be a "**genuine** issue of **material** fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In order to be "material," a disputed fact must "affect the outcome of the suit under the governing law." *Id.* at 248. For a dispute over a material fact to be "genuine," the evidence must be "such that a reasonable jury could return a verdict

for the non-moving party." *Id.* The question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A mere disagreement between experts does not, of itself, create a genuine dispute as to a material fact. For example, "[w]hen an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993); *e.g.*, *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1080 (Fed. Cir. 2005) ("speculative difference of opinion"); *Arthur A. Collins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042, 1048 (Fed. Cir. 2000) (finding that cited references conclusively established that plaintiff's expert's conclusion was wrong); *Lockwood v. American Airlines, Inc.*, 107 F.3d 1565, 1571 (Fed. Cir. 1997) (expert opinion not supported by sufficient facts).

When the nonmovant's experts do not dispute the material facts themselves, only how the facts should be applied to the legal question, summary judgment is

appropriate. *Cable*, 770 F.2d at 1026 ("At most, the declaration offered an

**interpretation** of undisputed factual evidence, but did not set forth specific

conflicting facts that showed a genuine issue requiring a trial.") (emphasis in

original); *Petersen Mfg. Co., Inc. v. Central Purchasing Inc.*, 740 F.2d 1541, 1548

(Fed. Cir. 1984) ("[C]onflicting opinions on a legal issue *vel non* raise no issue of

fact.").

### B.    The Claimed Invention Would Have Been Obvious.

There is no genuine dispute that the prior art taught monthly dosing of

risedronate to treat osteoporosis. For example, the Winter 2000 *Lunar News* article

discloses monthly dosing of risedronate. (A9498.) Additionally, the Schofield

patent application discloses a monthly maintenance dose of risedronate. (A11693.)

The district court discussed both of these references extensively in its summary

judgment opinion. (A28–29, 26–27.)

Appellants do not dispute that the skilled person would have understood

*Lunar News* and Schofield to teach a 150 mg dose for monthly administration of

risedronate. As the district court recognized, Schofield discloses a daily

risedronate dose of about 5 to about 10 mg, and states that "equivalent doses" can

be given once a month. (A31.) It discloses one such equivalent intermittent dose:

35 mg per week, i.e., seven times the daily dose. (A31.) As the district court

noted, appellants' own expert recognized that one of ordinary skill in the art might

expect risedronate dosing to scale linearly, so that the daily 5 mg dosage could be extrapolated to a monthly dosage of 150 mg. (A31; A12830; A12675 ¶ 20.)

Appellants' discussion of the "loading dose" aspect of Schofield does not create an issue of fact. Although appellants argue that the loading dose is intended to be useful for those patients with acute bone loss (Blue Br. at 18–19), appellants do not dispute that after a short initial period, it is the maintenance dose that provides the therapeutic effect. (*See* A9329 ¶ 57.) As the district court noted in *Hoffmann-La Roche I*, "Schofield's treatment regimen for the maintenance period is very, very close to the treatment method at issue." 2012 WL 869572, at *6. In affirming that claims to once-monthly administration of ibandronate are invalid, this Court confirmed that Schofield was among the references that disclosed "monthly oral administration of bisphosphonates." *Hoffmann-La Roche IV*, 748 F.3d at 1330.

Moreover, Schofield provides even more disclosure for risedronate than for ibandronate, and is even closer to the claims asserted here than to the claims in *Hoffmann-La Roche IV*. Schofield teaches that its method is broadly applicable to a number of bisphosphonates, and preferably those in a list that includes both ibandronate and risedronate. (A11696 ¶ [0029].) An almost identical list of bisphosphonates is essentially the only disclosure that the patents in suit provide about risedronate. (A114; A122.) Unlike the patents in suit, however, Schofield

– 24 –

provides specific disclosures as to risedronate, disclosing maintenance dose amounts including 5 mg per day, and teaching that "[e]quivalent doses" may be administered weekly and monthly. (A11696 ¶ [0037].) Schofield also provides administering an intermittent dose of 35 mg of risedronate per week as one example. (A11697 ¶ [0042].)

### C. Appellants' Arguments About Uncertainty Of Safety And Efficacy Are Unavailing.

Appellants assert that the district failed to recognize a disputed fact issue about whether such a 150 mg monthly dosing regimen would be expected to be safe and effective. (Blue Br. at 44–46.) On the contrary, the district court recognized and properly disposed of the argument. (A32–34.) Moreover, even were there any doubt as to the safety and efficacy of monthly dosing of risedronate, the patents in suit disclosed nothing to solve that problem or to overcome any such doubt. Instead, the prior art disclosed more about monthly dosing of risedronate than these patents. As detailed below, the alleged "disputes" are immaterial or non-existent.

### 1. Appellants' "Uncertainty" Arguments Do Not Raise A Genuine Issue Of Material Fact.

First, the alleged disputes are immaterial. *Lunar News* and Schofield both stated that the regimens would be safe and effective: *Lunar News* indicates that

risedronate "has met all the standards for efficacy" (A9498), while Schofield specifically discloses that it concerns a "safe and effective amount" (A11697 ¶ [0016]). The patents in suit say nothing more; they add nothing to those disclosures. They provide no data about monthly dosing of any drug, and they include nothing about risedronate other than the word, which appears only twice in its detailed description, both times lumped in a laundry list of 15 bisphosphonates.[3]

Appellants offer no explanation why they should receive a 20-year exclusive right to subject matter in the prior art when they have added nothing to it except their names. In *Merck*, the patentee made the same argument about another disclosure in *Lunar News*, the once-weekly dosing of alendronate, where, as here, the patent merely restated the prior art disclosure under the name "Merck." *Merck*, 395 F.3d at 1375 ("Indeed, to the extent the district court finds Merck's weekly-dosing idea non-obvious because it went against prevailing wisdom, the court must still explain why Merck and not Dr. Mazess should get credit for the idea."). The

---

[3] According to the patents in suit, "[p]rior to the completion of ibandronate clinical development program, no bisphosphonate had prospectively demonstrated fracture reduction efficiency with a drug-free interval beyond daily administration." (A112, col.2 ℓℓ.62–66.) There is no evidence that this "program" involved monthly administration on a single day. It is also specific to ibandronate, not risedronate. Moreover, the statement does not bear scrutiny. Before the priority date, the FDA had approved once-weekly alendronate for treatment of osteoporosis, i.e., for fracture reduction. *Merck*, 395 F.3d at 1367. It had also approved once-daily risedronate, and the literature reported that once-weekly risedronate was as effective as the once-daily regimen. (A9319–20 ¶¶ 36–37.)

Court rejected Merck's argument that it should disregard the prior art because of

possible skepticism about whether the regimen would be safe and effective:

> So while the district court may have been correct in finding that the *Lunar News* articles may have invited skepticism . . . , the claimed invention adds nothing beyond the teachings of those articles. Thus, the district court clearly erred in finding any difference between the claimed invention and the articles on this point.

395 F.3d at 1375.

Appellants argue that "no one had a reasonable expectation that [once-

monthly administration of risedronate] would succeed." (Blue Br. 2.) Of course,

neither Dr. Mazess[4] nor Dr. Schofield is a "no one." Both were scientists working

in the field, and both taught in their respective publications that monthly dosing

would succeed. Certainly, they expressed the same expectation as the named

inventors based on the same information; but they—and not the named inventors—

expressed it first, and placed it in the prior art. Moreover, their expectation of

success was consistent with the prior art, including Riis 2001 (A11921–28), which

demonstrated that the total dose concept applied over intervals longer than two

weeks, thereby negating the osteoclast life cycle theory. (A29–30.) *See also*

*Hoffmann-La Roche IV*, 748 F.3d at 1331. As the district court noted, appellants'

experts did not cite a single study published after Riis 2001. (A33.) In addition,

---

[4] Dr. Mazess, the author of *Lunar News*, was "one of ordinary skill in the art, and the *Lunar News* was widely circulated in the field." *Merck*, 395 F.3d at 1275 n.13. In fact, *Lunar News* had a readership of 15,000 to 20,000. (A9325 ¶ 48.)

Delmas 1997 (A11938–45) and Zegels 2001 (A11931–35), which are specific to risedronate, also confirm that the total dose effect was applicable to longer intervals.

### 2. Appellants' "Bioavailability" Arguments Do Not Raise A Genuine Issue Of Material Fact.

Appellants assert that knowledge of bioavailability was "sparse" in 2002. (Blue Br. at 37–41.)  They also argue that the bioavailability of some bisphosphonates is not linear at extraordinarily high doses, and argue from this observation that the skilled person would have been paralyzed with indecision about investigating whether the bioavailability of risedronate would be linear.  (*Id.*) The district court recognized that, sparse or not, the only published data on risedronate showed that its bioavailability is linear at all doses tested.  (A31.) Appellants do not challenge this finding of undisputed fact, noting that "this data showed that risedronate's bioavailability was linear from 2.5 mg to 50 mg."  (Blue Br. at 38.)  Moreover, the specifications of the patents in suit are silent on this issue.  If bioavailability really were a concern, these patents offered nothing to allay it.

Based on this undisputed evidence, the district court correctly concluded that "one of ordinary skill in the art might expect risedronate dosing to scale linearly, so that the daily 5 mg dosage could be extrapolated to a monthly dosage of 150 mg."

*Confidential Material Redacted*

(A31.)  Appellants challenge this conclusion, citing Dr. Mitchell's statement that a skilled person could not "assume" that the bioavailability of risedronate would be linear up to 150 mg.  (Blue Br. at 41.)  Dr. Mitchell did not base his statement on data about risedronate, but instead on studies of other drugs at extraordinarily high doses, e.g., tiludronate, 400 mg/day for 12 days; and alendronate, 20 mg/kg, i.e., about 140 times the daily dose.  (A12675–76.)   However, having considered all the evidence relating to bioavailability of a variety of bisphosphonates, including risedronate itself, Dr. Mitchell admitted that linearity would not be an unreasonable assumption for risedronate, but instead that its bioavailability was merely "unknown" (A31):



(A12830 at 78:20–79:12.)

*Confidential Material Redacted*

Obviousness does not require certainty. All that is required is a "reasonable" belief. *In re O'Farrell*, 853 F.2d 894, 903–04 (Fed. Cir. 1988); *Hoffmann-La Roche IV*, 748 F.3d at 1331 ("Conclusive proof of efficacy is not necessary to show obviousness. All that is required is a reasonable expectation of success."); *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.,* 491 F.3d 1342, 1363–64 (Fed. Cir. 2007); *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1364 (Fed. Cir. 2007). The fact that the expected result must be "verified through testing" does not impart patentability to the claimed invention. *PharmaStem*, 491 F.3d. at 1364 (citing *Pfizer*, 480 F.3d at 1367–69). The district court correctly considered Dr. Mitchell's deposition, including his admission that an assumption of linearity would not have been unreasonable based on the available information. (A31.) Moreover, Dr. Mitchell also admitted that ███████████████████████ ███████████████████████████ (A12834 at 204:12–205:9.) Even if one of ordinary skill in the art was not certain about the expected success of the 150 mg dose, confirming it was merely a matter of routine experimentation, well within the abilities of a person of ordinary skill. (A9340–41 ¶¶ 86–88.) Accordingly, appellants' bioavailability argument does not raise a material issue of fact.

Indeed, this Court has recognized that the 150 mg monthly dose for ibandronate would have been obvious notwithstanding that it is based on twice the

approved daily dose. *Hoffmann-La Roche IV*, 748 F.3d at 1332. The Court recognized that persons skilled in the art could readily determine, from studies of ibandronate, that 150 mg was at least one of the appropriate doses. *Id.* at 1332–33. Here, the patent does not disclose a single test concerning risedronate, nor any amount specific to it. Nevertheless, it claims that a 150 mg monthly dose of risedronate would be effective. The patentees made the same assumption Dr. Mitchell admitted was reasonable for the person of ordinary skill at the time.

### 3. Appellants' "Retention On Bone" Theory Does Not Raise A Material Issue Of Fact.

Appellants argue (Blue Br. at 27–28) that some studies purport to show that risedronate is not retained on bone to the same extent as some other bisphos-phonates—an issue to which appellants devoted a single sentence (A11116) in the district court. Those studies, however, cannot support the inference that risedro-nate could not be effective with a dose free interval of one month, because studies such as Delmas 1997 (A11938–45) and Zegels 2001 (A11931–35) confirmed that risedronate was effective with dose free intervals of ten weeks and six weeks, respectively (regardless of how much risedronate was retained after four weeks in comparison to other bisphosphonates). Moreover, *Lunar News* and Schofield specifically taught monthly dosing of risedronate. Those teachings trump the hypothetical inferences of doubt that appellants now urge.

*Confidential Material Redacted*

### 4. Appellants' Denigration Of Their Own Riis Study Does Not Raise A Genuine Issue Of Material Fact.

Appellants attempt to manufacture a factual issue by pointing to their expert's opinion regarding the proper inferences to be drawn from Riis. (Blue Br. at 23.) But appellants cannot dispute that that Riis discloses what is plainly written: intermittent dosing is "as effective" as continuous treatment. (A11927.) Riis's statement is prior art; appellants' expert Dr. Bilezikian's litigation-induced opinion is not. Thus, appellants' arguments about Riis do not create a disputed issue of material fact. *See Brooke*, 509 U.S. at 242; *Arthur A. Collins*, 216 F.3d at 1048 (finding that cited references conclusively established that plaintiff's expert's conclusion was wrong).

In fact, Dr. Bauss, the first named inventor on the patents in suit, described Riis as ██████████████████████████████████████████████ ████████████████████████████████████████████ (A8901–02 at 41:24–42:3.) Indeed, after Riis "the game changed." *Hoffmann-La Roche III*, 2012 WL 1637736, at *9. Riis was a report on a Roche-sponsored study that included Roche scientists as authors. (A11921–28.) Riis states the total dose concept as follows:

> These results confirm the preclinical data showing that it is the total dose of a predefined period and not the dosing regimens that is the determining factor for effect on bone mass and architecture after ibandronate treatment.

(A11927.)  Riis also states:

> In conclusion, this trial also showed that intermittent ibandronate is as effective as the continuous treatment in terms of significantly increasing BMD and suppressing markers of bone turnover.

(*Id.*)  Appellants argue that their retained expert witnesses "disagreed about the inference to draw" from Riis, putting forward the opinion of Dr. Bilezekian that it "reinforced the belief that intermittent dosing regimens were unlikely to be effective."  (Blue Br. at 23.)  A difference in interpretation of facts, however, is not itself a genuine issue of material fact.  *Cable*, 770 F.2d at 1026 ("At most, the declaration offered an **interpretation** of undisputed factual evidence, but did not set forth specific conflicting facts that showed a genuine issue requiring a trial.").  Moreover, there is no disagreement that the daily and intermittent regimens are equivalent in terms of bone mineral density, which "is a powerful surrogate for measuring antifracture risk."  *Hoffmann-La Roche IV*, 748 F.3d at 1331.  Finally, as the district court noted, there is no disagreement that Riis's regimens are "effective."  (A33.)  The patents' claims require nothing more.

### 5.    *Appellants' Safety Concern Arguments Do Not Raise A Genuine Issue Of Material Fact.*

Appellants assert in their "Statement of Facts" that (1) bisphosphonates have known potential "side effects involving the upper gastrointestinal tract" (hereinafter "UGI") (Blue Br. at 8–9) and (2) "renal impairment concerns" (Blue

Br. at 9–10). Nowhere, however, do appellants explain how these allegations about bisphosphonates generally raise a genuine issue of material fact about the claimed dosing regimen.

Those alleged safety concerns do not detract from or diminish the prior art, which actually disclosed a monthly dosing regimen of risedronate. *Lunar News* and Schofield still render a monthly dosing regimen obvious.

Also, the FDA had already approved risedronate as being safe and effective for treating osteoporosis. (A9320 ¶ 37.) Published studies also showed that weekly risedronate administration was as effective as daily. (*Id.*) If the FDA deems a product safe and effective, the possibility of known side effects would not prevent a person of ordinary skill in the art from developing new treatment regimens. In this regard, appellants' argument that *Lunar News* does not set out a definition of "proper" dosing (Blue Br. at 17) is beside the point. By 2002, risedronate was a commercial product, and the proper dosing instructions were well known.

The alleged UGI concerns would not have dissuaded one of ordinary skill in the art from developing a monthly dosing regimen, but instead provided a motivation to develop that regimen. The '329 patent had already disclosed that an increased dosage that is less frequently administered would reduce, not increase, the incidence of gastrointestinal side effects. *Merck*, 395 F.3d at 1373–74. In the

– 34 –

*Confidential Material Redacted*

*Lunar News* article, Dr. Mazess mentioned the known potential for UGI side effects, and states that weekly **or monthly** dosing was one way to address those concerns. (A9498.) Experience showed that increasing the dosing interval tended to reduce, not increase, the incidence of such side effects; the once-weekly dose of alendronate actually yielded a lower incidence of gastrointestinal side effects than the once-daily version. (A9319.) Even higher doses did not cause unacceptable side effects. A published study showed that alendronate at 160 mg weekly was "safe and well tolerated." (A9768–69.) In light of those disclosures, the known potential for UGI side effects is a factor tending to make a monthly dosing regimen more obvious, not less.

Appellants also assert that a study suggested that "the damage to the epithelial cells of the UGI tract is greater at higher doses," citing ¶ 20 of Dr. Bilezikian's declaration. (Blue Br. at 9.) But when asked about that conclusion in his deposition, Dr. Bilezikian admitted that ███████████████████ ████████████████████████████████████████████████████████ (A12862–63 at 102:18–21.) Citing a study that that appellants' expert admits is ███████████████ does not raise a genuine issue of material fact.

The alleged "renal impairment concerns" were part of what Dr. Bilezekian called ██████████████████████ (A12468.) As appellants note (Blue Br. at 10), citing Dr. Mitchell's declaration, the Actonel® 5 mg daily product

*Confidential Material Redacted*

cautioned that "Actonel® is not recommended for use in patients with severe renal impairment (creatinine clearance < 30mL/min) because of lack of clinical experience." (A12682.) This statement does not suggest that risedronate or any other bisphosphonate **causes** renal impairment; instead, it merely cautions about using bisphosphonates in patients who **already have** renal impairment. (A12468; A12682.) Dr. Mitchell admitted that ████████████████████████

████████████████████████████████████████████████

██████████. (A12831 at 130:3–8.) Dr. Bilezikian admitted in his deposition that ████████████████████████████████████████████

███████████████████ (A12864 at 108:15–17.)

Additionally, the district court correctly concluded that appellants' experts' opinions were conclusory, and could not create an issue of fact precluding summary judgment. (A32–33 (citing *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1001 (Fed. Cir. 2008).) Accordingly, none of these alleged safety concerns raise a genuine issue of material fact, or serve as an impediment to affirming summary judgment.

### D. No Secondary Consideration Creates A Genuine Issue Of Material Fact Precluding Summary Judgment.

#### 1. The Patents In Suit Satisfied No Long Felt Need Concerning "Onerous Dosing Restrictions," And The District Court Properly Analyzed This Factor Under *Graham*.

Appellants argue that patients taking oral bisphosphonates before the patents in suit were "subject to onerous dosing restrictions" requiring that they "take the drug in a fasting state, to wait 30 minutes before eating, and not to recline during this time." (Blue Br. at 48.) This observation does not raise a genuine issue about obviousness because nothing in the patents in suit changed those restrictions. After the 150 mg product was approved, the dosage and administration instructions for Actonel® continued to direct that it be "taken at least 30 minutes before the first food or drink of the day," that it should be "swallowed while the patient is in an upright position," and that patients "should not lie down for 30 minutes after taking the medication." (A7877–916 at A7878.) If the elimination of these restrictions was a long felt need, then the patents in suit did not meet it.

If appellants meant to argue that longer dosing intervals can reduce the inconvenience of administration, that argument is likewise unavailing as it was nothing these patentees discovered; it was already both well- and long known in the art and was, in any event, obvious. The alleged motivation for the patent on weekly dosing of alendronate (which this Court held invalid) was to increase patient compliance by decreasing the dosing interval. *Merck*, 395 F.3d at 1373

("The '329 patent, and both the April and July 1996 articles, explain the motivation for a once-weekly dose as increasing patient compliance, by making it easier to take the drug (and incur the inconvenience of the rigorous dosing regimen less frequently)."). The alleged motivation for the patent claims on monthly ibandronate dosing (which this Court also held invalid) was likewise to increase patient compliance by decreasing the dosing interval. *Hoffmann-La Roche IV*, 748 F.3d at 1329 ("A relatively infrequent dosing schedule has long been viewed as a potential solution to the problem of patient compliance stemming from the inconvenience of oral bisphosphonate regimens."). Here, the prior art, not the patents in suit, teach the motivation for monthly dosing: "foster long-term compliance as well as minimizing side effects." (A9498.) In making the identical argument that this Court has twice rejected, the patentees are dragging the Court on a third trip to a well that was dry the first two times.

Moreover, the district court correctly applied the same analysis to the issue of long felt need as did the Supreme Court in *Graham*: "At the latest, those differences were rendered apparent in 1953 by the appearance of the Livingstone patent, and unsuccessful attempts to reach a solution to the problems confronting Scoggin made before that time became wholly irrelevant." 383 U.S. at 36. In *Graham*, the Court disregarded as "wholly irrelevant" unsuccessful attempts to solve the putative problem made before the relevant prior art reference rendered

apparent the differences between the claimed invention and the prior art. Here, the prior art disclosed monthly risedronate in 2000, and the Riis article appeared in 2001. The district court did not err in concluding that any unsuccessful efforts before these more pertinent references here were, like the similar earlier efforts referenced in *Graham*, "wholly irrelevant." (A33.)

**2. *Witnesses' Conclusory Assertions Of "Skepticism" That Were Not Reflected In The Prior Art And Their Own Contemporaneous Publications, Raise No Genuine Issue Of Material Fact.***

First, the alleged skepticism here (Blue Br. at 51–55) has no bearing on obviousness over the prior art because the patents in suit add nothing to the prior art's disclosures that would have addressed any such skepticism. *See Merck*, 395 F.3d at 1374.

Second, appellants' accusation that the district court erred by not addressing alleged skepticism mischaracterizes the record. (Blue Br. at 52.) The only suggestion in appellants' opposition brief before the district court concerning alleged "skepticism" was a single sentence cross-referencing the earlier discussion of a reasonable expectation of success. (A11130.) The district court considered and thoroughly addressed all of appellants' arguments on that issue, and correctly concluded that a person of ordinary skill in the art would have had a reasonable expectation of success. (A29–33.)

As the district court noted, the patentees do not point to any publication after Riis 2001 suggesting that the total dose concept would not support monthly dosing. (A33.)  A conclusory assertion by witnesses that they were allegedly "skeptical" at the time does not raise a genuine issue of fact about obviousness.  *See, e.g.*, *Imperial Tobacco Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575, 1581 (Fed. Cir. 1990); *Applied Cos. v. United States*, 144 F.3d 1470, 1475 (Fed. Cir. 1998) (noting that "a conclusory statement on the ultimate issue does not create a **genuine** issue of fact" (emphasis added)).

Moreover, much of what these alleged skeptics claim that they believed is redacted as confidential from appellants' brief.  (Blue Br. at 52–54.)  Even were these averments of prior skepticism true, whatever secret doubts the skeptics might have harbored but did not express in the prior art could not have dissuaded the person of ordinary skill in the art from doing the obvious.  Thus, such secrets do not make the subject matter any less obvious to those of ordinary skill in the art at the time of the invention.  The publicly-available prior art reflected no such skepticism, and instead confirmed the reasonable expectation of success for one of ordinary skill in the art.  This alleged "skepticism by experts" (Blue Br. at 55) is nothing more than late-arrived-at and conclusory assertions, and is insufficient to raise a genuine issue of material fact.

*Confidential Material Redacted*

Moreover, some of these same witnesses filed prior art patent applications that also disclosed monthly dosing regimen. Thus, Dr. Schofield's published application (A11693–98) reflects nothing but enthusiasm for intermittent dosing of risedronate. Her secret alleged misgivings are nowhere apparent. Dr. Daifotis's patent application (A8915–66) touting and claiming once-monthly alendronate at four times the weekly dose demonstrates her belief that such a regimen would be effective to treat osteoporosis. (A30.) Appellants assert that her application was amended to remove the tablet example (Blue Br. at 21), but the concept of monthly dosing at the equivalent daily strength remained (A8944)—which can only mean that she continued to believe that a once-monthly regimen would be effective. Similarly, Dr. Gately's allegedly secret qualms (Blue Br. at 55–56) do not create a material issue. Notwithstanding his supposed misgivings, he does not deny that ███████████████████████████████ (A8912–13), which implies that he and others had reason to believe that it would be safe and effective.

### 3. There Was Ample Evidence Of Simultaneous Invention.

Appellants' criticism of the district court's analysis of simultaneous invention also does not fairly reflect the record below. The undisputed record shows that three different pharmaceutical companies conceived the same concept at about the same time. Roche conceived once-monthly ibandronate; P&G

conceived once-monthly risedronate (A8912–13; A11693–98); and Merck conceived once-monthly alendronate (A8915–66).

Dr. Gately's litigation-prompted, undocumented statements of his concerns about once-monthly dosing (Blue Br. at 55–56) cannot change the fact that P&G conceived of the claimed invention at about the same time as Roche.  (A8912–13) Notwithstanding his alleged concerns, P&G persisted by proceeding with the evaluation and eventual commercialization of that concept to sell the drug at issue here.

The undisputed fact is that many researchers were working on similar bisphosphonate projects at the time because all had a reasonable expectation of success.  Such simultaneous development is a strong indicium of obviousness. *Nat'l Steel Co. v. Canadian Pacific Ry., Ltd.*, 357 F.3d 1319, 1337–38 (Fed. Cir. 2004); *In re Merck & Co.*, 800 F.2d 1091, 1098 (Fed. Cir. 1986).

### E.    The Recent Federal Circuit Ibandronate Decision Supports Obviousness.

Appellants' argument that this Court's "ibandronate decision does not support summary judgment in this case" is wrong.[5]  (Blue Br. at 57 (citing

---

[5] Both appellants have a strong connection to the parties in *Hoffmann-La Roche IV*. Patent owner Hoffmann-La Roche is an appellant in each action.  Warner Chilcott's parent, Actavis, was a successful appellee in *Hoffmann-La Roche*,

*Hoffmann-La Roche IV*) (capitalization omitted).) The reasoning and legal principles of *Hoffmann-La Roche IV* apply here. Both the district court here and *Hoffmann-La Roche IV* considered similar facts, applied similar law, and arrived at the same conclusion.[6]

*Hoffmann-La Roche IV* fully supports a finding that intermittent dosing of bisphosphonates, including risedronate, for the treatment of osteoporosis would have been obvious in light of the prior art.[7] Indeed, the district court and *Hoffmann-La Roche IV* found that the prior art taught once-monthly bisphosphonate dosing using a 150 mg monthly dose based on an effective 5 mg daily dose in combination with teachings that "equivalent doses [based on a daily dose] can be given . . . monthly." (A29–A31 (citing, e.g., teachings in *Lunar News* and Schofield)); *Hoffmann-La Roche IV*, 748 F.3d at 1129–30 (citing same). The parallels are exact.

Appellants' attempt to sidestep *Hoffmann-La Roche IV*'s reasoning by arguing that the Court "lacked information about risedronate" (Blue Br. at 57–59)

---

arguing forcefully there that the patents were invalid. ECF No. 44 at 58 (Ex. 6, Leitzinger Decl. ¶18); *Hoffmann-La Roche IV*, 748 F.3d at 1326.

[6] The district court's decision issued before this Court's opinion in *Hoffmann-La Roche IV*.

[7] As noted *supra*, this Court also found intermittent weekly dosing of bisphosphonates obvious in *Merck*, 395 F.3d 1364.

is beside the point.  As detailed earlier, the patents in suit were primarily directed

to ibandronate.  The specifications for the patents in suit here state that "the

preferred bisphosphonate is ibandronate"—risedronate is not even mentioned in

the "Summary of the Invention" of either patent.  (A112–14, col.2 ℓ.39–col.3 ℓ.2,

col.6 ℓ.39; A120–22 col.2 ℓ.41–col.3 ℓℓ.23, col.6 ℓℓ.38–39.)  Furthermore, the

patents' specification mentions risedronate only three times; twice it is nested

among an undifferentiated group of bisphosphonates that may be "selected."

(A114 col.5 ℓℓ.22–28, col.6 ℓℓ.42–50; A121 col.5 ℓℓ.24–30, col.6 ℓℓ.42–50.)

Other than swapping "risedronic" for "ibandronic," the claimed methods here in

the '634 patent are the same as those in *Hoffmann-La Roche IV*, even including the

150 mg dose.

In their efforts to decouple any consideration of *Hoffmann-La Roche IV* from

this case, appellants attempt to create distinctions not reflected in the patents

themselves with conclusory expert testimony concerning the "bioavailability and

skeletal retention of risedronate."  (Blue Br. at 57.)  Appellants argue that "a

skilled artisan would not have predicted linear absorption for all doses of

risedronate," and "one of ordinary skill would be uncertain if oral administration of

a high dose of a bisphosphonate would provide consistent drug absorption."  (Blue

Br. at 58.)  As discussed *supra*, the person of ordinary skill could reasonably have

believed that risedronate's bioavailability is linear.  Moreover, as the Court noted

in *Hoffmann-La Roche IV*, "[t]he evidence regarding bioavailability is [] of little relevance to the obviousness inquiry." *Hoffmann-La Roche IV*, 748 F.3d at 1334–35. Thus, appellants have not demonstrated and cannot demonstrate that the skilled person would have reached a different conclusion about risedronate than about ibandronate.

Concerning skeletal retention, appellants virtually ignored the issue in the district court, devoting only a sentence to it in their summary judgment opposition brief. There, the alleged "concern" was whether a skilled artisan would have expected a month-long dose-free interval to be effective. (A11114–15.) To the extent appellants are offering new arguments about skeletal retention on appeal, they should be disregarded. *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997) ("If a litigant seeks to show error in a trial court's overlooking an argument, it must first present that argument to the trial court."). *Hoffmann-La Roche IV* expressly considered the efficacy of a month-long dose-free interval with bisphosphonates. *Hoffmann-La Roche IV*, 748 F.3d at 1330. For example, *Hoffmann-La Roche IV* noted that Schofield "taught dosing of 'bone-active phosphonate[s]' and referred to equivalent doses that 'can be given . . . monthly.'" *Id.* (quoting Schofield). Moreover, the patents in suit offer no data or information beyond that already known in the prior art. *Cf. Hoffmann-La Roche IV*, 748 F.3d at 1331 (noting that "Roche's patents do not themselves

present data regarding antifracture efficacy for a once-monthly 150 mg dose"). In any event, the law is clear that "[a]ll that is required [to show obviousness] is a reasonable expectation of success." *Id.* at 1331. Appellants' "concern" does not change this reasonable expectation of success.

Appellants also argue that this Court should arrive at a different decision because of "additional" information not before the *Hoffmann-La Roche IV* court. But, as discussed *supra*, all of the so-called "additional" information was unavailable in the prior art, and thus not part of "the scope and content of the prior art" for obviousness purposes. *See Graham*, 383 U.S. at 17. First, appellants' expert Dr. Daifotis alleges that Merck's researchers decided that monthly alendronate dosing "was not 'a feasible endeavor for [them] to investigate.'" (Blue Br. at 60.) These unsupported allegations, however, are not prior art,[8] and the prior art, including Dr. Daifotis's own patent application (A8915–66 at A8953 ℓℓ.2–10), taught monthly bisphosphonate dosing, including with alendronate and risedronate. (*E.g.*, A29 (citing *Lunar News* and Schofield)); *Hoffmann-La Roche IV*, 748 F.3d at 1329–31. Second, appellants rely on testimony from Dr. Schofield in arguing risedronate's nonlinear bioavailability. (Blue Br. at 61–62.) This knowledge was likewise not in the prior art and, if it were relevant, the district court noted

---

[8] Merck also had little incentive to pursue monthly dosing because it had a weekly—and market dominating—alendronate product. *See Hoffmann-La Roche IV*, 748 F.3d at 1329; *Merck*, 395 F.3d at 1367.

"[appellants'] own expert recognizes that one of ordinary skill might expect risedronate to scale linearly . . . and [] linear scaling [was] disclosed in [the] Schofield and Daifotis" references. (A31.) Finally, appellants' expert Dr. Gately alleges that ███████████████████████████████ ███████ (Blue Br. at 62.) Again, Sanofi-Aventis's supposed "concern[s]" are not part of the scope and content of the prior art. Accordingly, none of Defendants' experts' allegations change the applicability of *Hoffmann-La Roche IV* to the analysis here, nor do they raise genuine issues of material fact as to whether a person of ordinary skill in the art would have had a reasonable expectation of success with once-monthly dosing of risedronate.

## II.     APPELLANTS ARE JURISDICTIONALLY BARRED AND COLLATERALLY ESTOPPED FROM CHALLENGING THE DISTRICT COURT'S CONCLUSIONS OF INVALIDITY.

Because appellants did not perfect appeals in three of the eight related civil actions in the district court, they did not confer appellate jurisdiction on this Court to review those judgments, which now have preclusive effect for the rest of this appeal.

The district court entered eight separate final judgments. Appellants, however, only appealed from the four judgments in the '938 cases and one judgment in the case against Teva on the '634 patent. Appellants' failure to file notices of appeal from the final judgments in the other three cases—against Sun,

Apotex, and Mylan—is jurisdictional. The claims in those cases therefore merged in and are barred by those judgments, and are not subject to review in this appeal. The failure to appeal the final judgments that the '634 patent is invalid as to Sun, Apotex, and Mylan is also dispositive on the '634 patent as to Teva under *Blonder-Tongue Labs., Inc. v. Univ. of Illinois Found.*, 402 U.S. 313 (1971). Moreover, under the principles set forth in *Blonder-Tongue*, appellants are also collaterally estopped from continuing to assert the '938 patent, which does not differ from the '634 patent in any substantial respect material to invalidity for obviousness.

With respect to jurisdiction, the Federal Circuit applies its own law rather than that of the regional courts of appeal. *Spraytex, Inc. v. DJS&T*, 96 F.3d 1377, 1379 (Fed. Cir. 1996) ("Because this is an issue concerning our jurisdiction, we apply our own law and not the law of the regional circuit."). Here, this Court does not have jurisdiction to review those three judgments.

### A. No Jurisdiction Exists To Review Final Judgments Not Specified In Timely Notices Of Appeal For Three Of Eight Civil Actions.

Both the timely filing and the content of a notice of appeal are jurisdictional and mandatory. *Bowles v. Russell*, 551 U.S. 205, 214 (2007) ("Today we make clear that the timely filing of a notice of appeal in a civil case is a jurisdictional requirement."); *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 314 (1988) ("The failure to name a party in a notice of appeal is more than excusable 'informality'; it

constitutes a failure of that party to appeal."). The Court may not waive

jurisdictional requirements, even for "good cause shown." *Torres*, 487 U.S. at 317

(1988). The "failure to file" an appellant's "notice of appeal in accordance with

the statute" deprives a court of jurisdiction. *Bowles*, 551 U.S. at 213. Because the

"error is one of jurisdictional magnitude, he cannot rely on forfeiture or waiver to

excuse his lack of compliance . . . ." *Id.*

The pleadings define the scope of the actions, and the complaints in the eight

civil actions below separately accused each of four different generic manufacturers

of infringing each of two different patents, as follows:

| COMPLAINTS | THE '938 PATENT | THE '634 PATENT |
|---|---|---|
| **Teva** | 08-0627 (A124–66) | 11-0081 (A643–58) |
| **Sun** | 09-0061 (A178–91) | 10-1085 (Not in record) |
| **Apotex** | 09-0143 (A194–209) | 10-1111 (Not in record) |
| **Mylan** | 10-0285 (A286–301) | 11-0236 (Not in record) |

The district court entered final judgment in Teva's favor on the '938 patent in

08-0627 (A39–40), in Sun's favor on the '938 patent in 09-0061 (A41–42), in

Apotex's favor on the '938 patent in 09-0143 (A43–44), in Mylan's favor on the

'938 patent in 10-0285 (A46–46), and in Teva's favor on the '634 patent in 11-

0081 (A47–48). The district court also entered final judgments on the '634 patent

in Sun's favor in 10-1085, in Apotex's favor in 10-1111, and in Mylan's favor in

11-0236. The latter three judgments are not part of the record on appeal because

plaintiffs did not file notices of appeal after entry of those final judgments. In the

other five cases, appellants filed five separate notices of appeal and paid five

separate appeal fees.  (A13159–63, A86; A13164–68, A92; A13169–73, A101;

A13174–78, A106; A13179–83, A109.)  The clerk docketed five appeals in this

Court, as follows:

| D. Del. | Fed. Cir. | J.A. | Claimed That . . . |
| --- | --- | --- | --- |
| 08-0627 | 14-1439 | A13184 | . . . Teva infringed the '938 patent |
| 08-0061 | 14-1444 | A13186 | . . . Sun infringed the '938 patent |
| 09-0143 | 14-1445 | A13188 | . . . Apotex infringed the '938 patent |
| 10-0285 | 14-1446 | A13189 | . . . Mylan infringed the '938 patent |
| 11-1085 | 14-1441 | A13191 | . . . Teva infringed the '634 patent |

These five appeals, on those five claims, are the only appeals now before

this Court.  The other three final judgments entered in 10-1085 (claiming that Sun

infringed the '634 patent), 10-1111 (claiming that Apotex infringed the '634

patent), and 11-0236 (claiming that Mylan infringed the '634 patent) are not before

this Court.

In *Bowles*, the Court rejected the "unique circumstances" doctrine that had

grown out of *Harris Truck Lines, Inc. v. Cherry Meat Packers, Inc.*, 371 U.S. 215

(1962).  *Bowles*, 551 U.S. at 214 ("Because this Court has no authority to create

equitable exceptions to jurisdictional requirements, use of the 'unique

circumstances' doctrine is illegitimate.").  In *Bowles*, the appellant filed the notice

of appeal in actual reliance on the date specified by the district court, but the Court

decided that even where an appellant's failure to perfect an appeal arises from

reasonable reliance on other occurrences in the district court, the court of appeals

still lacks jurisdiction. *Id.* Here, it cannot be disputed that neither plaintiff filed any notice of appeal, timely or otherwise, from three of the final judgments entered below, and why they failed to do so is irrelevant. Review of those judgments is therefore not within the jurisdiction afforded this Court.

The content of the notice of appeal is also jurisdictional. In particular, the notice "must (1) specify the party or parties taking the appeal; (2) designate the judgment from which the appeal is taken; and (3) name the court to which the appeal is taken." *Becker v. Montgomery*, 532 U.S. 757, 765–66 (2001); *Torres*, 487 U.S. at 315 ("Permitting courts to exercise jurisdiction over unnamed parties after the time for filing a notice of appeal has passed is equivalent to permitting courts to extend the time for filing a notice of appeal."). In *Torres*, a party's name was inadvertently omitted from a notice of appeal due to a clerical error in the notice (which instead included the phrase "*et al.*"). After the court of appeals reversed and remanded the case, the district court entered partial summary judgment against the omitted party on the grounds that the prior judgment was final and not appealed as to that party. The court of appeals affirmed, and the Supreme Court confirmed that the contents of the notice are jurisdictional, and that the failure to list some parties barred the court of appeals from exercising jurisdiction over those parties, regardless of the consistency of that caption with

how the case had been captioned in other papers filed earlier in the district court proceedings.

Here, the five notices of appeal that appellants filed named five civil actions by district court docket number and designated "the judgment entered April 1, 2014 in the above-named cases" as the judgments from which appeal was taken, and did not designate the other three final judgments. (A13163–83.) Just as in *Torres*, where the notice listing other parties was not the "functional equivalent" of a notice naming the omitted appellant, so here the notice listing other final judgments is not the functional equivalent of a notice designating the omitted final judgments. Just as in *Torres*, where the use of "*et al.*" on the notice (consistent with its use on earlier pleadings in that case) was not sufficient to meet the jurisdictional requirement, here the fact that the notice of appeal followed the captions on some of the earlier items in the case (including the summary judgment order and summary judgment motion but not the final judgments) is insufficient to meet the jurisdictional requirement. Because the failure to name all of the parties in the notice in a single action in *Torres* was jurisdictionally fatal, then *a fortiori* appellants' failure to (a) file notice of appeal in three civil actions and (b) designate the judgments entered in those separate civil action is fatal to the exercise of appellate jurisdiction over those judgments.

Appellants' reliance (Blue Br. at 5 n.1) on *Spraytex*, 96 F.3d at 1379–82

(Fed. Cir. 1996) is misplaced, because that case was about finality under FED. R.

CIV. P. 54(b), not about the need to file a notice of appeal or what is required in

that notice.  In *Spraytex*, the Court held that absent disposition of all the claims in a

consolidated action, an appeal was not proper without a Rule 54(b) certification.

Here, it is undisputed that the district court disposed of all claims as to all parties in

all the actions, and separately entered final judgments in all the actions.

Appellants' argument that their filing in the Teva '938 patent case (08-0627)

absolves them of their failure to appeal the other three cases because those other

cases were "consolidated" with the Teva '938 patent case (08-0627) is wrong.  The

district court had consolidated the cases concerning the '938 patent with the Teva

'938 patent case (08-267) for pretrial purposes.  (A282–83; A318–20; A324–25.)

When appellants commenced four new civil actions after the '634 patent issued,

asserting that patent against Teva, Sun, Apotex, and Mylan, respectively, the

district court also consolidated all four of the '634 cases with 08-267 "for all

pretrial purposes" only, and made 08-0627 "the lead case for pretrial purposes"

only, and directed only that "pretrial filings" be made in that lead case.  (A722–

23.)  The final judgment, however, is not a "pretrial filing," as the district court

made clear by entering a separate judgment in each case.  (A39–48; the three other

judgments are not in the record.)  Notices of appeal also are not pretrial filings,

Appellants were well aware of the separate nature of these actions after entry of the final judgments, as reflected in the fact that they filed five separate notices of appeal (A13159–83) and paid five separate appeal fees (A86, A92, A101, A106, A109.)  Their failure to appeal the final judgments entered against them in the other three civil actions jurisdictionally bars appellate review of those judgments.

The consequence is that those three final non-appealed judgments are now res judicata by operation of the doctrine of merger and bar.  *See generally Hallco Mfg. Co., Inc. v. Foster*, 256 F.3d 1290, 1294 (Fed. Cir. 2001) ("The general concept of claim preclusion is that when a final judgment is rendered on the merits, another action may not be maintained between the parties on the same 'claim,' and defenses that were raised or could have been raised in that action **are extinguished**." (emphasis added)); *Jet, Inc. v. Sewage Aeration Sys.*, 223 F.3d 1360, 1362 (Fed. Cir. 2000) ("Over the years, the doctrine has come to incorporate common law concepts of merger and bar, and will thus also bar a second suit raising claims based on the same set of transactional facts.").  It was only in those three civil actions that Warner Chilcott and Roche asserted the '634 patent against Sun, Apotex, and Mylan, and the original complaints in those actions are not even part of the record here on appeal.  The answers filed in those other three civil actions included affirmative defenses of invalidity and various counterclaims for declaratory judgments of invalidity on the '634 patent.  All the claims that were

asserted or could have been asserted in those actions are merged in the final judgments entered in favor of Sun, Apotex, and Mylan. Any arguments Warner Chilcott or Roche made in them or could have made in them are barred by the judgments. They are not subject to review in this appeal.

### B. Because Of Those Final Judgments Of Invalidity, Plaintiffs Are Also Estopped To Assert The '634 Patent Against Teva.

The final judgment that the '634 patent is invalid also bars further litigation of that issue as to appellee Teva. *Blonder-Tongue Labs., Inc. v. Univ. of Illinois Found.*, 402 U.S. 313, 329 (1971) ("Permitting repeated litigation of the same issue as long as the supply of unrelated defendants holds out reflects either the aura of the gaming table or 'a lack of discipline and of disinterestedness on the part of the lower courts, hardly a worthy or wise basis for fashioning rules of procedure.'"); *Mississippi Chem. Corp. v. Swift Agr. Chems. Corp.*, 717 F.2d 1374, 1379 (Fed. Cir. 1983) ("The judge cannot permit relitigation because of equitable considerations."); *Stevenson v. Sears, Roebuck & Co.*, 713 F.2d 705, 712 (Fed. Cir. 1983) ("We believe the rationale of *Blonder-Tongue* extends to all prior determinations of invalidity; its application is not dependent on how the judgment of invalidity was reached.").

**C.     Plaintiffs Are Also Collaterally Estopped To Deny The Facts Compelling The Conclusion That The '938 Patent Is Invalid for Obviousness, Because Patentees Identified No Difference Between The Two That Is Material To Patentability.**

Because the patentees have not argued that the '938 patent claims differ from the '634 patent claims in any way material to patentability, the final judgments not appealed as to the '634 patent are also dispositive as to the '938 patent.  The '938 patent and the '634 patent are children of the same parent (A110; A117) and do not differ in any way that the appellants have identified as being material to patentability.  All of the district court's conclusions about "the three elements of the asserted claims: (1) oral administration of risedronate for the treatment of osteoporosis, (2) once-monthly, (3) at a dose of 150 mg" (A28) apply equally to the asserted claims in both patents.  Appellants made no different arguments on the two patents in opposing summary judgment in the district court (A11104–34), or in their principal brief on this appeal.  Accordingly, because the '634 patent has been held invalid in a final judgment that is no longer subject to appeal, appellants are likewise collaterally estopped from continuing to assert the '938 patent.  *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1341–43 (Fed. Cir. 2013) ("Our precedent does not limit collateral estoppel to patent claims that are identical. Rather, it is the identity of the **issues** that were litigated that determines whether collateral estoppel should apply.") (relying on *Bourns, Inc. v. United States*, 537 F.2d 486, 491 (Ct. Cl. 1976) ("[T]he correct view. . . held

collateral estoppel applicable to unadjudicated claims where it was shown that the adjudicated and unadjudicated claims presented identical issues.") and *Westwood Chem., Inc. v. United States*, 525 F.2d 1367, 1372 (1975) ("[I]n determining the applicability of the estoppel, the first consideration is 'whether the issue of invalidity common to each action is substantially identical.' It is the issues litigated, not the specific claims around which the issues were framed, that is determinative.")).

Although appellants' failure to appeal three of the judgments on the '634 patent is jurisdictional, the application of collateral estoppel is not. Accordingly, if the Court rules in appellees favor in affirming the district court's final judgment of invalidity on grounds of obviousness in the five cases on appeal, it would not be necessary also to address the substantial similarity of the issues for purposes of collateral estoppel.

# CONCLUSION

For the reasons set forth above, the district court's final judgments entered below should be affirmed.

*/s/ James Galbraith*
James Galbraith
Maria Luisa Palmese
A. Antony Pfeffer
Peter L. Giunta
KENYON & KENYON LLP
One Broadway
New York, NY 10004
Telephone: 212-425-7200
*Counsel for Appellee*
*Teva Pharmaceuticals USA, Inc.*

*/s/ Philip D. Segrest, Jr.*
Steven E. Feldman
Philip D. Segrest, Jr.
James P. White
Daniel R. Cherry
Sherry L. Rollo
Samuel A. Brown
HUSCH BLACKWELL LLP
120 S. Riverside Plaza, Suite 2200
Chicago, Illinois 60606
Telephone: 312-655-1500
*Counsel for Appellees*
*Apotex Inc. and Apotex Corp.*

*/s/ Edgar H. Haug*
Edgar H. Haug
Richard E. Parke
Richard F. Kurz
FROMMER LAWRENCE & HAUG LLP
745 Fifth Avenue
New York, New York 10151
Telephone: 212-588-0800
*Counsel for Appellee*
*Mylan Pharmaceuticals Inc.*

*/s/ Eric C. Cohen*
Eric C. Cohen
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street
Chicago, Illinois 60661
Telephone: 312-902-5200
*Counsel for Appellee*
*Sun Pharma Global, FZE.*

# United States Court of Appeals
## for the Federal Circuit

*Warner Chilcott Company, LLC v. Teva Pharmaceuticals USA, Inc.*,
Nos. 2014-1439, -1441, -1444, -1445, -1446

### CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by attorneys for Appellees to print this document. I am an employee of Counsel Press.

On **July 14, 2014**, counsel has authorized me to electronically file the foregoing **Joint Brief of the Appellees (confidential and non-confidential versions)** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

| | |
|---|---|
| David B. Bassett (*Principal Counsel*)<br>Christopher R. Noyes<br>Martin Gilmore<br>Wilmer Cutler Pickering Hale<br>and Dorr LLP<br>7 World Trade Center<br>250 Greenwich Street<br>New York, NY 10007<br>212-230-8858<br>David.Bassett@wilmerhale.com<br>christopher.noyes@wilmerhale.com<br>martin.gilmore@wilmerhale.com<br>*Counsel for Appellant*<br>*Warner Chilcott Company, LLC* | Mark E. Waddell<br>(*Principal Counsel*)<br>Kathleen Gersh<br>Warren K. MacRae<br>Loeb & Loeb LLP<br>345 Park Avenue<br>New York, NY 10154-1895<br>212-407-4127<br>mwaddell@loeb.com<br>wmacrae@loeb.com<br>kgersh@loeb.com<br>*Counsel for Appellant*<br>*Hoffmann-La Roche Inc.* |

| Vinita Ferrera | |
| Sydenham B. Alexander, III | |
| Tasha Joy Bahal | |
| Mark C. Fleming | |
| Wilmer Cutler Pickering Hale | |
| and Dorr LLP | |
| 60 State Street | |
| Boston, MA 02109 | |
| 617-526-6000 | |
| Vinita.Ferrera@wilmerhale.com | |
| sydenham.alexander@wilmerhale.com | |
| tasha.bahal@wilmerhale.com | |
| mark.fleming@wilmerhale.com | |
| *Counsel for Appellant* | |
| *Warner Chilcott Company, LLC* | |

Paper confidential copies will also be emailed and mailed to the above principal counsel on this date.

Upon acceptance by the Court of the e-filed document, six confidential paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

July 14, 2014

/s/ Robyn Cocho
Robyn Cocho
Counsel Press

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(b).

1. Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 12,913 words.

2. The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font. As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

*/s/ Philip D. Segrest, Jr.*
Philip D. Segrest, Jr.
HUSCH BLACKWELL LLP
*Counsel for Appellees*
*Apotex Inc. and Apotex Corp*